

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

NOV 16 2007

J. T. NOBLIN. CLERK
BY_____DEPUTY

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

GARY BRICE MCBAY                                    **PLAINTIFF**

**VERSUS**                    CIVIL ACTION NO.: L07CV1205LG-JMR

HARRISON COUNTY, MISSISSIPPI BY AND
THROUGH ITS BOARD OF SUPERVISORS;
HARRISON COUNTY SHERIFF GEORGE PAYNE,
in his official and individual capacity; DIRECTOR
OF OPERATIONS MAJOR WAYNE PAYNE,
in his official and individual capacity; DIRECTOR
OF CORRECTIONS MAJOR DIANE GASTON RILEY,
in her official and individual capacity; DIRECTOR OF
PROFESSIONAL STANDARDS UNIT CAPTAIN
STEVE CAMPBELL, in his official and individual
capacity; SUPERVISOR OF BOOKING CAPTAIN
RICK GASTON, in his official and individual capacity;
CORRECTIONS OFFICER SERGEANT RYAN TEEL,
in his official and individual capacity; CORRECTIONS
OFFICERS MORGAN THOMPSON, in his official
and individual capacity; CORRECTIONS OFFICERS
JOHN DOE 1-4 in their official and individual capacity;
AMERICAN CORRECTIONAL ASSOCIATION and its
EXECUTUVE DIRECTOR JAMES A. GONDLES, JR.
and employee(s) JOHN AND/OR JANE DOE 1-3;
HEALTH ASSURANCE LLC and its employee(s)
JOHN AND/OR JANE DOE 1-2                          **DEFENDANTS**

# COMPLAINT

## PLAINTIFF REQUESTS A TRIAL BY JURY

COMES NOW the Plaintiff, Gary Brice McBay, by and through his undersigned

Counsel, James Bailey Halliday, Attorney and Counselor at Law, and Robert G.

Harenski, Attorney at Law, and files this his COMPLAINT, for gross deprivation of his

civil rights resulting in grievous physical and mental injuries and related and resultant

damages, against these Defendants and in support thereof, respectfully submits the following to this Honorable Court:

## PRELIMINARY STATEMENT OF CLAIM

1.      This is a Federal Civil Rights lawsuit, claim and action brought under 42 USC § 1983, 42 USC § 1985, 42 USC § 1986 and 42 USC § 1988 and under the protections, privileges and provisions afforded the Plaintiff, Gary Brice McBay, and any similarly situated accused and arrested citizen temporarily incarcerated as a "pre-trial detainee" under the Due Process Clause of the Fourth Amendment to the United States Constitution and the Fourteenth Amendment to the United States Constitution and also the protections afforded incarcerated prisoners under the provisions and standards of the Eight Amendment to the United States Constitution as that Amendment applies to pre-trial detainees held in certain circumstances and conditions similar and/or analogous to convicted offenders incarcerated in a penal institution as prisoners.

2.      Your Plaintiff, Gary Brice McBay, alleges that, on or about November 6, 2005, he was brutally beaten by Corrections Officers of Harrison County while temporarily held in custody as a pre-trial detainee in the Booking Department of the Harrison County Adult Detention Center/Facility located in Gulfport, Mississippi.

3.      The aforementioned Corrections Officers, while acting under color of law, willfully, wantonly and intentionally used excessive force against Gary Brice McBay in an act of corporal punishment amounting to an assault and battery resulting in significant injury to his person.

4.      That after a complaint was made concerning these gross abuses and injuries your Plaintiff Gary Brice McBay suffered, high ranking officials of the Harrison

County Sheriff's Department, with final decision making authority, engaged in acts to falsely deny and/or cover-up what had occurred and further threaten the injured Plaintiff with retaliatory actions.

5.     That similar actions by Harrison County Corrections Officers, acting under color and authority of law, of civil rights violations, abuse and injurious use of excessive force as acts of corporal punishment amounting to assault and battery against other inmates and pre-trial detainees and cover-ups by officials occurred both before and after these injurious actions of abuse against Gary Brice McBay to such an extent as to evidence a prior and continuing pattern, custom and usage of similar violations regarding the constitutional protections afforded persons incarcerated within the Harrison County Adult Detention Center (HCADC).

6.     That the Defendants, Harrison County Board of Supervisors and Sheriff George Payne were well aware of: (1) a Consent Decree issued in 1995 by the United States District Court; (2) continuing violations of that Consent Decree and (3) official correspondence from the United States Department of Justice notifying these Defendants of a "a very disturbing pattern of misuse of force" and continuing concerns of other deprivations within the HCADC; yet failed to take any affirmative action to prevent the continuation of such abuse and deprivations and/or come into compliance with the Consent Decree thus evidencing a "deliberate indifference" by them.

7.     That these defendants, knew or should have know, of the conditions existing within the HCADC, including the custom and pattern of use of abuse of inmates and detainees and misuse of injurious excessive force; and that such continuing conditions and abusive actions within the HCADC became a widespread practice to

3

constitute a custom and usage with the force of law credibly evidencing a conscious choice and "deliberate indifference" by the defendants which would foreseeably and consequently result in continued abusive violations and serious harm of incarcerated persons including your Plaintiff, Gary Brice McBay.

8.      That the Defendants, Harrison County Board of Supervisors and Sheriff George Payne, and/or their appointed officials granted and clothed with final policy and/or decision making authority, whether actual or de facto, participated, encouraged, authorized or acquiesced in the existence and continuation of the deprivation of civil rights, injurious abuse of and injuries to inmates and detainees including your Plaintiff, Gary Brice McBay.

9.      That the Defendants, Harrison County Board of Supervisors and Sheriff George Payne, and/or their appointed officials granted and clothed with final policy and/or decision making authority, whether actual or de facto, participated, encouraged, authorized or acquiesced in the existence of subordinate officials' failure to properly supervise, control, direct, discipline and/or train Harrison County Corrections Officers to prevent these constitutional violations resulting directly, foreseeable and consequently in continuing abuses of and use of injurious excessive force on inmates and detainees held within the HCADC including your Plaintiff, Gary Brice McBay.

## JURISDICTION OF THE COURT

10.      This Honorable District Court has original jurisdiction under 28 U.S.C. § 1331 Federal Question for all civil actions arising under the Constitution of the United States and 28 U.S.C. § 1343 to redress deprivations, under color of state law, custom or usage, of any right, privilege or immunity secured by the Constitution of the United

States or by any Act of Congress providing for equal rights of citizens or all persons within the jurisdiction of the United States and to recover damages or other relief under any Act of Congress providing for the protection of civil rights. This is a Complaint brought against the Defendants for the intentional violation of liberties secured, protected and guaranteed by the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States and by the applicable Federal Statutes prohibiting such deprivations, more particularly, 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986 and 42 U.S.C. § 1988 wherein your Plaintiff is seeking to obtain a judgment for all damages, including all allowable costs of this suit and an award of reasonable attorney's fees, suffered and sustained by the Plaintiff, Gary Brice McBay, for the egregious and heinous acts committed against him under color and authority of law, resulting in his significant and serve injuries.

**VENUE**

11.    The filing of this Complaint in the United States District Court for the Southern District of Mississippi, is proper pursuant to 28 U.S.C. § 1391 (b) as a substantial part of the events or omissions giving rise to the claim occurred in Harrison County, Mississippi, which is part of this Court's jurisdictional district and division.

**PARTIES TO THE LAWSUIT**

**PLAINTIFF**

12.    Plaintiff, Gary Brice McBay, is a citizen of the United States of America and a native of the State of Texas, where he currently resides.

5

## DEFENDANTS

13.     Defendant, Harrison County, Mississippi, by and through its Board of Supervisors, is a political subdivision of the State of Mississippi and is the entity having ultimate authority, responsibility and control of and for the oversight, decisions affecting and funding of the Harrison County Sheriff and the Harrison County Adult Detention Center. As such, the Board of Supervisors is ultimately responsible for all local policies, procedures practices and customs employed by its law enforcement officials, supervisors and officers. Defendant may be served with process by lawfully affecting same upon the current President of the Board, Honorable Larry Benefield, and/or the Chancery Clerk for Harrison County, Mississippi, Honorable John McAdams; both at the location of their official offices located within the Harrison County Courthouse in Gulfport, Mississippi.

14.     Defendant, George Payne, at all times relevant to this Complaint, was the duly elected Sheriff of Harrison County, Mississippi, is an adult resident citizen of Harrison County, Mississippi. As Sheriff, Defendant Payne was vested with the final decision making authority and responsibility to hire, train, supervise, set policies and determine procedures, enforce policies and procedures, delegate authority and generally oversee and supervise the daily operation of the entire Harrison County Sheriff's Department and all its divisions, departments and personnel including the Harrison County Adult Detention Center (HCADC). As such, he was directly and personally responsible for the safety and well-being of all persons detained, confined, incarcerated or otherwise held, regardless of individual status, within the HCADC. Sheriff Payne is sued in his individual and official capacity. He may be served with process as authorized by law where he or his duly authorized designee, at his offices within the Harrison

6

County Courthouse or at the HCADC located at 10451 Larkin Smith Drive, Gulfport, Mississippi.

15.    Defendant, Wayne Payne, at all times relevant to this Complaint, was the appointed Chief Deputy for the Sheriff of Harrison County, Mississippi, and/or the Director of Operations commissioned as a Deputy Sheriff and holding the rank of Major, is an adult resident citizen of Harrison County, Mississippi. As a Director of Operations holding the rank of Major, Defendant Payne was vested with final decision making authority and responsibility to hire, train, supervise, set policies and determine procedures, enforce policies and procedures, delegate authority and generally oversee and supervise the daily operation of the entire Harrison County Sheriff's Department and all its divisions, departments and personnel including the Harrison County Adult Detention Center (HCADC). As such, he was directly and personally responsible for the safety and well-being of all persons detained, confined, incarcerated or otherwise held, regardless of individual status within the HCADC. Defendant Payne is sued in his individual and official capacity. He may be served with process as authorized by law where he or his duly authorized designee, at his offices within the Harrison County Courthouse or at the HCADC located at 10451 Larkin Smith Drive, Gulfport, Mississippi, or at his office located within the City Hall of D'Iberville, Mississippi.

16.    Defendant, Dianne Gaston-Riley, at all times relevant to this Complaint, was appointed by the Sheriff of Harrison County, Mississippi, as the Director of Corrections a/k/a the Warden and commissioned as a Deputy Sheriff and holding the rank of Major, was (and is believed to still be) an adult resident citizen of Mississippi, living within the jurisdiction of this Court. As a Director of Corrections, holding the rank of

7

Major, Defendant Gaston-Riley was vested with final decision making authority and responsibility to hire, train, supervise, set policies and determine procedures, enforce policies and procedures, delegate authority and generally oversee and supervise the daily operation for the Harrison County Sheriff's Department Adult Detention Center (HCADC). As such, she was directly and personally responsible for the safety and well-being of all persons detained, confined, incarcerated or otherwise held, regardless of individual status within the HCADC. Defendant Gaston-Riley is sued in her official and individual capacities. She may be served with process as authorized by law where she may be found.

17.    Defendant, Steve Campbell, at all times relevant to this Complaint, was the appointed Director of Internal Affairs for the Sheriff of Harrison County, Mississippi, and commissioned as a Deputy Sheriff holding the rank of Captain, was (and is believed to still be) an adult resident citizen of Mississippi, living within the jurisdiction of this Court. As a Director of Professional Standards a/k/a Internal Affairs holding the rank of Captain, Defendant Campbell was vested with final decision making authority and responsibility to train, supervise, set policies and determine procedures, enforce policies and procedures, delegate authority and generally oversee and supervise the daily operations of the entire Harrison County Sheriff's Department and all its divisions, departments and personnel including the Harrison County Adult Detention Center (HCADC). As such, he was directly and personally responsible for the safety and well-being of all persons detained, confined, incarcerated or otherwise held, regardless of individual status within the HCADC. Defendant Campbell is sued in his official and

individual capacities. He may be served with process as authorized by law where he may be found.

18.     Defendant Rick Gaston, at all times relevant to this Complaint, was the appointed Supervisor of the Booking Department for the Sheriff of Harrison County, Mississippi, and commissioned as a Deputy Sheriff holding the rank of Captain, was (and is believed to still be) an adult resident citizen of Mississippi, living within the jurisdiction of this Court. As the Captain in charge of the Booking Department, Defendant Gaston was vested with final decision making authority and responsibility to train, supervise, set policies and determine procedures, enforce policies and procedures, delegate authority and generally oversee and supervise the daily operations of the Harrison County Sheriff's Booking Department within the Harrison County Adult Detention Center (HCADC). As such, he was directly and personally responsible for the safety and well-being of all persons detained, confined, incarcerated or otherwise held, regardless of individual status within the HCADC. Defendant Gaston is sued in his official and individual capacities. He may be served with process as authorized by law where he may be found.

19.     The Defendant, Ryan Teel, at all times relevant to this Complaint, was a Shift Supervisor of the Booking Department for the Sheriff of Harrison County, Mississippi, appointed and commissioned as a Corrections Officer holding the rank of Sergeant, was an adult resident citizen of Mississippi, and within the jurisdiction of this Court. As a Shift Supervisor in charge of a specific Booking Department shift, Defendant Teel was vested with de facto final decision making authority and responsibility to train, supervise, set policies and determine procedures, enforce policies

9

and procedures, delegate authority and generally oversee and supervise the daily operations of his specific shift of the Harrison County Sheriff's Booking Department within the Harrison County Adult Detention Center (HCADC). As such, he was directly and personally responsible for the safety and well-being of all persons detained, confined, incarcerated or otherwise held, regardless of individual status within the HCADC Booking Department during his shift. Defendant Teel is sued in his official and individual capacities. He may be served with process as authorized by law where he may be found as a convicted offender incarcerated within the authority of the Federal Bureau of Prisons for criminal violation of the civil rights of individuals under his control and authority while employed by the Sheriff's Department as a Corrections Officer assigned to the Booking Department.

20.    Defendant, Morgan Thompson, at all times relevant to this Complaint, was an appointed and commissioned Corrections Officer of the Booking Department for the Sheriff of Harrison County, Mississippi, was an adult resident citizen of Mississippi and within the jurisdiction of this Court. As a Corrections Officer, Thompson participated in the daily operations of his specific shift of the Harrison County Sheriff's Booking Department within the Harrison County Adult Detention Center (HCADC). As such, he was directly and personally responsible for the safety and well-being of all persons detained, confined, incarcerated or otherwise held, regardless of individual status within the HCADC. Defendant Thompson is sued in his official and individual capacities. He may be served with process as authorized by law where he may be found as he is a convicted offender incarcerated within the authority of the Federal Bureau of Prisons for criminal violation of the civil rights of individuals under his control and authority while

employed by the Sheriff's Department as a Corrections Officer assigned to the Booking Department.

21.    Defendants, John Does 1-4, at all times relevant to this Complaint, was appointed as a commissioned Corrections Officers (based on information and belief to be Officers Preston Wills, Carl Stoltz, and other yet unidentified Officers) of the Booking Department for the Sheriff of Harrison County, Mississippi, were (and is believed to still be) an adult resident citizens of Mississippi, and within the jurisdiction of this Court. As a Corrections Officers, they participated in the daily operations of their specific shift of the Harrison County Sheriff's Booking Department within the Harrison County Adult Detention Center (HCADC). As such, they were directly and personally responsible for the safety and well-being of all persons detained, confined, incarcerated or otherwise held, regardless of individual status within the HCADC. Defendants John Doe are sued in their official and individual capacities. They may be served with process as authorized by law where they may be found. Some of these as yet positively identified Defendants are believed to be convicted offenders incarcerated or awaiting incarceration within the authority of the Federal Bureau of Prisons for criminal violations of the civil rights of individuals under their control and authority while employed by the Sheriff's Department as Corrections Officers assigned to the Booking Department.

22.    Defendant, the American Correctional Association (ACA) is a national private non-profit 501 (c) (3) organization, formed under the laws of the State of New York, with its main office located at the address of 206 North Washington Street, Suite 200, Alexandria, VA 22314; (703) 224-0000. ACA is a corrections association and believed to be the largest in the world. The ACA, upon specific request, evaluates

prisons, jails and related detention and correctional facilities to assess those facilities in accordance with "national standards" and other self-determined peneological criteria to determine if a facility meets and/or complies with recognized standards involving all aspects of operations, conditions and treatment of incarcerated persons.  With this evaluation, the ACA issues an "accreditation" to the facility indicating that the evaluated facility meets and/or complies with the "standards" set by the ACA.  For this evaluation, the ACA receives a fee.  The ACA had evaluated the HCADC prior to McBay's beating and issued its "accreditation" on behalf of Sheriff George Payne and the Harrison County Sheriff's Department indicating to the citizens of Harrison County and the general public on or about August 7, 2005, that the HCADC meet and/or complied with the "standards" set for "accreditation" by the ACA, even though, the HCADC remained under a Consent Decree from the United States District Court concerning improper conditions of confinement and under scrutiny of the United States Department of Justice which had issued statements of concern regarding "a pattern of inmate abuse."  The ACA may be served with lawful process upon its President or other duly authorized corporate officer at the address of 206 North Washington Street, Suite 200, Alexandria, VA 22314; (703) 224-0000.

      23.    Defendants, John and/or Jane Doe, at all times relevant to this Complaint, were appointed and employed by ACA as auditors to inspect and/or evaluate the HCADC to determine if it was in compliance with the applicable "Mandatory Standards" and applicable "Non-Standards for Adult Local Detention Facilities" per the Accreditation Contract with ACA of May 2005.  Defendants, John and/or Jane Doe, determined that the HCADC was in compliance, even though, the HCADC remained under a Consent Decree

from the United States District Court concerning improper conditions of confinement and under scrutiny of the United States Justice Department which had issued statements of concern regarding "a very disturbing pattern of misuse of force" and the HCADC was re-accredited on or about August 7, 2007. These three Defendants are unknown to the Plaintiff at this time but upon positive identification, may be served where they may be found and their individual names added to this Complaint in accordance with the applicable Rules of Federal Civil Procedure and this Honorable Court.

24.     The Defendant, James A. Gondles, Jr., at all times relevant to this Complaint, was the Executive Director for Defendant ACA and the corporate officer for ACA and was at all times personally and ultimately responsible for the management of the day-to-day operation of ACA and its programs, including the Correctional Facility Accreditation Program operated by the Commission on Accreditation for Corrections (a division of ACA), and the ACA officer who actually signed the initiating Accreditation Contract between the ACA and the HCADC. Gondles may be served as allowed by law at the main corporate office of the ACA located at the address of 206 North Washington Street, Suite 200, Alexandria, VA 22314; (703) 224-0000 or where he may be found.

25.     The Defendant, Health Assurance LLC (hereinafter "Health Assurance") provides on-site primary health care services for correctional institutions. At all times material hereto, Health Assurance was under contract with Harrison County, Mississippi, to provide certain professional medical services to inmates, detainees and other persons held within the HCADC in a timely and reliable manner as might be required. Health Assurance is a domestic corporation with its principal offices located at the address of 5903 Ridgewood Road, Suite 320, Jackson, Mississippi 39211, and may be served with

13

lawful process upon its registered agent, Melvin Priester at the address of 371 Edgewood Terrace Drive, Jackson, Mississippi 39206.

26.    Defendant(s), John and/or Jane Doe, at all times material hereto, were employed by Health Assurance, LLC to provide certain on-site professional medical services to inmates, detainees and other persons within the HCADC in a timely and reliable manner as might be required.  These Defendants are unknown to the Plaintiff at this time but upon positive identification, may be served where they may be found and their individual names added to this Complaint in accordance with the applicable Federal Rules of Civil Procedure and this Honorable Court.

## STATEMENT OF THE CASE

### VIOLATION OF CONSTITUTIONAL PROTECTIONS AFFORDED PRE-TRIAL DETAINEE GARY BRICE MCBAY RESULTING IN SERIOUS INJURY BY CORRECTIONS OFFICERS AND MEDICAL STAFF ACTING UNDER COLOR OF STATE LAW

27.    This is a Federal Civil Rights lawsuit, claim and action brought under 42 USC § 1983, 42 USC § 1985, 42 USC § 1986 and 42 USC § 1988 and under the protections and provisions afforded the Plaintiff, Gary Brice McBay, and any similarly situated accused and arrested citizen as a "pre-trial detainee" under the Due Process Clause of the Fourth Amendment to the United States Constitution and the Fourteenth Amendment to the United States Constitution and also the protections afforded incarcerated prisoners under the provisions and standards of the Eight Amendment to the United States Constitution as that Amendment applies to pre-trial detainees held in certain circumstances and conditions similar and/or analogous to convicted offenders incarcerated in a penal institution as prisoners.

14

28.     While temporarily held in the Harrison County Adult Detention Center (HCADC), on or about November 6, 2005, McBay was brutally beaten by Corrections Officers using excessive force, in the course and scope of their employment and while acting under color of state law as local officials for Harrison County, Mississippi, resulting in serious injuries and a gross deprivation of protective constitutional provisions and complete denial of McBay's due process and related civil rights.

29.     All the public officials and private Defendants injurious and harmful actions against McBay are alleged to have been committed while acting under "color of law", specifically state law and authority, resulting in gross deprivations of the Plaintiff's afforded and asserted constitutional rights, interests, immunities and protections, resulting in serious, severe and significant physical and mental injuries.

30.     In the alternative, the private Defendant, ACA, its officers and employees committed separate and distinct private torts against McBay as set forth in detail within this Complaint that ultimately resulted in gross harm to his person.

31.     In the alternative, the private Defendant, Health Assurance LLC and its employees committed separate and distinct private torts against McBay as set forth in detail within this Complaint that ultimately resulted in gross harm to his person.

### DELIBERATE INDIFFERNCE TO MCBAY'S MEDICAL NEEDS

32.     The private Defendant's, Health Assurance LLC, employees willful, intentional, injurious and harmful actions against McBay are alleged to have been committed while acting individually and/or in concert with the other public official Defendants (while at all times material hereto under contract with Harrison County Sheriff's Department and/or Harrison County, Mississippi to provide professional

15

medical care and related health services to inmates and detainees at the HCADC) evidencing a "deliberate indifference" to the obvious medical care and related health needs of the injured Plaintiff and acting or otherwise participating in harmful, intentional and conspiratorial conduct under "color of law" with the public official Defendants and/or during cooperative state action and/or activity. These injuries suffered by McBay were immediately obvious and apparent (even to non-medical professional/lay person) evidencing the need for timely medical attention.

33.    Among the injuries McBay sustained from his beating were:

A.    Both of his eyes were severely swollen, bruised, blackened and Bloodied;

B.    One eye was almost swollen shut;

C.    The top left side of his forehead had a large laceration in the form of a bloody, red "X.";

D.    His whole face was deformed and distended;

E.    His nose was broken to such an extent that it was crooked; and

F.    His clothing was covered in blood. **[A copy of the Official HCADC Booking photograph of McBay is attached hereto as Exhibit "A", and incorporated herein by reference.]**

34.    Health Assurance employees' actions/inactions and deliberate indifference to the serious medical needs of McBay was an intentional denial and/or delay of needed and necessary medical care and treatment for his injuries to such an extent that it rose to the level of willful, wanton and intentional infliction of pain and constituted cruel and unusual punishment resulting in a gross deprivation of federal rights, privileges,

protections and immunities afforded McBay under the Fourth, Eighth and Fourteen Amendments to the United States Constitution.

35.    In the alternative, Health Assurance LLC and its employees' failure to provide the proper medical care and treatment for Plaintiff's obvious and apparent injuries, objectively serious medical needs and conditions, and substantial pain and suffering caused by the actions and/or inactions of the other Defendants that their actions/inactions constituted a substantial departure from accepted medical practice to the level that their actions/inactions demonstrated an absence of professional medical judgment that no minimally competent professional would have responded/not responded under the circumstances of McBay's beating and resultant gross injuries to such an extent to evidence "deliberate indifference."

36.    Employees of Health Assurance, on duty at the HCADC when McBay was brutally beaten, intentionally ignored the obvious and apparent injuries inflicted upon him that created an objectively serious medical need which they were aware of, but disregarded.

37.    Such disregard created a substantial risk of serious harm and/or a risk of serious damage to McBay's future health and an in

suffering by the denial and/or delay of needed medical treatment.

38.    Such disregard to McBay's obvious medical needs also amounted to conspiratorial and concerted actions with Corrections Officers in Booking to discount, minimize, cover-up and otherwise conceal the wanton and abusive misuse of force against McBay and other similarly situated pre-trial detainees.

## CONSPIRACY BETWEEN HARRISON COUNTY OFFICIALS AND ACA
## TO OBTAIN FRAUDULENT ACA ACCREDITATION

39.    The private Defendant, American Correctional Institution, injurious and harmful actions affecting McBay are alleged to have been committed while acting in concert with the public official Defendants evidencing a "deliberate indifference" to McBay and other similarly situated pre-trial detainees within the HCADC resulting in denial and deprivations of the federal rights, privileges, protections and immunities afforded McBay under the Fourth, Eighth and Fourteen Amendments to the United States Constitution and acting or otherwise participating in "conspiratorial conduct" with the public official Defendants under "color of law," specifically state law, thus becoming a state actor.

40.    American Correctional Institution (ACA) and its officers and employees, acting in concert with Sheriff Payne and/or officials of the Harrison County Sheriff's Department and/or the HCADC (with final decision making authority), while under contract with Harrison County, allegedly inspected and/or evaluated the HCADC on or about May 16th through May 18th of 2005 to determine if the HCADC was in compliance with the applicable ACA's nationally recognized "Mandatory Standards" and applicable "Non-Mandatory Standards for Adult Local Detention Facilities" per the Accreditation Contract with ACA of May 3, 2005.

41.    Defendants, John and/or Jane Does, as auditors for ACA, and/or the ACA's Executive Director James A. Gondles, Jr. the corporate officer for ACA personally and ultimately responsible for the management of the day-to-day operation of ACA and its programs, including the Correctional Facility Accreditation Program operated by the Commission on Accreditation for Corrections (a division of ACA)

18

determined that the HCADC was in one hundred percent (100%) compliance with all applicable ACA Mandatory Standards, regardless of the fact that the HCADC remained under a 1995 Consent Decree from the United States District Court concerning continuing and unresolved improper conditions of confinement and regardless of the fact that the HCADC was under the scrutiny of the United States Justice Department which had formally issued written statements of concern directly to policy making officials of Harrison County  (the Supervisors and the Sheriff) regarding "a very disturbing pattern of misuse of force."

42.    The aforesaid notification was sent by the Justice Department to the Supervisors and the Sheriff (separately to each) via formal correspondence dated July 20, 2005, between the time the ACA auditors were on-site at the HCADC in May of 2005, and the ACA's re-accreditation of the HCADC on or about August 7, 2007.

43.    Based on this alleged inspection by ACA Auditors, the ACA issued a re-accreditation of the HCADC on August 7, 2005, stating that the HCADC was one hundred percent (100%) in compliance with all applicable "Mandatory Standards" and ninety-seven point one percent (97.1%) of all applicable "Non-Mandatory Standards for Adult Local Detention Facilities", despite the fact that the HCADC remained under (and was in continuing violation of) a 1995 Consent Decree from the United States District Court concerning improper conditions of confinement and under scrutiny of the United States Department of Justice which had issued a strong statement of concern regarding "a very disturbing pattern of misuse of force" and other relevant and related defective and deficient conditions within the HCADC.

44.     Therefore, this alleged re-accreditation was patently defective and otherwise false and fraudulent because of the pre-existing and continuing defective and deficient conditions within the HCADC and with a very disturbing pattern of misuse of force and other problems that existed (as determined by the U.S. Department of Justice) at the time of the ACA inspection/audit/evaluation.  Under these existing defective and deficient conditions and abusive and otherwise improper treatment of inmates and detainees, it was not possible for the HCADC to be in compliance as reported by the ACA and Sheriff Payne.

45.     Aware that the HCADC did not, and could not, meet the required criteria for re-accreditation, the Sheriff and/or other officials of the Harrison County Sheriff's Department with final decision making authority entered into a 'conspiracy' with the ACA Auditors and/or corporate officers and/or other employees of the ACA to obtain the desired re-accreditation.

46.     The aforementioned 'conspiracy' involved a mutual agreement and meeting of the minds between these officials and the ACA, for the ACA auditors to intentionally ignore, overlook and/or cover-up and conceal the obvious deficiencies of the HCADC that did not meet the ACA specified criteria to obtain the required level of 'compliance' to obtain the desired re-accreditation.

47.     In exchange, the inspecting ACA auditors and/or other ACA officials received a monetary payment, payoff and/or bribe from the Sheriff and/or officials with final decision making authority of the Harrison County Sheriff's Department.  This monetary payment was concealed from the general public and was separate and distinct

from the contractual fees paid to the ACA for its compliance audit for re-accreditation of the HCADC.

48.    Therefore, the ACA, its officers and employees by joining in this conspiracy were willful participants in a joint enterprise with the Sheriff and other public officers and officials of Harrison County to intentionally deceive the public of the actual existing deficient and defective conditions within the HCADC and the very disturbing pattern of misuse of force.  Thus, the ACA, its officers and participating employees by this willful participation became "state actors."

49.    This patently defective, false and/or fraudulent ACA re-accreditation was actively and intentionally promulgated and otherwise disseminated within the public venue by the Sheriff and/or Harrison County Officials to intentionally deceive the public that the conditions of confinement within the HCADC meet one hundred percent (100%) of the Mandatory ACA Standards, when they did not.

50.    This patently defective, false and/or fraudulent ACA re-accreditation was used by the Sheriff and/or other Harrison County Officials to intentionally deceive members of the public who were concerned about the conditions within the HCADC and citizens complaining of abuses to them, family and/or friends, etc. occurring within the HCADC, and convince them that the conditions of confinement within the HCADC meet one hundred percent (100%) of the ACA's "Mandatory Standards" for the required and appropriate nationally recognized 'conditions of confinement', when they did not.

51.    Specific to McBay, this false and fraudulent ACA accreditation was intentionally and deceptively used by Defendants Wayne Payne and Steve Campbell to

respond to the complaints by McBay's parents concerning his brutal beating and resultant injuries.

52.    In responding to concerns of McBay's parents regarding his mistreatment while at the HCADC, Payne and Campbell relied upon the fact that the HCADC was accredited and met "national standards" under the leadership of Sheriff Payne; and thus, convinced McBay's parents that what happened to their son was solely his own fault, and not the fault of theirs or their Corrections Officers.

53.    The ACA, by providing re-accreditation to a patently deficient and defective corrections facility under a long standing U.S. District Court Consent Decree and under the scrutiny of the U.S. Department of Justice, which facility the ACA, its auditors and officials were aware did not meet the required mandatory ACA standards, evidenced a "conscience shocking" and "deliberate indifference" to the constitutionally mandated rights, privileges and protections required for the welfare and safety inmates and detainees within the HCADC.

54.    The ACA, its officials and inspecting employees' intentional, fraudulent, deceitful, deficient and defective actions, by conspiratorially deceiving the public with officials of Harrison County through its false accreditation, committed an illegal action by obtaining money allocated to be used for the public good under false pretenses and by fraudulent actions.

55.    The ACA, its officials and inspecting employees' intentional, fraudulent, deceitful, deficient and defective actions, by conspiratorially deceiving the public through false accreditation, directly allowed the prevailing and prevalent officially identified 'conditions of abuse' to continue within the HCADC.

56.    It was these 'conditions of abuse' (including the U.S. Department of Justice's findings of a "very disturbing pattern of misuse of force") that lead directly to the constitutional deprivations and subsequent gross injuries suffered by McBay when he was brutally beaten in Booking only ninety (90) days after the false and fraudulent ACA re-accreditation (accreditation on August 7, 2005 and McBay's beating followed on November 6, 2005).

57.    The ACA's Executive Director James A. Gondles, Jr. as the corporate officer for ACA, personally and ultimately responsible for the management of the day-to-day operation of ACA and its programs, including the Correctional Facility Accreditation Program, operated by the Commission on Accreditation for Corrections (a division of ACA), and the ACA officer who actually signed the initiating Accreditation Contract (on May 5, 2005) between the ACA and the HCADC (referred to in the contract as Harrison County Detention Facility), had a duty to properly manage and supervise his inspecting auditors on behalf of ACA and therefore knew, or should have known, of the conspiracy between his inspecting employees at the HCADC and officials of Harrison County.

58.    Gondles had an affirmative duty to prevent such conspiracy which he negligently and/or intentionally failed to do; resulting in the continuing constitutional deprivations of pre-trial detainees leading ultimately to the violations and injuries incurred by McBay.

59.    The ACA, Sheriff and/or policy making officials of the Sheriff's Department were well aware that the ACA's Accreditation is considered the national standard by which correctional facilities such as the HCADC are evaluated and of other desired and tangible benefits of the HCADC remaining accredited by the ACA, as the

23

ACA's website (ACA.org) clearly states that accreditation by the ACA is used by accredited correctional facilities to obtain "public recognition of a considerable honor among correction institutions" of this "national benchmark." Further, ACA accreditation is used to: "Demonstrate to interested parties that it (the accredited facility) is operating at acceptable professional levels." ACA's website also states that their accreditation is used to: "Comply with court orders;" "Defend against frivolous lawsuits," and ultimately that "ACA standards are used as a basic tool to ensure the constitutional rights of the offender."

60.    The ACA, its corporate officers and/or evaluating auditors became "state actors" under "color of law" when they engaged in a conspiracy with the Sheriff and/or policy making officials of the Harrison County Sheriff's Department to falsely and fraudulently award re-accreditation as described above.

61.    The ultimate purpose of this conspiracy was to subvert justice by interfering with the administration of justice in the federal court concerning not only the 1995 - U.S. District Court Consent Decree and the ongoing investigation by the U.S. Department of Justice, but, also pending and future litigation in the Courts of the United States.

62.    The Harrison County Board of Supervisors, the Sheriff, the ACA, its corporate officers and employees and its Executive Director Gondles and the other defendants had a duty to discover such conspiracy to subvert justice and to prevent it; which they negligently failed to do.

## INTENTIONAL USE OF INJURIUOUS EXCESSIVE FORCE

63.    Corrections Officers of the HCADC used unnecessary, unreasonable and wanton force on pre-trial detainee McBay when he was brutally beaten in Booking on or about November 6, 2005.  Such force was intentional, malicious, sadistic, excessive, not applied in good faith and was used for the sole purpose of causing harm and inflicting pain.  Such force amounted to willful punishment of a pre-trial detainee.

64.    The force described in the preceding paragraph:

A.    Was grossly disproportionate to any need for use of force and was inspired by malice rather than merely careless or unwise zeal.

B.    Said force amounted to an abuse of official power, intentional to the extent that it "shocks the conscience."

C.    Such force evidenced a "deliberate indifference" to the safety, well-being and protections afforded McBay.

D.    Such force caused significant pain and unbearable suffering to McBay.

E.    Such force amounted to cruel and unusual punishment.

F.    Such force caused and directly resulted in substantial, severe, significant, debilitating and permanent physical, mental and psychological injuries to McBay.

65.    These intentional injurious actions by Correctional Officers in HCADC Booking violated the due process protections afforded McBay under the Fourth and Fourteenth Amendments to the U.S. Constitution and violated McBay's protections under

the Eighth Amendment prohibiting cruel and unusual punishment as it applies to incarcerated persons being held as pre-trial detainees.

### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS FOR SUBSTANTIAL INJURIES SUSTAINED BY MCBAY FROM BRUTAL BEATING IN BOOKING

66.    Plaintiff, Gary Brice McBay, suffered serious injuries and substantial pain and suffering due to the injuries he sustained at the hands of Harrison County Correctional Officers. These injuries suffered by McBay were immediately obvious and readily apparent (even to a non-medical professional/lay person) evidencing the need for timely medical attention.

67.    After McBay's beating:

A.    Both of McBay's eyes were severely swollen, bruised, blackened and bloodied;

B.    One eye was almost swollen shut;

C.    The top left side of his forehead had a large laceration in the form of a bloody red "X";

D.    His whole face was deformed, disfigured and distended;

E.    His nose was broken to such an extent that it was crooked; and

F.    His clothing was covered in blood.

68.    Regardless of these obvious, readily apparent and immediately observable injuries; McBay was denied necessary medical care and treatment by Correctional Officers of the HCADC and by Health Assurance medical personnel who were deliberately indifferent to his objectively serious and plainly obvious medical needs.

69.    These Officers and medical personnel were aware and/or knew of his serious medical needs but intentionally disregarded them.  Such conduct rose to the level of constituting the unnecessary, willful, wanton and intentional infliction of substantial pain and suffering.  Such conduct rose to the level of cruel and unusual punishment.

70.    Such conduct:  (1) Exposed McBay to a substantial risk of serious damage to his future health.  (2) Denied McBay reasonable medical care for which a pre-trial detainee was entitled.  (3) Such denial and deliberate indifference to McBay's obvious need for timely treatment of serious, substantial and painful injury, in and of itself, violated the due process protections afforded him under the Fourth and Fourteenth Amendments to the U.S. Constitution and violated McBay's protections under the Eighth Amendment prohibiting cruel and unusual punishment as it applies to incarcerated persons being held as pre-trial detainees.

## CONSPIRACY TO COVER-UP BEATING(S)
## BY CORRECTIONAL OFFICERS

71.    Supervisors and supervisory personnel of the HCADC had actual knowledge and acquiescence of their Correctional Officers and other employees' injurious actions against McBay.

72.    Prior to the intentional injuries inflicted upon pre-trial detainee McBay, these supervisors and supervisory personnel were aware of similar injurious actions against other pre-trial detainees.

73.    After McBay's beating, Defendants participated in a conspiratorial scheme to camouflage, cover-up, falsely explain and/or deny what in truth and in fact happened to McBay.

27

74.    In aid of their conspiracy, Defendants directly, intentionally and falsely accused McBay of having illegal narcotics in his system, assaulting Correctional Officers and committing further criminal acts for which McBay could be charged, prosecuted and punished.

75.    Defendants made other false statements that McBay had been injured prior to arriving at the HCADC.

76.    Defendants also threatened McBay with criminal prosecution for making knowingly false accusations against law enforcement officers if McBay persisted in his complaints of abuse by the HCADC Corrections Officers.

77.    The aforementioned false statements and threats were intentionally made by Supervisors who were officials of the Harrison County Sheriff's Department and the HCADC having final policy making authority, Defendants Major Wayne Payne and Major Steve Campbell.

78.    These false statements and threats were made in furtherance of a conspiracy to cover-up, conceal and otherwise camouflage an existing pattern and continuing custom of the gross misuse of force within the Booking Department of the HCADC against detainees such as McBay.

79.    These false statements and threats were intentionally made in furtherance of a conspiracy by these two aforementioned policy making Defendants in order to protect the HCADC's recently received ACA re-accreditation, to protect themselves and the Sheriff from existing and potential lawsuits in Federal Court, to prevent possible repercussions concerning the existing U.S. District Court Consent Decree and to thwart

or otherwise obstruct the ongoing investigation and concerns of the U.S. Department of Justice.

80.    In furtherance of this conspiracy to cover-up and conceal the pattern of abuse and misuse of force within Booking on pre-trial detainees such as McBay, Defendants Teel, Morgan, Stoltz and other Corrections Officer falsified reports by intentionally and incorrectly documenting events involving the use of force against pre-trial detainees and/or by failing to properly document events and/or not documenting in writing uses of force in Booking.

81.    In furtherance of this conspiracy to cover-up and conceal the pattern of abuse and misuse of force within Booking on pre-trial detainees such as McBay, Defendant Major Steve Campbell, as the ranking officer with final decision making authority for the Internal Affairs Division of the Sheriff's Department aided and abetted the misuse of force within Booking by assisting in covering up and concealing the actions of the Corrections Officers.

82.    Campbell's assistance included reviewing, condoning and approving falsified reports and/or lack of reports on the use of force.

83.    Campbell did so by tacitly instructing the Correction Officers how to avoid detection by the video surveillance cameras in Booking and/or how to move and act while in view of the video cameras to avoid accurate documentation of events involving use of force on pre-trial detainees.

84.    In addition to the acts of commission/omission mentioned herein above, Campbell failed to take appropriate investigative actions and recommend appropriate

disciplinary measures in order to prevent the abusive and injurious actions of the Corrections Officers in Booking. Campbell had a positive duty to do so.

85.    In furtherance of this conspiracy to cover-up and conceal the pattern of abuse and misuse of force within Booking on pre-trial detainees such as McBay, Defendant Major Wayne Payne, as Campbell's immediate supervisor, approved Campbell's actions and even participated with Campbell in actions to deceive the inquiring public, federal authorities and complaining citizens.

86.    In furtherance of this conspiracy to cover-up and conceal the pattern of abuse and misuse of force within Booking on pre-trial detainees such as McBay, Defendant Sheriff George Payne, approved Major Wayne Payne's and Major Campbell's actions and even participated with them in actions to deceive the inquiring public, federal authorities and complaining citizens.

87.    Sheriff Payne had an affirmative duty to prevent this ongoing conspiracy, which he negligently failed to do, thus allowing the abuses and injuries to McBay and others.

88.    The Supervisors of Harrison County had an affirmative duty to be aware of and prevent this ongoing conspiracy concerning the covering up of on-going abuses in the HCADC involving McBay and other similarly situated pre-trial detainees. They negligently failed to do so thus allowing the abuses and injuries to McBay and others.

## KNOWLEDGE OF HABIT, PATTERN, CUSTOM OR POLICY

89.    Prior to (and after) McBay's brutal beating in Booking, elected officials and appointed officers with final policy making authority, were aware of a habit, pattern, custom or policy of the use intentional injurious excessive force against both prisoners

and more relevant to this action, pre-trial detainees, within the HCADC in direct violation of the federally mandated constitutional protections afforded citizens and other persons so incarcerated. Their knowledge was personal and/or official, individual and cumulative. Their knowledge was of public record prior to McBay's beating, as official correspondence from the United States Department of Justice, formally addressed to Sheriff George Payne and the Harrison County Board of Supervisors, put them on official notice that officials of the Department of Justice had determined that a "very disturbing pattern of a misuse of force" existed within the HCADC concerning improper and excessive use of force against detained and incarcerated persons held within their facility. Further, the HCADC was under a Consent Decree from this Honorable Court (judgment filed of record on January 12, 1995 with the United States District Court) concerning the deteriorated conditions of incarceration and improper treatment of incarcerated persons and detainees.

## EVIDENCE AND DOCUMENTATION OF OFFICIAL RECORD

90.     Evidence in the form of numerous sworn eye-witness testimony is now of public record before this Honorable Court by virtue of the guilty pleas of former Correctional Officers to criminal charges concerning intentional, abusive, harmful, injurious, unnecessary, malicious, wanton and willful use of excessive force against pre-trial detainees and prisoners.

91.     The aforementioned evidence documents a wide spread and lengthy habit, pattern or custom of abusing detained and incarcerated persons by the use of excessive force resulting in significant injuries. This evidence also came to light and of record during the trial of two supervisory personnel. (Specifically, during the trial, former

31

Corrections Officers testified in open court to the routine and pervasive physical and mental abuse of pre-trial detainees in the Booking Division of the HCADC. Further, these witnesses testified to personal participation and observation of supervisors and Deputy Sheriff's up to the rank of Major having participation, personal knowledge of and otherwise being aware of these former Corrections Officers abusive actions.)

### PERSISTENT AND WIDESPREAD PRACTICES OF INJURIOUS ABUSE AND USE OF EXCESSIVE FORCE ON PRE-TRIAL DETAINEES THAT "SHOCK THE CONCIENCE"

### WELCOME TO THE HOUSE OF PAYNE

92.    Shift supervisor Sergeant Ryan Teel, commonly referred to the HCADC as the "House of Payne" as a play on words of the Sheriff's last name and the term "pain."

93.    Other Correction Officers, including Morgan, working on Teel's shift commonly welcomed arriving arrestees into the Booking room of the HCADC using this term.

94.    The phrase "Welcome to the House of Payne!" was used in a menacing, threatening manner designed specifically to immediately intimidate and instill fear and psychological terror.

95.    The Correctional Officer's routine statements (such as the one mentioned) upon arriving and during the in-processing of detainees within Booking evidence a pattern and practice of behavior that was pre-planned, customary, routine and intentional.

### "THUMPING" ARRIVING ARRESTEES

96.    Corrections Officers also routinely "thumped" arriving arrestees by slamming their heads down onto the Booking Room counter where handcuffed arrestees where initially processed upon arrival in Booking.

97.    Corrections Officers would escort a handcuffed arrestee up to the in-processing Booking Room counter and then without warning "thump" the head of the arrestee on the hard counter.

98.    This "thump" resulted in pain and suffering to the individual thumped and many times resulted in a bloody cut, split or gash on the person's head and/or face.

99.    After the thump, medical treatment was not provided and, if bleeding, the arrestee was further berated for causing a mess, etc.

100.    After a "thump," no medical care or treatment was given to the arriving arrestee, regardless of obvious and apparent injury.

101.    Such force in the manner described evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees resulting in cruel and unusual punishment.

### ARRIVING ARRESTEES WHO WERE CONSIDERED VERBALLY AGGRESSIVE WERE RESPONDED TO WITH EXCESSIVE AND UNJUSTIFIED USE OF UNNECESSARY FORCE

102.    Teel, Morgan and the other Defendant Corrections Officers would routinely berate and belittle and otherwise antagonize arriving arrestees to incite them to respond.  When an arriving arrestee responded, in any manner deemed to be "unruly" or even "verbally aggressive," Corrections Officers in Booking would react with abusive, unnecessary, unjustified, excessive and injurious use of force.

103.    Merely speaking up was considered a show of "aggression."  This unnecessary response and misuse of force included striking with fists to the face and body, kicking, choking and slamming an arriving arrestee against the concrete walls and

floors within the Booking area while the arriving arrestee was still restrained with handcuffs.

104.    After the aforementioned uses of force, no medical care or treatment was given to the assaulted arriving arrestee regardless of obvious and apparent injury and pain.

105.    Unless a 'Use of Force Report' was generated, medical personnel on duty did not examine the injured arrestee/detainee even if they witnessed the unjustified assaults, which the on duty Health Assurance medical personnel routinely did.

106.    Such force in this manner evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees resulting in cruel and unusual punishment.

## THEME NIGHTS IN BOOKING

107.    Corrections officers working in Booking had "theme nights", where various nights of the week had specific titles.

108.    Some of the aforementioned "theme nights" were:    "Drunk Bitch Wednesday", "Thump a Thug Thursday", "Fight Night Friday" and "Slap a Hoe (whore) Saturday."

109.    The very existence of these "theme nights" evidences a callous and degrading disregard for the dignity of arrested citizens entering the Booking area as pre-trial detainees and a cavalier attitude towards the civil rights and protections afforded citizens merely accused of committing crimes and being temporarily held as pre-trial detainees.

110.    After these uses of force, no medical care or treatment was given to the assaulted arriving arrestee regardless of obvious and apparent injury and pain.

111.    Unless a 'Use of Force Report' was generated, medical personnel on duty did not examine the injured arrestee/detainee even if they witnessed the unjustified assaults, which the on duty Health Assurance medical personnel routinely did.

112.    Such force in the aforesaid manner evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees, resulting in cruel and unusual punishment.

## THE FLOOR SHOWS

113.    Corrections Officers working in Booking also had what was referred to as "Floor Shows", which involved a coded invitation extended to the other HCADC Correction Officers, Deputy Sheriffs and staff to come to Booking for special events called "floor shows."

114.    These "floor shows" involved Teel, Morgan and other Corrections Officers in Booking putting on a "show" for the other officers present. The "show" involved inhumane treatment of restrained detainees in a manner and means similar to physical and psychological torture, that was designed to terrify detained persons in Booking by the use of demeaning, dehumanizing, degrading activities and excessive, injurious force and threats including being beaten and/or choked to death.

115.    While the subject of the "floor show" was being abused, beaten, demeaned, threatened, terrified and tortured by the Correction Officers in Booking, the watching crowd of HCADC officers and staff would join in with insults, sarcastic

comments, derogatory remarks and even laughter in response to the cries of agony of the abused detainee that were evidenced by pain-filled yells, yowls, moans, and screams.

116.    After these "Floor Shows" / uses of force, no medical care or treatment was given to the assaulted arriving arrestee regardless of obvious and apparent injury and pain.

117.    Unless a 'Use of Force Report' was generated, medical personnel on duty did not examine the injured arrestee/detainee even if they witnessed the unjustified assaults, which the on duty Health Assurance medical personnel routinely did.

118.    Such force in this manner evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees, resulting in cruel and unusual punishment.

### THE SLEEPER GAME

119.    Teel, Morgan and other Corrections Officers in Booking would play the "Sleeper" game with intoxicated detainees held in Booking.

120.    The "Sleeper" game involved a Corrections Officer grabbing an intoxicated detainee (usually in the shower with no video recording), placing one arm around the detainee's neck and then locking both hands together in a choke hold. The Correction Officer would then tightly squeeze the detainee's neck until the detainee 'blacked out' (from lack of oxygen to the brain), after which the Corrections Officer would hold up the 'passed out' detainee until the he/she regained consciousness. When the choked drunken detainee 'woke up', the Corrections Officer would say, "Why are you falling asleep?", "Wake up!" and/or similar words to that effect. Then the Corrections Officer would repeat the process causing the restrained and helpless detainee to black out

again, to the amusement of the Corrections Officers. The process would be repeated upon the whim of the participating Corrections Officers regardless of the risk to the drunken detainee chosen as the "Sleeper."

121.    After the "Sleeper" game, no medical care or treatment was given to the assaulted arriving arrestee regardless of obvious and apparent injury and pain.

122.    Unless a 'Use of Force Report' was generated, medical personnel on duty did not examine the injured arrestee/detainee even if they witnessed the unjustified assaults, which the on duty Health Assurance medical personnel routinely did.

123.    Such force in this manner evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees resulting in cruel and unusual punishment.

### THE NO HABLOES

124.    Teel, Thompson and other Corrections Officers in Booking referred to Spanish speaking detainees as the "No Habloes."

125.    These non-English speaking detainees were routinely abused, harassed, intimidated and threatened.

126.    "No Habloes" would be instructed (by means of subtle hand signals) to step towards the Correction Officers while putting their hands up over their heads, after which the Correction Officers would respond by punching, kicking and using other untoward, unnecessary and excessive injurious force against them. The video cameras recording these incidences in Booking would then reflect these detainees stepping towards the Corrections Officers while raising their hands which the Corrections Officers would assert justifying their actions by claiming they were defending themselves.

127.    After a "No Hablo" was abused in this manner, no medical care or treatment was given to the assaulted arriving arrestee regardless of obvious and apparent injury and pain.

128.    Unless a 'Use of Force Report' was generated, medical personnel on duty did not examine the injured arrestee/detainee even if they witnessed the unjustified assaults, which the on duty Health Assurance medical personnel routinely did.

129.    Such force in this manner evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees resulting in cruel and unusual punishment.

### THE SHOWER

130.    Teel, Thompson and other Correction Officers routinely used the shower facility within Booking for special purposes.  Although designed for use as a shower and secluded area where in-processing persons could change clothes and be searched (especially females), the Correction Officers used the "shower" for their own special purposes.

131.    The Corrections Officers knew there were no video surveillance cameras in the shower.

132.    The Corrections Officers used the lack of surveillance cameras in the shower to their advantage in order to avoid video documentation of their most brutal, sadistic and savage uses of injurious excessive force.

133.    Corrections Officers would escort a selected detainee into the shower where they would savagely punch, strike, kick and otherwise beat and physically abuse the unlucky detainee.

38

134.    When a detainee was being beaten and abused inside the shower, Correction Officers abusing them would shout, "Quit resisting, Quit resisting!", although the detainee being beaten was not resisting.

135.    Corrections Officers outside the shower would join in the refrain also shouting, "Quit resisting, Quit resisting!"

136.    When satisfied that the detainee had received enough "Get Right" or punishment, the detainee would be dragged out of the shower and thrown into a holding cell or sometimes left lying moaning and bleeding on the Booking room floor as an "example" to others who might get smart, mouth off, want to fight or otherwise in any manner attempt to challenge the authority of the Corrections Officers.

137.    Often, so much blood and other bodily fluids remained on the floor of the shower or elsewhere after an inmate beating that an inmate trustee would be required to mop up the mess.

138.    After a detainee was abused in this manner, no medical care or treatment was given to the detainee unless a 'Report of Use of Force' was generated which required examination by the HCADC medical staff and their signature on the report.  Unless a 'Use of Force Report' was generated, medical personnel on duty did not examine the injured arrestee/detainee even if they witnessed the unjustified assaults, which the on duty Health Assurance medical personnel routinely did.

139.    Such force in this manner evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees resulting in cruel and unusual punishment.

## SPRAY THE BITCH

140.    When females were brought into the shower to be searched and change into the required attire for incarcerated persons, they would be escorted by female Correctional Officers.  While in the showers, the male Correctional Officers would listen for any indication that the female detainee did not immediately comply with female Corrections Officer's commands.  Upon any indication of any non-compliance, Teel, Thompson and other Correctional Officers would immediately shout, "Spray that Bitch. Go on spray her.  Spray the Bitch! Spray her now...." and/or similar words to encourage the female Corrections Officers within the shower to spray the naked or partially clothed female detainee with Mace, pepper spray or similar pain inducing aerosol chemicals.

141.    Teel, Thompson and other Correctional Officers encouraged the aforementioned completely unnecessary use of unjustified, painful and excessive use of force for their own purposes and to encourage their fellow female Corrections Officers to follow their lead by routinely abusing and employing unnecessary force on non-compliant and/or verbally aggressive detainees who were not a threat.

142.    Encouragement to use such force in this manner evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees resulting in cruel and unusual punishment.

143.    Such encouragement of the use of force in this manner evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees resulting in cruel and unusual punishment.

## USE YOUR WHOLE BODY TO MAKE ME FEEL GOOD

144. Teel, Thompson and others would use all manner of derogatory terms and make all manner of demeaning comments to intimidate and terrify detainees within Booking.

145. The aforementioned statements where specifically designed to instill fear and grave concern upon the listener.

146. While in the shower with detainees, Correction Officers would routinely make comments about sexually related matters and comment about the disrobing detainees while detainees were required to change clothes in front of them and their persons be searched.

147. Teel and others would also state, "I'm going to use your whole body to make me feel good" and/or similar words to that effect. Often, after this particular comment, depending upon the response of the detainee, the detainee would be physically abused with use of excessive and unjustified injurious force.

148. Such force in this manner evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees resulting in the intentional infliction of cruel and unusual punishment.

## YARD CALLS

149. Another example of the habit, pattern, custom and use of excessive force within the HCADC was the use of "Yard Calls." "Yard calls" were similar to "floor shows" in Booking, but involved taking a prisoner to the enclosed and secured area of the HCADC outside of the main facility. Once outside with the prisoner, Correction Officers

and others would participate in what was generally termed "get right" as pay back against the prisoner for some alleged offense, procedural violation or personal affront.

150.    During "Yard Calls" the prisoner would be beaten, kicked, punched and otherwise physically assaulted by anyone and everyone present and then taken back and thrown into a cell.

151.    After a "Yard Call," no medical care or treatment was given to the prisoner regardless of obvious and apparent injuries.

152.    Such force in this manner evidenced the habit, pattern, custom and usage by Correctional Officers within HCADC Booking of the intentional infliction of pain without justification on detainees, resulting in cruel and unusual punishment.

### FAILURE TO PROPERLY TRAIN AND SUPERVISE

153.    The above described widespread practices of abuse and the specific incident involving the brutal beating of McBay were a direct result of Sheriff Payne and/or other final policy making officers under him failing to properly train and/or supervise the Corrections Officers and their supervisors.

154.    With proper training, these abuses in Booking could not have occurred to the extent that such abuses became widespread and persistent practices.

155.    Such abject failure by the Sheriff and/or other final policy making officers, to properly train and/or supervise his Corrections Officers and their supervisors constituted deliberate indifference to McBay's and other detainees safety, welfare and their constitutional protections, privileges, immunities and rights and directly resulted in the "very disturbing pattern concerning misuse of force" as determined by the U.S. Department of Justice.

156.    The direct actions and knowledge of the Sheriff and his subordinates with final policy making authority intentionally allowed this abject lack of training and/or supervision to become so pervasive, endemic and well settled within the HCADC as to constitute a custom with the force of law.

157.    Sheriff George Payne had been put on notice by the U.S. Department of Justice of concerns of "misuse of force" in June of 2006, and instead of ensuring proper oversight and supervision of his Corrections Officers, he intentionally chose to acquiesce in the continuing abusive actions towards detainees within the HCADC.

158.    Major Wayne Payne, Major Steve Campbell and Captain Rick Gaston not only acquiesced in the continuing abusive actions towards detainees within the HCADC, but also encouraged, participated in and/or covered up these abusive and injurious actions by their officers.

159.    Payne, Campbell and Gaston all had personal knowledge and/or participation in the lack of proper supervision and training and were aware of the continuing misuse of force by Correction Officers within the HCADC.

160.    Instead of ensuring proper oversight and supervision of their Corrections Officers, these Defendants, intentionally chose not only to acquiesce in the continuing abusive actions towards detainees within the HCADC, but also to participate therein.

161.    The Harrison County Board of Supervisors had been put on notice by the U.S. Department of Justice of concerns of "misuse of force" in June of 2006, and instead of ensuring proper oversight by requiring proper training and supervision of the Corrections Officers employed within the HCADC intentionally chose to acquiesce in the continuing abusive actions towards the detainees.

43

162.    Proper training and supervision would have prevented the deprivations, abuses and injuries McBay and others suffered.

163.    And now having set forth the known facts and credible evidence concerning the conspiratorial custom, habit, pattern and usage of unnecessary, excessive injurious force, at all times relevant and material to this Complaint, and having set forth known facts and provable evidence concerning the improper hiring, lack of required training and complete failure to supervise the Corrections Officers of the HCADC, and having set forth the conspiratorial actions of officials of Harrison County with final decision making authority and the conspiratorial actions and deliberate indifference to the medical needs of injured and abused pre-trail detainees, your Plaintiff reaffirms these allegations and incorporates each and every allegation and Defendant in his Specific Statement of the Facts.

## SPECIFIC STATEMENT OF THE FACTS

### ARREST AND DETENTION OF MCBAY

164.    On or about November 6, 2005, the Plaintiff, Gary Brice McBay was arrested on suspicion of Public Drunk by Harrison County Deputy Kenneth Neal Allen, II, Badge Number 75, and transported to the Harrison County Adult Detention Center (HCADC) where he was booked into custody.

165.    After arrival at the HCADC intake area as an arrestee, McBay held the legal status of a "pre-trial detainee", as he had not been convicted of any crime, sentenced to any period of incarceration as punishment and was not a convicted offender. Further, he was not incarcerated for any judicially sanctioned punishment. McBay was merely being held on suspicion of committing a crime.

**HOG-TYING OF MCBAY**

166.    While in the HCADC intake area, commonly known as the "Booking Room", McBay's feet and hands were bound together in a manner referred to as "hog-tied", where both hands are handcuffed behind the back, and both legs shackled together. Then the shackled feet are forcibly pulled-up behind the back and handcuffed or otherwise attached to the handcuffed hands.

167.    The "hog-tying" of McBay was in and of itself unnecessary and constituted use of injurious and excessive force.

168.    The "hog-tying" of McBay was in direct violation of the proper use of force by Corrections Officers of a pre-trial detainee.

169.    After McBay was "hog-tied", he was left to suffer in a holding cell.

**MCBAY TAKEN INTO THE "SHOWER"**

170.    At some point later, McBay was released from his "hog-tie" and then taken into the Booking Room "shower."

171.    McBay did not need a shower.

172.    There were no surveillance cameras inside the separate room in Booking containing the shower.

173.    The Corrections Officers were well aware that there were no cameras or other means of video recording or seeing inside the shower room (the "shower") when they took McBay inside there.

174.    There is only one door to the shower and no windows.

175.    They did not take McBay in there for a shower.

176.    They took McBay into the shower to intentionally beat him.

45

177.    Prior to taking McBay into the shower, Thompson and Teel put on black leather gloves in preparation of what they knew was going to happen with McBay once inside the shower.

178.    They put the gloves on in McBay's presence in order to intimidate and terrify him.

179.    When McBay saw the Correction Officers putting the gloves on in front of him, he felt fear as their actions, attitudes and statements signaled what was about to happen.

180.    After they put on the black leather gloves, McBay was forcibly dragged into the shower so no one could see what they were going to do to him.

181.    Once inside the shower, McBay and the Corrections Officers with him could not been seen from the general Booking Room area.

### MCBAY BRUTALLY BEATEN

182.    McBay was then brutally beaten inside the shower by Correction Officer Morgan Thompson and others.

183.    Morgan Thompson was assisted by his supervisor, Sergeant Ryan Teel and other yet unidentified Corrections Officers.

184.    McBay was held down by the officers (by stepping, kneeling and/or standing on his arms, hands, legs and feet) while Thompson also kneeled on him and repeatedly struck him in the face and head.

185.    McBay's head was brutally slammed into a water drainage grate in the floor of the shower, resulting in a gross injury to his upper left forehead which left a large cut in the form of a bloody red "X" where his head impacted the grate.

186.    All the Corrections Officers striking, kicking and/or holding McBay used intentional, unnecessary, wanton and willful excessive force.

187.    The force used on McBay was without any justification.

188.    McBay was only 5'5" tall and weighed less than 120 lbs.

189.    Two of the Corrections Officers alone, Thompson and Teel, were both over 6' tall and weighed well over two hundred (200) pounds each.

190.    The brutal and bloody blows where on portions of McBay's body without any justification whatsoever.

191.    The multiple strikes by fists, feet, elbows and hands were on a restrained person.

192.    The injurious blows were not in self-defense.

193.    The actions of these Corrections Officers were sadistic in nature and for the sole purpose of exacting punishment and revenge and/or other satisfaction for some insult/offense they believed McBay had committed.

194.    While restrained, McBay was repeatedly and forcefully struck in and about his head and face while lying on the floor of the shower.

195.    McBay was repeatedly struck and/or kicked over other portions of his body.

196.    McBay, helpless to defend himself while he was held down by four to five much larger and heavier Corrections Officers, begged the officers to quit beating him crying out: "Please stop. Please stop."

197.    Instead of stopping, Thompson, Teel and others cruelly continued their sadistic beating of McBay until he lost consciousness.

198.    The brutal blows broke McBay's nose.

199.    The brutal blows blackened both of McBay's eyes.

200.    The brutal blows damaged both of McBay's eyes to such an extent that his left eye was swollen shut and his vision became blurry.

201.    McBay was beaten until he lost consciousness and then thrown in a holding cell located within Booking.

## MCBAY DENIED NEEDED MEDICAL ASSISTANCE

202.    After his sadistic abuse and brutal beating, McBay's injuries were plainly obvious and observable to anyone looking at him.

203.    McBay's injuries were intentionally ignored and he was denied needed medical care and assistance.

204.    McBay suffered unnecessary pain and suffering, a worsening of his condition and a substantial risk of serious harm from the denial of this needed medical care and assistance.

## "TROPHY" PICTURE OF MCBAY'S "ASS WHIPPING"

205.    Sometime after McBay's brutal beating, his picture was taken in Booking as a "trophy" while Thompson bragged about the "ass whipping" Thompson and others had given McBay.

206.    A true and correct copy of the Booking Room picture taken by Corrections Officers after McBay was brutally beaten is attached to this Complaint as **EXHIBIT "A"**.

207.    The graphic photograph clearly documents the areas of McBay's head, face and neck that suffered significant injury at the hands of Thompson, Teel and others.

48

208.    When the photograph was taken, McBay had suffered the following injuries:

A.    His face and head were swollen and cut and bruised in numerous locations;

B.    His left eye was purple and black and almost swollen completely shut;

C.    His right eye was blackened;

D.    His nose was swollen and cut;

E.    His mouth swollen; and

F.    Splotches of dried blood dotting his face and left forehead where he had a bloody red "X" cut into him from the shower drain.

## VERBAL TAUNTING, THREATS AND HUMILIATION

209.    Sometime after McBay's beating, while he was still handcuffed to a bench in Booking, a number of Corrections Officers looking at McBay taunted and attempted to humiliate him by stating, "You really got your ass beat by Thompson" and/or similar words that effect.

210.    Sometime after McBay's beating, while he was still in Booking, Thompson taunted him by stating, "You are a tough little son of a bitch" and/or similar words to that effect.

211.    Sometime after McBay's beating, while he was still in Booking, a Corrections Officers looking at McBay, taunted him and attempted to humiliate him by stating, "You got the small man syndrome" and "You want some of me" and/or similar words to that effect.

49

212.    Later, on or about the same day, while being processed for release from the HCADC, a large Corrections Officer looked at McBay and while laughing further taunted and attempted to humiliate McBay by stating that, "You hit Thompson and got what you deserved.  You could have gotten six years for assaulting a cop, but we didn't want to do the paperwork - so you got it (referring to McBay's brutal beating) instead" and/or similar words to that effect.

213.    Another large Corrections Officer then threw McBay's bag of clothes at him without warning striking him forcefully and painfully in the stomach.

214.    When being finally released, McBay's shirt that he wore into the jail was so covered in blood that it was not wearable and a trustee/prisoner working in Booking gave McBay a clean shirt and threw his blood soaked shirt in the trash.

215.    McBay's Parents, Gary and Terry McBay, a bails bondsman, Ben Ray Williams and a private investigator, Tony McGill went to the HCADC for the release of McBay.

216.    The McBay's had previously been informed, over the telephone by staff personnel of the HCADC, to expect their son to have some minor injuries as he had arrived at the jail with a "bloody nose."

217.    However, when McBay's parents, the bails bondman and the private investigator saw him they where "shocked" at his bloody, battered and beaten appearance, almost to the point of McBay's parents becoming physically ill.

218.    McBay was immediately taken to the Memorial Hospital of Gulfport for emergency evaluation and medical treatment of his obvious injuries.

50

## MCBAY'S IMMEDIATE INJURIES

219.    Shortly after his release, McBay was evaluated on November 7, 2005, at Memorial Hospital and determined to have ". . . *multiple bruises-blackened eyes; nose not straight; abrasions across front forehead; abrasion right elbow; numerous knee contusions; bruising over arms bilaterally; bruising under right eye, large left temproparietal scalp hematoma* and/or *contusion*." McBay was also diagnosed as having a ". . .*comminuted nasal bone fracture*."

## DECEPTIVE STATEMENTS AND THREATS
## BY MAJOR WAYNE PAYNE AND CAPTAIN STEVE CAMPELL

220.    Shortly after McBay's brutal beating, his Father Gary McBay and his Mother, Terry McBay, had a meeting with Major Wayne Payne and Captain Steve Campbell at the HCADC.

221.    Major Payne served as Chief Deputy and/or Chief of Operations and Patrol reporting directly to Sheriff George Payne.

222.    Captain Steve Campbell was in charge of the Internal Affairs (IA) Division of the HCADC.  He also reported directly to the Sheriff.

223.    IA was tasked with investigating improper conduct of Corrections Officers and/or abuse of inmates and altercations involving inmates/detainees.

224.    At the meeting, Captain Campbell (in the presence of Major Payne) explained how proud they were of their "highly rated" department and their jail; and how "lowly rated" the department had been before Sheriff George Payne was elected.

225.    They also explained how Sheriff Payne "expected" their "ratings" to stay "high" and "that's what they intended to do."

226.    Payne and Campbell stated they had reviewed a video tape of McBay's son in jail and that McBay was hog-tied in a holding cell and appeared to be asleep when the Correction Officers untied him and McBay became "combative."  Campbell stated that McBay struck Corrections Officer Thompson outside of the shower and that Thompson struck him back.

227.    Payne and Campbell both stated their officers had the right to defend themselves and had a "right to hit prisoners if necessary."

228.    McBay's parents asked to see the video tape of what had happened concerning their son, but, Payne and Campbell refused; unless a lawyer asked for it.

229.    Campbell alleged that McBay was "on drugs."

230.    Payne's and Campbell's usual custom, habit and pattern, in response to any complaints of how a person detained in the HCADC was treated by Corrections Officers was to allege that the person was on "drugs."

231.    Payne and Campbell routinely responded to complaints of abuse (of persons abused and/or injured in the HCADC by Corrections Officers) stating that the person was on "drugs" and assaulted or otherwise confronted their officers, and the officers had to defend themselves.

232.    If the person had a few bumps/bruises, Payne and Campbell would say that they got what they deserved for their actions against the officers.

233.    Payne and Campbell would also threaten anyone who complained about being abused by telling them that anyone assaulting an officer (while in custody within the HCADC) was guilty of a felony, for which they could do six years in jail, and if the

complaint was continued, they (Campbell and Payne) would have no choice but to pursue charges.

234.    Upon being released from the HCADC, McBay was warned that Campbell and/or Payne would say he was on drugs and assaulted a Corrections Officer, if he made a complaint about the treatment he received at the HCADC; therefore, McBay was tested for drugs while at Memorial Hospital.  McBay tested negative for any illicit/illegal or other psychoactive drugs.

235.    McBay's parents took the results of McBay's drug test with them to the meeting with Campbell and Payne.

236.    When Campbell alleged McBay was on drugs, McBay's parents showed the negative test results to him.

237.    After seeing that the medical tests proved McBay was not on drugs, Campbell did not participate further in the discussion and remained silent.

238.    Payne then recounted to McBay's Parents how his own nephew had gotten a few "bumps" while in the jail (HCADC) but that he got what he deserved stating his officers had a right to defend themselves.

239.    Payne further informed the McBay's that their son was guilty of a felony for assaulting Officer Thompson and he could go to jail for what he had done, but, that he "was willing to help" and to give him a call if they needed anything.

240.    Neither Payne nor Campbell expressed any concern or remorse for the injuries inflicted by their Corrections Officers on McBay.  Instead, they were adamant that "their officers" had the "right to do what they did" to McBay.

241.    After the meeting with Payne and Campbell, McBay's father asked a staff member of the HCADC working at the main entrance to the facility for his son's shirt which had been left in Booking.

242.    McBay's father was informed that McBay had "thrown it away" and "now the shirt belonged to them" and further that "he could not have it."

243.    None of the Corrections Officers were ever disciplined for the brutal beating of McBay.

### MCBAY'S PERMANENT INJURIES AND DAMAGES

244.    McBay suffered, and still suffers from, serious, significant and permanent injuries, life altering impairments and mental and physical disabilities as a direct result of the brutal beating he received on or about November 6, 2005, at the hands of Corrections Officers within Booking at the HCADC.  These injuries were compounded by the lack of and/or significant delay of needed medical care, treatment and attention.

245.    As a direct consequence of his severe and brutal beating in the HCADC and denial of needed medical care and treatment, McBay suffered and continues to suffer from the following painful and disabling symptoms:

(1)    Broken Nose with scaring and sinusitis;

(2)    Low grade fevers and severe headaches;

(3)    Blurred vision in both eyes;

(4)    Constant fatigue;

(5)    Memory loss;

(6)    Pain in nose with sinus maladies;

(7)    Pain and numbness in left thumb;

(8)     Post Concussion Syndrome;

(9)     Post Traumatic Stress Disorder; and

(10)    Depression and paranoia.

246.    Since his severe and brutal beating in the HCADC and denial of needed medical care, and directly from and as a consequence of these debilitating injuries and related impairments, McBay has been unable to be gainfully employed.

247.    Prior to his brutal beating, McBay was a Regional Disaster Response Adjuster for a nationally known company. Consequently, he has lost significant income and employment opportunities.

248.    Since his severe and brutal beating in the HCADC and denial of needed medical care, and directly from and as a consequence of these debilitating injuries and related impairments, McBay has endured significant, prolonged pain and continued suffering.

249.    Since his severe and brutal beating in the HCADC and denial of needed medical care, and directly from and as a consequence of these debilitating injuries and related impairments, McBay has suffered a substantially reduced quality and enjoyment of life.

250.    Since his severe and brutal beating in the HCADC and denial of needed medical care, and directly from and as a consequence of these debilitating injuries and related impairments, McBay has suffered physical and mental impairments resulting in continuing permanent disability.

251.    Since his severe and brutal beating in the HCADC and denial of needed medical care, and directly from and as a consequence of these debilitating injuries and

55

related impairments, McBay has suffered physical disfigurement from the deformity of his broken nose.

## CONCLUSION

The brutal beating and subsequent abuse of your Plaintiff, Gary Brice McBay, cries out for justice. McBay suffered a devastating life altering event at the hands of sadistic and cruel jailers. He was brutally beaten, abused, taunted and terrorized by Corrections Officers in Booking after being taken to the Harrison County Adult Detention Facility. He was denied needed medical care and treatment by these same officers and present medical staff. Because of this, he will never be the same physically or mentally. When his parents complained to officers running the Harrison County Adult Detention Center, they blamed McBay for what happened to him and further threatened him with serious criminal charges if he continued to complain. These officers showed zero remorse for McBay's injuries and suffering and further deceitfully used their false national accreditation to cover-up what really happened to McBay in Booking. Unfortunately, McBay was not the exception as evidenced by the numerous abuses and injuries suffered by other detainees held in Booking. The intentional abuse, brutal beating, taunting and terrorizing, denial of medical care and humiliation he suffered was not an unusual event within Booking. A conspiratorial culture of cruelty existed within the "House of Payne" that created and fostered a custom of abuse, misuse of force and intentional injury and deprivation to detainees unfortunate enough to be held under conditions dictated by their tormentors.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the Plaintiff, Gary Brice McBay, respectfully requests that a timely trial be granted to present the abundant evidence and eye-witnesses testimony concerning the abusive and injurious actions of these Defendants against him and at the conclusion of the requested trial that this Honorable Court enter a judgment as follows:

(1)    Against the Defendant Harrison County Board of Supervisors and all other public official Defendants according to the proof presented against them, jointly and/or severally, in an award for all actual and compensatory damages, past, current and future, for and from the injuries, disabilities and suffering sustained by the Plaintiff, Gary Brice McBay.

(2)    Against the private Defendant, American Correctional Association and its employees according to the proof presented against them for all actual and compensatory damages, past, current and future for and from the injuries, disabilities and suffering sustained by the Plaintiff, Gary Brice McBay.

(3)    Against the private Defendant, Health Assurance LLC and its employees according to the proof presented against them for all actual and compensatory damages, past, current and future for and from the injuries, disabilities and suffering sustained by the Plaintiff, Gary Brice McBay.

(4)    Against the private Defendant, American Correctional Association and its employees according to the proof presented against them for the intentional, willful and wanton, malicious conduct concerning its conspiratorial, false and fraudulent accreditation of the Harrison County Adult Detention Center that resulted in a deliberate

indifference to the rights, privileges, immunities and protections constitutionally afforded the Plaintiff and all similarly situated pre-trial detainees evidencing a gross and reckless disregard and deliberate indifference for the Plaintiff's protections, welfare and safety in an award of punitive or exemplary damages in an amount sufficient to deter such future actions against others, protect the integrity of the accreditation of the American Penal System and to provide for just monetary punishment for these intentional acts and actions resulting in ultimate harm to the Plaintiff, Gary Brice McBay.

(5)     Against the private Defendant, Health Assurance LLC and its employees according to the proof presented against them for the intentional, willful and wanton, malicious conduct concerning its conspiratorial, complicit and concerted actions with the public official defendants within the Harrison County Adult Detention Center that resulted in a deliberate indifference to the medical needs and thus the rights, privileges, immunities and protections constitutionally afforded the Plaintiff and all similarly situated pre-trial detainees evidencing a gross and reckless disregard for the Plaintiff's protections, welfare, health and safety in an award of punitive or exemplary damages in an amount sufficient to deter such future actions against others, protect the integrity of the safety of and safeguards of persons detained by the criminal justice system and to provide for just monetary punishment for these intentional acts and actions resulting in ultimate harm to the Plaintiff, Gary Brice McBay.

(6)     Against the private Defendant, Health Assurance LLC and its employees according to the proof presented against them for their failure to properly treat and care for the obvious medical needs of the Plaintiff after his brutal beating in Booking which actions and/or lack of actions evidences medical malpractice.

58

(7)    Against these Defendants, jointly and severally, for all Plaintiff's reasonable attorney's fees pursuant to 42 USC § 1988 and all associated allowable costs, related litigation expenses and recoverable expert witness fees.

(8)    Against these Defendants for other such relief as this Honorable Court may deem necessary, appropriate, equitable and just under the circumstances of this action.

RESPECTFULLY SUBMITTED, this the 16th day of November, 2007.

Gary Brice McBay, Plaintiff
By His Undersigned Counsel

James Bailey Halliday, MSB # 2924
Attorney at Law
P.O. Box 6783
Gulfport, MS 39506
Phone: (228) 831-3778
E-Mail: jbhallidayesq@earthlink.net

Robert G. Harenski, MSB #10037
Attorney at Law
P.O. Box 4961
Biloxi, MS 39535
Phone: 228-669-9700
E-Mail: harenskilaw@yahoo.com