Case 1:07-cv-01205-LG-RHW   Document 300-3   Filed 11/13/09   Page 1 of 9

```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                    SOUTHERN DIVISION


GARY BRICE MCBAY,
     Plaintiff,


VERSUS            CIVIL ACTION NO: 1:07CV1205-LG-RHW


HARRISON COUNTY, MISSISSIPPI,
BY AND THROUGH ITS BOARD OF
SUPERVISORS; HARRISON COUNTY
SHERIFF GEORGE PAYNE; WAYNE
PAYNE; DIANE GASTON RILEY;
STEVE CAMPBELL; RICK GASTON;
RYAN TEEL; MORGAN THOMPSON;
JOHN DOES 1 - 4; AMERICAN
CORRECTIONAL ASSOCIATION;
JAMES A. GONDLES, JR.; UNKNOWN
DEFENDANTS 1 - 3 EMPLOYEES OF
AMERICAN CORRECTIONAL
ASSOCIATION; HEALTH ASSURANCE,
LLC, AND UNKNOWN DEFENDANTS 1
- 2 EMPLOYEES OF AMERICAN
CORRECTIONAL ASSOCIATION,
     Defendants.
```

## DEPOSITION OF THOMAS RANDAZZO

Taken at the offices of Dukes, Dukes, Keating & Faneca, 2909 13th Street, Sixth Floor, Gulfport, Mississippi, on Thursday, July 9, 2009, beginning at 9:32 a.m.

**ORIGINAL**

SIMPSON BURDINE & MIGUES (228) 388-3130
dusty@sbmreporting.com



EXHIBIT "B"

```
               IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                         SOUTHERN DIVISION



    GARY BRICE MCBAY,
         Plaintiff,


    VERSUS            CIVIL ACTION NO: 1:07CV1205-LG-RHW


    HARRISON COUNTY, MISSISSIPPI,
    BY AND THROUGH ITS BOARD OF
    SUPERVISORS; HARRISON COUNTY
    SHERIFF GEORGE PAYNE; WAYNE
    PAYNE; DIANE GASTON RILEY;
    STEVE CAMPBELL; RICK GASTON;
    RYAN TEEL; MORGAN THOMPSON;
    JOHN DOES 1 - 4; AMERICAN
    CORRECTIONAL ASSOCIATION;
    JAMES A. GONDLES, JR.; UNKNOWN
    DEFENDANTS 1 - 3 EMPLOYEES OF
    AMERICAN CORRECTIONAL
    ASSOCIATION; HEALTH ASSURANCE,
    LLC, AND UNKNOWN DEFENDANTS 1
    - 2 EMPLOYEES OF AMERICAN
    CORRECTIONAL ASSOCIATION,
         Defendants.
```

## DEPOSITION OF THOMAS RANDAZZO

Taken at the offices of Dukes, Dukes, Keating & Faneca, 2909 13th Street, Sixth Floor, Gulfport, Mississippi, on Thursday, July 9, 2009, beginning at 9:32 a.m.

**ORIGINAL**

1   understand the question; is that fair enough?
2        A.   Yes, sir.
3        Q.   And sometimes folks will make an
4   objection or something.  If they do, if you'll
5   just pause a moment so that we can deal with that,
6   if they object to the form of the question or the
7   responsiveness of your answer.
8             And I'll try not to talk on top of you
9   if you'll let me finish my question, even if you
10  anticipate what it's going to be, so that the
11  court reporter here doesn't have to try to take
12  down two people talking at one time, okay?
13       A.   Okay.
14       Q.   We're here about an incident that
15  happened November 6th, 2005 at the Choppers Lounge
16  in Gulfport.  What was your involvement?  Were you
17  there the night of November 6th, 2005?
18       A.   Yes.  We had been in the bar playing
19  pool in a pool tournament.  The gentleman in
20  question had been asked to leave.  Visibly
21  intoxicated.
22       Q.   Who asked him to leave?
23       A.   The bartenders.  They had cut him off,
24  asked him -- you know, you need to go sleep, get a
25  ride home, whatever.

1     A.   Well, I ran their pool tournaments on
2  weekends, Friday, Saturday and Sundays.
3  Unofficial bouncer.  Whenever trouble would pop up
4  in the bar, myself or the owner, one of us, would
5  try to calm it down, you know, get control of the
6  incident.
7       The night in question, he was asked to
8  leave.  I watched him walk outside.  He's bumping
9  into cars.  I mean, he's really intoxicated.
10    Q.   Did you speak with him before --
11    A.   Not before he went out the door.  I
12 followed him out, tried to call him, hey, let us
13 call you a cab or sleep in your truck.  He just
14 kept walking, got in his truck.
15    Q.   Was this a parking lot outside the bar?
16    A.   Yes, sir.  It was attached to the bar
17 itself.  I mean, it's only maybe 30 foot out to
18 the road itself.
19    Q.   What road is that?
20    A.   I can't remember the name of it.
21    Q.   Is it a paved road?
22    A.   Yes, sir.
23    Q.   Okay.
24    A.   He climbed in his truck, which was quite
25 high off the ground, the bottom of it was.  The

1    door still open. I talked to him, said, look,
2    give me your keys, sleep in your truck, get the
3    keys in the morning, you don't need to be on the
4    road driving. He was really drunk. He continued
5    to argue with me. I said, look, let us call you a
6    cab, sleep in your truck or something, don't
7    drive. I said, I don't want to call the police on
8    you. Well, at that time, he swung at me.
9        Q.   Did he hit you?
10       A.   Glancing. I mean, it was a glancing
11   blow. So I pulled him out of his truck.
12       Q.   How did you do that?
13       A.   Grabbed him by his shirt and pulled.
14       Q.   Did you pull him all the way out?
15       A.   Yes, sir.
16       Q.   Where did he go?
17       A.   He landed on the ground right next to --
18   in front of me, actually. I picked him up. I
19   said, look, I don't want to call the police, sleep
20   in your truck or get a cab, you don't need to be
21   driving.
22       Q.   What happened next?
23       A.   He swung at me again.
24       Q.   Did he hit you that time?
25       A.   Yes, sir, he did. He caught me in the

1  jaw that time.
2      Q.   What did you do?
3      A.   I hit him back.  He went to the ground.
4  I picked him up, walked him over to the building.
5      Q.   Was he able to walk?
6      A.   He was able to walk, staggering, but he
7  was able to.
8      Q.   When you said you pulled him out of the
9  truck to the ground, what kind of ground are we
10 talking about, grass, gravel, pavement?
11     A.   Actually it's a mixture of grass, sand,
12 gravel.  Once I got him to the wall, my then
13 girlfriend, which is now my wife, walked outside.
14 I told her, call the sheriff's department.  He
15 commenced to swing at me again.
16     Q.   Did he hit you?
17     A.   No.  I put him to the ground.
18     Q.   How did you do that?
19     A.   I grabbed the back of him and put him
20 down.
21     Q.   Face down?
22     A.   Yes, sir.
23     Q.   What was the ground like where that
24 happened?
25     A.   About the same material, grass, sand,

1 gravel.

2   Q. Parking lot?

3   A. Yes, sir, still in the parking lot.
4 Once he was on the ground, I sat on him, put his
5 hands behind his back and held him there.

6   Q. Was he face down?

7   A. Yes, sir.

8   Q. Okay. Was he talking to you at the
9 time?

10   A. He was cussing me. I just sat there and
11 waited till the police showed up. And when the
12 officers came around the corner, I started to get
13 up. They told me, no, they want to get him in
14 handcuffs before I get off of him.

15        Once they put the cuffs on him, I stood
16 up. They asked me to go speak with the other
17 officer, which I did, and gave him my statement of
18 what had happened.

19   Q. What did you tell the officer?

20   A. That he was too drunk to drive. We
21 asked him to sleep in his car, taxi, you know,
22 options for him not to be driving. He refused.
23 He swung at me. I put him to the ground. Then I
24 brought him over here, and that's when we had, you
25 know, someone call y'all.

1   he quit.
2      Q.   Tell us how he tried to.
3      A.   Just wiggling, trying to get away from
4   me, trying to get his hands unloose from my hands.
5      Q.   When you say hands unloose from your
6   hands, were his hands on his stomach, were they
7   behind his back?
8      A.   I had them behind his back and gripped
9   as if he were in cuffs.
10     Q.   Another question I have:  On this
11  incident report -- actually the arrest report, and
12  I'm going to show you -- I'm just going to point
13  to you and read it right here.  It says, McBay had
14  a bloody nose.  Can you see it right there?
15     A.   Yes, sir.
16     Q.   Okay.  You talked to the officers after
17  this happened, right?
18     A.   Yes, sir.
19     Q.   Was your memory at that time fresh as
20  far as the things that happened that evening when
21  you talked to the officers?
22     A.   Oh, yes.
23     Q.   Okay.  It says that McBay had a bloody
24  nose.  Did he have a bloody nose before the police
25  got there?

1   A.   Yes.
2   Q.   Okay.  How did he get the bloody nose?
3   A.   Possibly caused by myself.
4   Q.   When you say possibly by yourself, did you see him get in a fight with anybody else in the bar?
7   A.   No, sir.  It could have been when I put him on the ground.
9   Q.   When you first saw Mr. McBay in the parking lot, did he have a bloody nose at that time?
12  A.   No.
MR. BRENDEL:
    That's all I have.

### EXAMINATION

BY MR. WATTS:
17  Q.   Mr. Randazzo, Exhibit 3, again, just look at it.  And if you can read starting with Deputy Allen observed, just read that sentence.
20  A.   Deputy Allen observed Mr. Randazzo sitting on top of Mr. McBay and noticed that Mr. McBay had a bloody nose.  AMR responded, and Mr. McBay refused.
24  Q.   And earlier you said that you can't remember whether or not he had a bloody nose, but