UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

GARY BRICE MCBAY                                                    PLAINTIFF

V.                                      CIVIL ACTION NO. 1:07CV1205-LG-RHW

HARRISON COUNTY, MISSISSIPPI BY AND
THROUGH ITS BOARD OF SUPERVISORS;
HARRISON COUNTY SHERIFF GEORGE PAYNE;
WAYNE PAYNE; DIANE GATSON RILEY;
STEVE CAMPBELL; RICK GATSON; RYAN TEEL;
MORGAN THOMPSON; JOHN DOES 1-4;
AMERICAN CORRECTIONAL ASSOCIATION;
JAMES A GONDLES, JR.; UNKNOWN DEFENDANTS
1-3 EMPLOYEES OF AMERICAN CORRECTIONAL
ASSOCIATION; HEALTH ASSURANCE LLC AND
UNKNOWN DEFENDANTS 1-2 EMPLOYEES OF
AMERICAN CORRECTIONAL ASSOCIATION                              DEFENDANTS

STATE OF MISSISSIPPI
COUNTY OF HARRISON

## AFFIDAVIT OF SHERIFF GEORGE PAYNE, JR.

PERSONALLY CAME AND APPEARED BEFORE ME the undersigned authority

in and for the County and State aforesaid, the within named, George Payne, Jr., who, after

first being duly sworn by me on his oath, did depose and state the following:

1.      My name is George Payne, Jr. I am over the age of twenty-one (21) years.

I have personal knowledge of the matters and facts contained in this Affidavit

and I am competent to testify to the matters stated herein. I was at all times

relevant to the Complaint in this Civil Action the duly elected Sheriff of

Harrison County and the final policy making official for the Harrison County

Sheriff's Office ("HCSO") and the Harrison County Adult Detention Center


EXHIBIT
"E"

("HCADC"). Additionally, at all relevant times, I was the only policy maker for the HCSD.

2.    I had no communication or other personal interaction or contact with the Plaintiff in this case at any time during the period of his incarceration at HCADC.

3.    I was not present during any of the alleged events in the Plaintiff's Complaint. Furthermore, I was never present at any locations where he may have been at any time.

4.    I had no involvement in, or knowledge whatsoever of, any events or incidents of November 6, 2005, involving Plaintiff which occurred in the booking area of the Harrison County Adult Detention Center, until after the alleged incident had already concluded.

5.    The normal procedure would be for the Professional Standard director Capt. Steve Campbell to perform an investigation of allegations of officer misconduct or excessive use of force. In the event that Capt. Campbell began an investigation and found no evidence to continue with a full investigation, no Internal Affairs Report would be completed. Therefore, no further information would be communicated to me other than the fact that Capt. Campbell looked into the matter and felt no further action needed to be taken

6.    At no time was I made aware of any potential risk of harm to Plaintiff's health or safety as an inmate at HCADC, nor was I aware of any facts from which the inference could be drawn that a substantial risk of serious harm existed as to Plaintiff.

7.      At all relevant times, it was the policy of HCADC to provide a safe and secure environment not only for inmates, but also for all officers and other employees of HCADC, and further to protect the general public by preventing any escapes from HCADC.  (See Facility Goals, Purpose, and Mission Policy and Procedure; Code of Ethics Policy and Procedure; and General Rules of Conduct Policy and Procedure attached hereto as **Exhibit "1- 3"**).

8.      Due to the nature and size of the HCADC, I could not personally supervise all employees at one time; however, there were in place adequate policies and procedures to ensure all officers were supervised and acted in a lawful and professional manner and in compliance with the department's policies and procedures, general orders, and the laws of Mississippi.

9.      At all relevant times, HCADC had a Use of Force, Use of Restraints, Weapons and Use of Force, General Order#10, and a Healthcare Service policy in place and in full effect.  (See the policies attached hereto as **Exhibits "4 - 7")**.  (See General Order #10 and Use of Force Policy).All officers were informed and trained on these policies.

10.      It was at all times the policy of the HCADC to thoroughly investigate all allegations and complaints of misconduct and to take the appropriate disciplinary action if such allegations were ever sustained.   At all relevant times, the Harrison County Sheriff's Department had a "Professional Standards Unit" policy in place and in full effect. (See General Order No. 65, which is attached hereto as **Exhibit "8").**  The Professional Standards Unit was responsible for conducting internal administrative investigation and applicant background development.

11.     Employees of the Harrison County Sheriff's Department were subject to disciplinary or corrective actions by their superiors if they failed to comply with departmental policies, rules and procedures, or if they failed to perform their duties in a satisfactory manner. A disciplinary board headed by the Major of specific departments and approved by me convened to hear such charges. After the disciplinary hearing was concluded, the board made recommendations to myself and at that time, I reviewed said charges and recommendations and made a final determination as to what disciplinary action should be taken. (See General Order #62 and #44 as **Exhibits "9" and "10"**.)

12.     At all times, the HCADC, had in place adequate hiring, training and supervisory procedures for its deputies. It was also the policy of HCADC to provide appropriate training for all employees, including correctional officers as required by the laws of Mississippi. See Miss. Code Ann. § 45-4-1, et. seq. At all relevant times, it was HCADC's policy to send newly hired correctional officers to complete an initial forty (40) hour training program by state certified officers prior to assuming duties in the jail. Upon completion of this initial forty (40) hour program, correctional officers were to receive on the job training under the supervision of a field training officer, and an additional eighty (80) hours of instructional training within the first two years, followed by refresher training provided throughout the course of the officer's employment. Specifically, Defendant Thompson received adequate training in all areas in accordance with Mississippi law. (See records attached hereto as **Exhibit "11"**.)

13.   I have first hand knowledge of the hiring guidelines for the Harrison County Sheriff's Office that were in place at all relevant times.  The Miss. Code Ann. § 45-4-1 et. seq. provides that the Board on Jail Officers Standards and Training should fix a minimum qualifications for the employment of jail officers in the State of Mississippi.  The Harrison County Sheriff's Office followed these guidelines in hiring correctional officers for the Harrison County Adult Detention Center.  Furthermore, all applicants are subject to a background investigation and pre-employment medical examination to determine whether an employee has the physical and mental qualifications necessary to perform his or her job.  Additionally, all employees are required to successfully pass a urinalysis test upon being offered employment.

14.   All allegations of the use of unwarranted or excessive force that were brought to my attention were investigated, and if such allegations were ever substantiated, the officers received the appropriate disciplinary actions.

15.   There did not exist any policy, practice or custom at the HCSD which condoned the use of unlawful excessive force or the concealment of such acts.  Rather, it was the policy of the HCSD for all corrections officers to use only those amounts of physical force, O.C. spray and restraints which was necessary to maintain or regain control of inmates.  (See Policy and Procedure attached hereto as **Exhibit "4 -7"** ).

16.   During my tenure as Sheriff of Harrison County the Harrison County Adult Detention Center had in effect a policy providing a process for inmates to file formal grievances.  (See attached Grievance Policy as **Exhibit "12"**) This policy included the ability of the inmates to file grievances against corrections

officers for officer misconduct. All such grievances filed by inmates were forwarded from the Grievance officer to the Security Officer, who in turn reviewed and forwarded the grievances to the Harrison County Adult Detention Center Warden for review. If the Warden determined that any grievance needed to be investigated further, the Warden and I would discuss same and after our discussion, I would decide whether to refer the Officer Misconduct Grievance to the Professional Standards Division for further investigation.

17.     I took office as the Sheriff of Harrison County in January of 2000 and the Harrison County Adult Detention Center was under a Consent Decree in the case of *United States of America v. Harrison County, Mississippi, et al.*, Civil Action No. 1:95-cv-5GR, at that time. Pursuant to the Consent Decree in place, the Department of Justice conducted on site inspections at the jail.

18.     Working with the United States Department of Justice's knowledge and consent, the Harrison County Adult Detention Center was accredited by the ACA on January 13, 2003. At that time, the Harrison County Adult Detention Center was the only county jail accredited in the State of Mississippi by ACA. In order to become accredited, Ed Hargett, an ACA auditor and expert in corrections, was hired to assist in implementing ACA standards and regulations into the then existing policies and procedures of the Harrison County Adult Detention Center. Subsequent thereafter, the Harrison County Adult Detention Center's Policies and Procedures were formulated and/or revised to meet ACA national standards and did so as of the date of the incident alleged in Plaintiff's complaint.

19.    Numerous actions were taken under my administration to implement the mandates of the Court Order.  The  following includes several of those measures: a)  $3,000,000.00 was obtained and spent on new locks, control panels, and surveillance systems at the Harrison County Adult Detention Center; b) with the assistance of the federal courts, I was able to hire eighteen (18) additional officers; c) Harrison County Adult Detention Center became the only ACA accredited jail in the State of Mississippi and through such accreditation process the Harrison County Adult Detention Center revised its policies and procedures in accordance with national standards; d) I hired full-time training staff and had a comprehensive  training program for the officers; e) enhanced the medical care staffing level by contracting with full-time health service providers and full-time licensed and qualified medical professionals.  Instituted policies and procedures regarding inmates' access to said health care services; f) enhanced the inmates access to the courts through its law library and by making Lexis Nexus resources available to the inmates; g) Good News Ministry and Life Learning Programs were brought to the jail and made available for the inmates; h) requested technical assistance from the National Institute of Corrections Jail Division; and i) complaints of excessive use of force were investigated according to policy and, when needed, were also referred to the Federal Bureau of Investigations.

20.    Upon the completion of the Department of Justice's compliance tour in December of 2004, I received a narrative from Steve Martin.  I did not receive Steve Martin's narrative dated February 1, 2005 until on or about July

20, 2005. I was deposed in this matter on October 1, 2009 and I stated I thought I had received this report back in February 2005; however, after the deposition and upon further review of documents related to Martin's narrative, I was mistaken and I did not receive the narrative until after July 20, 2005, as evident by the cover sheet attached hereto as **Exhibit "13"**.

21.     Upon receipt of the July 20, 2005 Department of Justice Report, which included the February 1, 2005, narrative from Steve Martin relating to 3 incidents of alleged inmate abuse during November of 2004, and 1 incident in December 2004, I called Dwight Johnson at the Federal Bureau of Investigations ("FBI") and informed him of all 4 incidents, so that the FBI could investigate or take the necessary action. Also, the Harrison County Sheriff's Department, Professional Standards Unit completed its investigation of the November 12, 2004 incident referred to by Steve Martin which involved inmate Joseph Towner. (See **Exhibit "14"** for a copy of IA Report 2004-29) As a result of this investigation, it was determined that no HCADC corrections officer physically assaulted Inmate Towner, but it was determined that deputies did engage in verbal harassment of Towner, in retaliation for Inmate Towner striking a HCADC deputy. These deputies were disciplined for their participation in the verbal harassment of Inmate Joseph Towner. (See Disciplinary Records collectively attached as **Exhibit "15"**)

22.     The Sheriff has never been held in contempt of this court's order in the consent decree. In addition, the National Institute of Corrections, after exhaustive interviews , policy reviews, and facility inspections certified that the HCADC policies met the standards for correctional facilities in the United

State.

23.    As the final policy maker of the HCSD, I have never authorized or condoned any policy, practice, or custom of using excessive force or of falsifying and/or covering up any acts done by officers of the HCSD.

24.    At no time was I ever deliberately indifferent to any detainee's rights, including the Plaintiff's.

27.    All policies attached hereto represent polices and procedures which were in place and effect at the time of the subject incident.

Further, Affiant sayeth not.

George Payne, Jr.

Sworn to and subscribed before me on this the _12th_ day of November, 2009.

Notary Public

My Commission Expires:

(SEAL)

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 5534
ROBIN D BUTLER
Commission Expires
Nov. 28, 2012
HARRISON COUNTY

*Harrison County Adult Detention Center*
*Policy & Procedure Directive*

## FACILITY GOALS, PURPOSE AND MISSION

**DEFINTIONS**
Facility Administrator refers to the Director of Corrections who is responsible for all Correctional facilities located in Harrison County.

**POLICY:**   The Harrison County Adult Detention Center is established in accordance with Harrison County Sheriff's Department Policies with the goals of:

    A. Ensuring public safety through the provision of professionally managed correctional services of confined offenders detained at the Harrison County Adult Detention Center.
    B. Providing a level and quality of programs at least equal to those provided by state-operated facilities that house similar types of inmates.

**MISSION STATEMENTS**

It is the mission of the Corrections Division to provide, in a cost effective manner, the highest degree of facility security and safety for the staff and inmates.  The philosophy of Corrections if predicated upon three assumptions:

    1.    Incarceration is, in and of itself, punishment;
    2.    All inmates shall be held accountable for their actions;
    3.    Inmates shall not leave the facility any worse physically, emotionally, or psychologically than when they entered.

A positive atmosphere shall be created for both the inmates and staff through the provision of:

    1.    A safe and secure environment;
    2.    Adequately trained Correctional personnel;
    3.    A variety of programs which provide inmates an opportunity to prepare themselves for eventual reintegration into their communities;
    4.    Positive incentives for inmates through a classification system.

The staff and management of the HARRISON COUNTY SHERIFF'S DEPARTMENT, Corrections Division are committed to the preservation of the basic human rights and dignity of the inmate population.  Our responsibilities are simply CUSTODY, CARE AND CONTROL of the inmate population detained in Harrison County.



**PROCEDURE:**

## I.  INSTITUTIONAL GOALS AND MEASURABLE OBJECTIVES

Harrison County Adult Detention Center Administrator shall, on an annual basis, establish goals and measurable objectives to successfully implement the Policy and Mission Statement of this Memorandum. These objectives shall be reviewed on at least an annual basis by the Harrison County Adult Detention Center Administrator or designee and re-formulated as deemed necessary. The initial goals shall include:

A. To seek and obtain ACA accreditation from the American Correctional Association.

B. Perform quarterly and unannounced audits to gauge the overall performance of the Harrison County Adult Detention Center departments. Audits shall include a review of policy and procedures to ensure practicability and soundness of operational procedures and to ensure compliance with procedural and mission requirements.

C. Perform daily accountability checks of security features to determine the operating status of the Harrison County Adult Detention Center and correct noted deficiencies in a timely manner.

D. Conduct staffing evaluations to determine the status of staffing deployment relative to functions and the need for increase or re-allotment of staff resources to correct noted deficiencies.

E. Develop and improve Management Information System to eliminate unnecessary expenditure of staff time and resources. Update information systems database to meet the overall needs of the institution and the operational needs of individual departments. The effectiveness of the information system as it relates to the overall institutional management will be evaluated in writing at least annually.

F. Substance Abuse Treatment is an important part of inmate programming; therefore, the goal shall be to encourage maximum participation by the inmate population.

G. Meet or exceed all standards defined by ACA contractual agreements.

_____          01 / 15 / 01
Facility Administrator                          Effective Date

*Harrison County Adult Detention Center*
*Policy & Procedure Directive*

## CODE OF ETHICS

**POLICY:**    It is the policy of the Harrison County Adult Detention Center that all employees conduct themselves in a manner that creates and maintains respect for themselves as well as the Harrison County Adult Detention Center.  In all their activities, personal and official, they should always be mindful of the high standards of behavior expected of them.  Therefore, employees shall avoid any action(s) which might result in, or create the appearance of, affecting adversely the confidence of the public in the integrity of the Harrison County Adult Detention Center.   It is expected that employees will discuss with their supervisors and/or superiors any problems arising in connection with matters within the scope of this policy.

**PROCEDURE:**

## I.    GENERAL INFORMATION

The Harrison County Sheriff's Department expects of its employees integrity and honesty, respect for the dignity and individuality of human beings and a commitment to professional and compassionate service.  To this end, we will be guided by the following code of ethics:

1.    Employees shall respect and protect the civil and legal rights of all individuals.

2.    Employees shall treat every professional situation with concern for the welfare of the individuals involved and with no intent of personal gain.

3.    Employees shall maintain relationships with colleagues to promote mutual respect within the facility and improve the quality of service.

4.    Employees shall make no public criticism of their colleagues or their facility.

5.    Employees shall respect the importance of all disciplines within the criminal justice system and work to improve cooperation with each segment.

**EXHIBIT**

"2"

6. Employees shall honor the public's right to information and share information with the public to the extent permitted by law subject to individuals' right to privacy.

7. Employees shall respect and protect the right of the public to be safeguarded from criminal activity.

8. Employees shall refrain from using their positions to secure personal privileges or advantages.

9. Employees shall refrain from allowing personal interests to impair objectivity in the performance of duty while acting in an official capacity.

10. Employees shall refrain from entering into any formal or informal activity or agreement which presents a conflict of interest or is inconsistent with the conscientious performance of duties.

11. Employees shall refrain from accepting any gifts, service or favor that is or appears to be improper or implies an obligation inconsistent with the free and objective exercise of professional duties.

12. Employees shall clearly differentiate between personal views/statements and views/statements/positions made on behalf of the facility or Sheriff's Department.

13. Employees shall report to appropriate authorities any corrupt or unethical behaviors in which there is sufficient evidence to justify review.

14. Employees shall refrain from discriminating against any individual because of race, gender, creed, national origin, religious affiliation, age, disability or any other type of prohibited discrimination.

15. Employees shall preserve the integrity of private information; they shall refrain from seeking information on individuals beyond that which is necessary to implement responsibilities and perform their duties; employees shall refrain from revealing non-public information unless expressly authorized to do so.

16. Administrators shall make all appointments, promotions and dismissals in accordance with established county policy, applicable contract agreements and individual merit rather than furtherance of personal interests.

_Riley_____          _01/15/01_____
Facility Administrator                            Effective Date

*Harrison County Adult Detention Center*
*Policy & Procedures Directives*

## GENERAL RULES OF CONDUCT

**POLICY:**   Employees of the Harrison County Adult Detention Center will obey all policies and procedures of the Harrison County Sheriff's Office as well as the policies and procedures contained in the Harrison County Juvenile Detention Center procedure manual.

**PROCEDURE:**

### I.    GENERAL INFORMATION

Shift Briefing:  The Shift Supervisor will conduct shift briefing and inspection 15 minutes prior to the beginning of each shift.  Personnel scheduled to work who are not present when shift briefing commences will be considered tardy.

Grooming:  All employees will be well groomed at all times following the Sheriff's Office policy regarding uniforms, clothing, hair length and style, facial hair, and the wearing of jewelry.

Courteous:  Employees will be courteous when dealing with the public, inmates, or co-workers.

Professionalism:  Professional behavior is required at all times.  Employees will not engage in any gossip or make any critical remarks that may be perceived as racial slurs or unprofessional behavior. Employees must refrain from fraternizing with people of questionable character on or off duty.

Inmate Treatment:  Employees will treat inmates with courtesy, dignity, and respect at all times.  Employees will be firm but fair when dealing with inmate's problems.  Employees must not form intimate relationships with inmates during nor after detention.

Tobacco Use:  Tobacco use is permitted in designated areas only.  The proper disposal of ashes, cigarette butts, spit cups, etc. is the responsibility of the user. Inmates are not allowed to use any tobacco products of any kind.  Employees nor visitor are permitted to give inmates cigarettes or any tobacco products.

Bulletins:  All personnel will read the bulletin board at the beginning and end of each shift to remain abreast of new orders, policies, etc.

**EXHIBIT**

"3"

<u>Timecards:</u>  Timecards will be completed daily.  All hours annotated on the timecard must reflect the exact hours that were worked.  Employees may not trade scheduled workdays with another employee unless both employees' Shift Supervisor grant prior approval.

<u>Facility Security:</u> Only Corrections Officers assigned to duty are allowed behind the counter, therefore, other individuals off-duty in that area must be on official business.

<u>Absences:</u>  An employee will be required to furnish a certificate from an attending physician for any sick leave used in excess of 3 consecutive days; On site medical evaluations may be offered by Shift Supervisor; Employees absent from work who fail to call in will be subject to disciplinary actions.

<u>Calling in Sick:</u>  When calling in sick, an employee must call his /her supervisor at least two hours prior to the beginning of the shift.  If unable to reach one of your supervisors an employee must call the facility and speak only with the Shift Supervisor on duty. An employee using sick leave which does not require hospitalization or medical attention will remain at his/her residence. Any change of status or location must be reported to the on-duty supervisor.

Employees placed on extended sick leave must advise his/her supervisor as soon as possible.  It is advisable to have the doctor's office fax excuse to your supervisor.

 No employee will be denied sick leave.  However, abuse of sick leave will be considered a serious violation and will be dealt with through disciplinary measures.  Abuse will be investigated based on the following circumstances:

1) Pattern of using sick leave before or after normal days off.
2) Pattern of using sick leave on weekends and/or holidays
3) Established pattern of frequent use of sick leave.
4) Pattern of using sick leave when special events occur in the city or surrounding area.

<u>Annual Leave, Military Leave, Training Leave Request:</u> Any employee requesting annual leave, military leave or a training leave must submit a leave request form at least 2 weeks prior to the date the requested leave is to begin.  Any employee scheduled to work on a traditional holiday or county scheduled holiday is expected to report as scheduled.  Depending on staffing needs, limitations may be placed on the number of employees who may be authorized leave at any given time.

**Facility Visits:**  No ex-employee of the Harrison County Sheriff's Office is allowed access inside the facility except in areas available to the general public.  Special visitors such as family members of employees may visit areas in the facility not accessible to the general public with approval from the Facility Captain or on duty Shift Supervisor.


_Riley_____          _7/27/01_____
Director of Corrections                Revision Date

*Harrison County Adult Detention Center*
*Policy & Procedures Directives*

## USE OF FORCE

**POLICY:**       All Corrections Officers assigned to duty in the Detention Center will use only those amounts of physical force necessary to maintain or regain control of an inmate. Use of force is clearly different from physical punishment that is not tolerated under any circumstances. In no event will physical force be considered justifiable as punishment.

**PROCEDURE:**    In order to give an inmate every opportunity to cease his or her disruptive or aggressive behavior and cooperate, the **Use of Force Theory** documented in **general Order # 10, 4,** will be followed, excluding Deadly Force (i.e., within the confines of the Detention Center.)

**I.    GENERAL INFORMATION:**

**General Order # 10,4**

**Use of Force Theory:**  Five categories of force applicable for corrections environment:

| | | |
|---|---|---|
| 1)  Dialogue | 2)  Escort Technique | 3)  Pain Compliance |
| 4)  Mechanical Control | 5)  Impact Weapon | |

Physical force will only be used as a last resort to control inmates.

All Corrections Officers will be trained in the proper application of physical force techniques.

**II.   Oleoresin Capsicum**

In the corrections environment, the use of Oleoresin Capsicum (O.C. Spray) may be used before or after Pain Compliance with any inmate who fails to comply with verbal orders and the inmate is yet uncontrollable. Only officers that are properly trained will be authorized use of O.C. Spray. Under no circumstances will O.C. Spray be used on an inmate while in approved

tabbles®

EXHIBIT "4"

restraints or behind a locked cell door. The effects may mask or cover other medical conditions such as allergies, heart conditions, lung problems, diabetes, and overdoses resulting from high toxic levels of drugs like Cocaine, Amphetamines, Barbiturates, PCP, Opiates, Heroin or Alcohol. Chemical agents like O.C. Spray is considered and intermediate use of force alternative.

## III.  Special Circumstances

In unique circumstances where verbal dialogue has failed or has proven to be impractical, staff may be forced to make a decision, such as whether to use force on a pregnant inmate or an aggressive inmate with open cuts, sores, or lesions. Special cases such as mentally ill, handicapped, or pregnant inmates must be carefully assessed by the Shift Supervisor or above, to determine whether the situation is critical enough to require the use of physical force.

**Pregnant Inmates** – When restraints become necessary for pregnant inmates, precautions to ensure the fetus is not harmed will be taken. Medical staff will be summoned immediately to decide whether the inmate's restraints are feasible for her condition, or whether the inmate would be safer restrained in the medical area.

**Inmates with Wounds or Cuts** – Aggressive inmates with open cuts or wounds who have attempted to harm themselves or others should be carefully approached , with staff wearing protective gear.

## IV.  MEDICAL EXAMINATION

Medical Staff will be immediately contacted to examine an inmate involved in an incident requiring the use of force which resulted in injury. An inmate's refusal or acceptance of an examination must be noted on the Incident Report. If injuries occurred, medical attention will be provided for the injured party. Force or restraint may be used when ordered by physician or his designee in order to allow medical staff to administer medical treatment deemed necessary. The force or restraint must be under the direct supervision of a physician & only when treatment is necessary to protect the health of other persons, as in the case of contagious disease or to protect the inmate against self-inflicted injury or death.

## V.  CLEAN-UP

Any area where there is spillage of blood, or other body fluids, will be sanitized immediately upon the authorization of the Shift Supervisor or above. However, the supervisor must first make the determination whether there is need to preserve evidence.

All blood and body secretions should be immediately removed and placed in an appropriate waste disposal container and the area washed with a disinfectant. In addition, any clothing that have been contaminated with these fluids, including the equipment and clothing of staff involved in the use of force, should be immediately disinfected or destroyed, as appropriate (Note: Assistance from the Medical area will be sought to assure proper handling of hazardous waste)

## VI.    DOCUMENTATION

Each officer involved will document force applied at any level on a Narrative Form. Officer viewing the use of force may be asked to write a narrative depending upon the circumstances. Complete narratives will be submitted to the Shift Supervisor at the conclusion of the shift.

**Use of Force Situations:** It is generally recognized that Corrections Officers have a right to use force as it relates to five situations.

1. Self- Defense: Correctional Officers may use force in their self-defense.

2. Defense of Third Party: Correctional Officers may use force in the defense of a third person, including another staff person, an inmate, or a visitor.

3. Prevention of a Crime: Correctional Officers may use force to prevent the commission of a crime within the facility.

4. Prevention of an Escape: Correctional Officers may use force to prevent an escape.

5. Enforcement of Detention Rules: Correctional Officers may use force in the enforcement of facility rules and regulations.

Force is intended to be used as a control measure when necessary. It will not be used for punishment. In the Use of Force Theory it is not required that an officer use the previous level on the continuum. By necessity, the level of force needed is most often made based on a quick assessment of the potential danger of the situation and the resources available. Typically the lowest level of force that will most quickly effect resolution and neutralize the danger is used. **All control force must cease as soon as the inmate is subdued, restrained or under control.**

## VII.    DEADLY FORCE

Firearms will only be used as a last resort to prevent an escape, to prevent life threatening injury to a person, to prevent hostages from Being taken or to quell a major disturbance. A verbal order to stop must be issued before a shot is fired. Firearms will not be discharged in any case where there is reason to believe that the life of an innocent bystander will be endangered.

Only employees with current certification will be allowed to carry firearms. No Corrections Officers will carry firearms or weapons on his/her person, concealed or not unless acting within the scope of official duties for the HCADC. Except in emergency situations, officers carrying firearms are assigned to perimeter.

_____          _____
Facility Administrator                   Effective Date

01/01/01

*Harrison County Adult Detention Center*
*Policy & Procedures Directives*

## USE OF RESTRAINTS

**POLICY:**    Restraints will be used as a precaution against escape, for medical reasons, when necessary to control inmates exhibiting violent behavior and for internal and external movement of inmates.

**PROCEDURE:**    For detention purposes, the basic authorized restraint devices are the pro-restraint chair, handcuffs, leg irons, waist chains, and medical restraints. Additional devices include items used by C. E. R. T. officers.

## I.    GENERAL INFORMATION:

A. No restraint device will be used by any staff member as a means of punishment.

B. Only staff members trained in the use of restraints may apply the authorized devices.

C. All restraining devices will be used in a humane manner, and applied only as long as absolutely necessary. At no time will restraints be applied in a manner often referred to as "hog tied." Nor will inmates be handcuffed to stair rails.

D. The use of medical restraints to prevent self-mutilation, self-injury or suicide, must be approved by a member of the medical staff. In an emergency situation, the Shift Supervisor will take the immediate actions necessary to control the situation and contact medical as soon as possible.

E. All inmates placed in any type of restraint will be closely monitored. Handcuffs and ankle shackles are temporary restraints devices. Inmates **will not** be cuffed and/or shackled & placed in a holding tank or cell indefinitely or without the permission of the Shift Supervisor or above.

**EXHIBIT**

**"5"**

**II.    APPLICATION OF MECHANICAL RESTRAINTS:**

All authorized restraints will be used in the following manner.

1.  Restraints will not be applied in a manner which causes undue physical discomfort, inflict pain, restrict blood circulation or breathing of the inmate. If at any time during the inmate's restraint an officer believes a medical problem may be developing he/she will immediately contact the on-duty supervisor and medical staff.

2.  Restraints will not be used about the head and/or neck of the inmate, except helmets designed for head protection.

3.  The maximum amount of continuous time a restraint may be applied to one individual is four hours. The Security Captain or above must authorize continued use of restraints for an inmate who remains unruly after four hours of being restrained.

4.  Restraints must be secured according to training and manufacture recommended usage.

5.  The Booking or Shift Supervisor must approve and will be present and directly supervise the placement and removal of a subject into the restraint chair.

**III.    RESTRAINT OBSERVATION:**

A.  Corrections Officers will maintain visual observation of the restrained inmate. A written five-minute activity log will be maintained for all inmates placed in the pro-restraint chair.

B.  Restraints will be checked for excessive tightness a minimum of once every 30 minutes. If a loss of circulation is detected, adjustment will be made as necessary. If an inmate complains of pain caused by restraints, the observing staff member will request an examination of the inmate from the medical staff.

C.  The Shift Supervisor will review the status and need for continued restraint of the inmate a minimum of once every two hours and will document the review on a narrative form.

D.  Any inmate who urinates or has a bowel movement while in the restraint chair or in medical restraint will be removed from restraint for cleaning as soon as possible under the circumstances.

**IV.    DOCUMENTATION:**

A. The Shift Supervisor is responsible for ensuring that Narratives and Observation Logs are completed.

B. Frequent Security checks and logs must be maintained anytime an inmate is in the pro-restraint chair.  Additionally, the Booking and Shift Supervisor or above must be contacted to approve or deny the use of the pro-restraint chair.

*Riley*
_____
Facility Administrator

01/01/01
_____
Effective Date



*Harrison County Adult Detention Center*
*Policy & Procedures Directives*

## HEALTH CARE SERVICES

**POLICY:**    All inmates incarcerated in the Harrison County Adult Detention Center will have access to medical, dental and mental health services as needed to maintain basic health.

**PROCEDURE:**

**I.     GENERAL INFORMATION**

Medical Care at the Detention Center is a contracted services with NAPH-CARE.

The Medical Staff are available on-site 24 hours per day, seven days a week.

The Medical Staff will deliver services as order by the contracted Physician.

Emergency treatment is available at the direction of Medical Staff.

The Health Service Administrator will submit monthly statistical reports to the Support Services Captain indicating the number of inmates receiving services.

There is a $5.00 fee for each physician, dentist and mental health visit.  Inmates WILL NOT be denied medical services because of an inability to pay.

It is the inmate's responsibility to request non-emergency medical services by completing a Medical Request Form and leaving it in Medical's box.

Medical staff will collect medical request forms daily and schedule inmates as soon as possible.

Corrections Officers must contact medical immediately if there is a medical emergency.

Health Evaluations will be performed by the medical personnel within 14 days of incarceration, FREE OF CHARGE.

If a requested medical procedure is not deemed a necessity by the doctor it will not be provided.

EXHIBIT

tabbies

"7"

Staff members of the facility will not take deliberate action designed to block, deny or delay access of an inmate to health care services.

Any time an inmate declines medical services, the refusal will be logged and filed as part of the inmate's permanent record.

Riley

_____          01/01/01
Facility Administrator                  Effective Date

General Order #10
Harrison County Sheriff's Department
January 3, 2000

George Payne, Jr, Sheriff

## WEAPONS & USE OF FORCE

1.   **SCOPE**

This policy is directed to all sworn personnel.

2.   **PURPOSE**

The purpose of this policy is to establish guidelines for sworn and reserve personnel regarding the use of force. This policy will also establish training criteria for both lethal and non-lethal use of force options.

3.   **POLICY STATEMENT**

The Harrison County Sheriff's Department recognizes and respects the value and special integrity of each human life. In vesting deputies with the lawful authority to use force to protect the public welfare, a careful balancing of all human interest is required. Therefore, it is the policy of this Department that deputies will use only that force that is necessary to bring an incident under control effectively while protecting the life of the deputy or another.

All sworn personnel will be provided with a precise departmental policy that establishes guidelines, proscriptions, and limitations on the use of force generally and the use of force in particular. Additionally, deputies will be trained in the appropriate and proficient use of force and the use of control and management of firearms and other non-lethal weapons.

4.   **USE OF FORCE THEORY**

The ability to use force is one of the most basic factors that distinguish deputies from the rest of society. Because of this responsibility, the use of force is under constant scrutiny by the public and the courts.

General Order #10—January 3, 2000                                            1



EXHIBIT

"6"

There are six (6) categories of force options that are available for depu-
ties     as a defensive tactic. They are:

A.  Dialogue for talking an individual into compliance with a lawful
request to avoid a physical confrontation.

B.  Escort Techniques are a means of providing a low level, non-threat-
ening and nonviolent compliance procedure used to remove an
individual from an area that may present danger to the deputy or
the subject.

C.  Pain Compliance involves the manipulation of a joint to cause pain.
It is generally used in circumstances in which an escort is inappropriate
or ineffective and yet a higher use of force level is not yet justified.

D.  Mechanical Control (a punch, kick, or throw) has a higher degree
of compliance; however, it also has a higher potential for injury to
the subject. It is only appropriate when the preceding levels of force
have been ineffective as a means of control.

E.  Impact Weapon (ASP TACTICAL BATON & PR-24) is an
intermediate level of force that bridges the gap between the use of
hands and fists and the use of deadly force.

F.  Deadly Force (firearms) is used as a final option when all other
means have been unsuccessful.

5.  DEADLY FORCE

A.  Deadly Force Defined - Deadly force is any use of force that is likely
to cause death or serious bodily injury.

B.  When May Deadly Force Be Used - Before using a firearm, a deputy
will identify himself and state the intent to shoot, where feasible.

C.  Deputies are authorized to fire their weapons to:

1.  Protect himself or others from what is reasonably believed to be
an immediate threat of death or serious bodily harm; or,

2.  Prevent the escape of a fleeing felon whom the deputy has
probable cause to believe will pose a significant threat to human
life should escape occur.

D.   Deadly force will not be intentionally used to maim or partially disable a person.

E.   Firearms will not be used as instruments of investigation. <u>The brandishing of a firearm is prohibited, as is the wearing of a sidearm in plain view in public by non-uniformed deputies, whether on or off duty, except at crime scenes or in emergencies</u>.

F.   Administrative Action

Where a deputy's use of force causes death, the Sheriff will determine, on a case by case basis, whether the deputy will be placed on administrative leave until all internal investigative requirements are met. The deputy will be required to undergo an evaluation by a mental health professional before return to normal duties.

G   Firearms may also be used:

To kill dangerous animals or to kill animals so badly injured that humanity requires its release from further suffering.

To give an alarm or call for assistance <u>when no other means is available</u>.

H.   Additional Restrictions –Deputies will adhere to the following restrictions when their weapon is exhibited:

1.   Except for maintenance or during training, Sheriff's Deputies will not draw or exhibit their firearm unless circumstances create reasonable cause to believe that it may be necessary to use the weapon in conformance with this policy.

2.   Warning shots are prohibited.

3.   Deputies will not fire their weapons at or from a moving vehicle unless there is an immediate threat of death or serious bodily injury to the deputy or other persons.

4.   Firearms will not be discharged when it appears likely that an innocent person may be injured.

General Order #10—January 3, 2000                                    3

I.    Animal Control Deputies – Animal Control Deputies of the Harrison County Sheriff's Department are exempt from the certain sections of this firearm policy and will follow the procedures as directed by the Sheriff or his designate.

In the event a deputy is called upon to destroy an animal, in a *non-emergency* situation, the deputy should request assistance from the on-duty animal control deputy. If the animal control deputy is unavailable, the deputy may continue with the humanitarian destruction of the animal. If the animal control deputy is on the scene, the deputy should relinquish control of the call to animal control and the destruction of the animal will be the responsibility of animal control. The animal control deputy's judgement shall be weighed heavily before any decision to destroy the animal.

*Deputies are expected to use their best judgement and good common sense when forced to destroy an animal that is obviously vicious or an immediate threat to the deputy or other citizens.*

J.    Restricted Acts – *Horseplay and unsafe acts with weapons are strictly prohibited.* When weapons are handed from one deputy to another for examination or inspection, they will be unloaded and have the cylinder or slide locked open. Shotguns will be transferred from one person to another with the action open and rifles will have the bolt back or action open.

6.    ISSUANCE OF FIREARMS

A.    Department Issued Weapons

The *Glock 22 safety-action semiautomatic pistol* will be issued to each deputy to be used in his official duty. At the time of the issuance, the serial number will be placed and maintained in a file kept by the Property Officer. The deputy will accept full responsibility for the care of the weapon. Two (2) additional ammunition clips will be provided for each deputy. Each deputy will keep the additional clips loaded and immediately available for use.

B.    Department Issued Leather Holsters

Besides the Glock 22 Safety Action pistol, the Department will issue each deputy a leather safety holster specifically designed for the weapon. The holster will be worn by all uniformed deputies while on duty. Deputies assigned to the Detective Division will be issued a holster designed for their particular needs.

General Order #10—January 3, 2000                                                    4

C. Personal Holsters / Nylon Duty Gear

Deputies who choose to wear nylon duty gear or Reserve deputies who purchase their own leather duty gear must select a holster that provides for a reasonable amount of security to prevent the weapon from accidentally falling out or to prevent its removal by a suspect. Any deputy using a holster that is not department issued must have the holster submitted to the Firearms committee for review before its use.

Upon separation from the department all deputies will surrender to the Property Officer all weapons, ammunition and related equipment previously issued to him.

7. NON-ISSUED DUTY WEAPONS

A. Full-Time / Part-Time Sworn Deputies

All deputies will be required to carry the Department issued firearm while on duty. Any deputy who wants to carry any weapon, other than department issued, must adhere to the following guidelines:

1. Number of Rounds

The deputy will be restricted to a revolver capable of chambering at least six (6) .38 caliber rounds or a semiautomatic double action pistol capable of chambering at least (7) seven 9mm, 380 caliber, forty caliber or forty-five caliber rounds unless assigned to special detail.

2. Weapon Brands

Colt, Smith & Wesson, Dan Wesson, Ruger, Beretta, Sig-Sauer or Safety-action Glock are acceptable.

3. Barrel Lengths

The weapon must have a barrel length between four (4) and six (6) inches.

4. Approval of Weapons

A "Weapons Authorization Form" must be completed and submitted. The Weapons Authorization Form requires approval by:

a. Department Armorer

b. NRA Certified Firearms Instructor

c. Firearms Committee Chairman

d. Sheriff

General Order #10—January 3, 2000                                      5

B.   Qualifications

Deputies will qualify with off-duty weapons quarterly during announced qualifications. The deputy must qualify with a minimum score of 75% with the weapon.

C.   Investigative Division Personnel

Deputies assigned to the Investigative Division may carry weapons with less than a four-inch barrel after submitting a written request, and Weapons Authorization Form as outlined within this policy.

D.   Reserve Deputies

1.   Number of Rounds

Reserve Deputies of the Harrison County Sheriff's Department, while on duty, will be restricted to a revolver capable of chambering at least six (6) .38 caliber rounds or a semiautomatic double action pistol capable of chambering at least (7) seven 9mm, 380 caliber, forty caliber or forty-five caliber rounds.

2.   Weapon Brands

The Reserve Deputy may carry personal weapons fitting into this category manufactured by either Colt, Smith & Wesson, Dan Wesson, Ruger, Beretta, Sig-Sauer or Safety-Action Glock which have a barrel length of between four (4) and six (6) inches. The weapon must be approved in the same manner as outlined within this policy.

3.   Qualifications

Reserve deputies will qualify with off duty weapons quarterly during announced qualifications. Reserve Deputies must qualify with a minimum score of 75%.

4.   Quarterly Qualifications

Reserve deputies wishing to carry a semiautomatic, double action pistol capable of chambering at least (7) seven 9mm, forty caliber, or forty-five caliber rounds must qualify with regular deputies quarterly.

E.   Request To Carry Personally Owned Weapon

Any deputy employed by the Harrison County Sheriff's Department wanting to carry a handgun other than those issued by the Harrison County Sheriff's Department must submit, in writing, a request to the Sheriff and the Firearms Committee Chairman. A "Weapons Authorization Form" must accompany the letter.

The Firearms Committee Chairman shall review the request to ensure that it complies with the policy. The deputy's letter of request and the Weapons Authorization Form either approving or disapproving the request will be sent to the Sheriff. If the request does not comply with established policy, the Firearm's Committee Chairman will attach a memo to the request explaining the reason for denying the deputy's request.

F.   Off-Duty / Back-up Weapons

Backup guns or off-duty guns must be approved by the Sheriff. All requests to carry off-duty or back-up weapons will be handled in the manner as outlined within this policy.

8.   CARRYING OF FIREARMS

A.   Deputies Required to be Armed at all Times

All on-duty sworn personnel will have a weapon or weapons on their persons at all times. Although certain hours are designated as off-duty, deputies in the performances of their police duties are subject to take police action anytime and should have available his official identification and a firearm at all times. This section shall apply to both regular and reserve deputies of the Harrison County Sheriff's Department. Sworn, on-duty deputies will have a clearly articulable reason for not being armed.

B.   Exceptions

On-duty deputies will be armed at all times with very few exceptions. These exceptions may include court appearances, entering onto certain Federal jurisdictions, entering into the jail section of the Harrison County Sheriff's Department, the psychiatric ward of Memorial Hospital & the locked ward of the Transitional Learning Center (TLC). In these and other circumstances, the deputy will be expected to use discretion, good judgement and above all, common sense.

General Order #10—January 3, 2000                                      7

9.  AMMUNITION

All ammunition carried by deputies of the Harrison County Sheriff's Department and Reserves, whether department issued or individually purchased, will be factory loaded of the anti-personnel design, i.e., hollow point. All special purpose ammunition such as armor piercing, etc. may be carried by the deputy *as standby ammunition only*. The Firearms Committee Chairman must approve all ammunition, other than department issued, before being carried. The carrying of target type ammunition, such as wad-cutters and solid lead round nose bullets, is *STRICTLY* prohibited.

Every sworn deputy will be issued 120 rounds of ammunition at the time the weapon is issued. Sixty (60) rounds will be used for the initial qualification. The remaining 60 rounds will be kept by the deputy for duty purposes. Deputies will be given sixty (60) rounds of new ammunition once a year. The old ammunition will be used during the qualification.

10.  SHOTGUNS, RIFLES AND SPECIAL PURPOSE WEAPONS

Weapons falling into the above category, whether department issued or privately owned, must be approved and qualified with before being carried. The Firearms Committee must also approve all modifications to these weapons. While being carried on duty, these weapons, when not in use, must be secured within the vehicle.

A.  Authorized Weapons

All weapons fitting into this category must be manufactured by Colt, Ruger, Beretta, SpringField Armory, Eagle Arms, H & K, Remington, Daewoo, Bushmaster or Galile.

B.  Authorized Calibers

The following calibers are approved:

223, 9mm, and 7.62 mm x 39

C.  Weapons Approval

All requests to carry the above-described weapons must be submitted on a Weapon Authorization Form along with *written justification* for the request. The committee will consider no weapons unless it falls within the above guidelines.

D.   Shotguns

Shotgun ammunition will be factory loaded of the "*00 buckshot*" or "*slug*" category in a size approved by the Firearms Committee. Special purpose ammunition, such as barricade penetrating tear gas rounds, may be carried in reserve. Deputies who carry weapons in the above category must use good judgement and common sense when using these weapons. The potential for harm to bystanders is greatly increased by their use. Only *EXTREME* situations would warrant the use of the above-described weapons; i.e., barricaded armed suspects, tactical situations, etc.

11.   TRAINING AND INSPECTION

Firearms will not be issued or carried by any deputy until the Sheriff and firearms training deputies are assured of the deputy's ability to handle and fire the weapon with safety and proficiency.

All full-time and part-time sworn deputies will be required to participate in an approved semiautomatic transition course before being issued the Glock 21 Safety-Action pistol. After the initial certification with the weapons, all personnel, except administrative and staff personnel, will be required to participate in firearms training monthly. All personnel including administrative and staff personnel will be required to qualify quarterly using the N.R.A. Distinguished expert course on a date and time designated.

Administrative personnel are those deputies who work from 8:00 a.m. to 5:00 p.m., Monday through Friday and perform administrative duties as designated by the Sheriff.

A.   Qualifications

The Firearms Training Center O.I.C. shall coordinate all monthly & quarterly qualifications. The O.I.C. will schedule training classes for tactical and close quarter confrontations, shotgun training, rifle training and mandatory NRA firearm qualifications. The dates & times of each qualification will be coordinated through the O.I.C. of Training & Planning and announced to all designated personnel.

B.   Reserve Qualification

Reserve Deputies will qualify three (3) times per year. Reserve Deputies failing to qualify will be required to retest with a Certified NRA Instructor until the minimum score is attained before re-turning to duty. The retesting is not necessarily required to be done on the same day as the regularly scheduled qualifications.

General Order #10—January 3, 2000                                          9

C.   Firearms Committee Meeting

The Firearms Committee Chairman will call a meeting of all
firearms instructors on the Wednesday preceding the quarterly
qualifications.

D.   Firearms Inspections

The firearms training deputy will inspect each individual deputy's
weapons and related equipment during the firearm's qualification
session. In addition the deputy may be required to produce his
weapons for inspection at anytime by any supervisory person or a
department designated firearms instructor.

12.  PR-24 & ASP TACTICAL BATON

The ASP PR-24 Tactical Batons are used to give deputies an
inconspicuous but effective defensive police impact weapon for use in
non-lethal situations. Both impact weapons are authorized for use by
sworn personnel following basic certification; however, the ASP Tactical
baton is the only Department issued impact weapon.

A.   Issuance of ASP Tactical Baton

Upon completion of the ASP Basic Certification Program, all
deputies will be issued one (1) ASP Tactical Baton and ASP
Scabbard that shall be issued by the Property Oeputy. Upon
issuance, all deputies, while in uniform, will be required to carry
the ASP Tactical Baton.

B.   ASP Basic Certification Training

All deputies issued an ASP Tactical Baton will be required to
complete a four- (4) hour basic certification course before carrying
the ASP Tactical Baton. This program is designed to provide
efficient defensive weapon tactics for law enforcement personnel.
Deputies of the Harrison County Sheriff's Department who have
completed an instructor certification course shall teach the basic
training. The ASP Tactical Baton is a non-lethal defensive weapon
allowed for use by sworn deputies to provide a force option between
hands and fists and the use of deadly force.

General Order #10—January 3, 2000                                    10

Deputies must maintain control at all times. Every technique must be evaluated as for its likelihood of gaining control as compared with its likelihood of causing harm to the subject. Deputies must maintain a high degree of control so that if a higher force option is needed, the deputy is prepared for the situation. When evaluating a technique, the most important consideration is deputy safety. This involves his or her ability to disengage or escalate a response to any given situation. Any technique that does not allow the deputy to escalate the force option in response to a subject's threats is unacceptable.

C.    Maintenance

The ASP Tactical Baton should be maintained on the same manner as your firearm. Batons should be kept dry. Due to the exposure to salty air, water and perspiration, the baton should be periodically opened and dried with a soft cloth. The butt cap, or plug, should be checked to make sure it is screwed tightly onto the handle. The tip should be checked for looseness. If the tip breaks loose, Loc-Tite should be applied to the threads to secure it to the end section. The baton should be periodically checked for hairline fractures or excessive wear between the sections. Fractures may occur if the baton is continually opened with too much force.

D.    ASP Tactical Baton Operation

Holding the handle and snapping the wrist activates the ASP Tactical baton. This action causes the blade to extend. The sudden snap of the wrist locks the shaft into place. To close the baton, the tip must be struck sharply and directly into a nongiving surface. When closed, the retaining spring in the handle holds the blade, preventing accidental extension.

The force necessary to open the baton may be adjusted using the retaining spring inside the handle. Extending the sides of the spring outward will increase the force necessary to open the baton. Pushing the sides of the spring together will lessen the force needed to extend the baton.

E.    Carrying the ASP Tactical Baton

Every deputy will carry the ASP Tactical Baton while in uniform. It may be carried on either the reaction side or the weapon side of the body. It will be carried in the closed mode, tip down. As with firearms, horseplay and unsafe acts with the ASP Tactical Baton are strictly prohibited. The ASP Tactical Baton will not be used as an instrument of investigation.

General Order #10—January 3, 2000                                    11

F.    Weapon Disarming

The ASP disarming technique is designed to deal with non-aggressive assailants effectively. It is not intended for deputies to use the ASP Tactical Baton to disarm an aggressive armed assailant. The ASP Tactical Baton should only be used when a deputy believes that the use of deadly force is not justified and the deputy believes that using the ASP Tactical Baton may successfully disarm the subject.

G.    Use of Force Documentation

Proper documentation is essential in avoiding potential liability. Any time a firearm or ASP Tactical Baton is used; the deputy will be responsible for completely documenting the circumstances surrounding their usage.

While reports may vary from deputy to deputy in form, the following details should be included in every report:

1.    The type of call that first brought the deputy in contact with the subject.

2.    The number of persons involved in the situation.

3.    The time of day and physical setting of the call.

4.    What the subject said to the deputy.

5.    The subjects general demeanor and attitude.

6.    What the deputy said to the subject.

7.    The subjects actions and reactions and those of the deputy.

8.    A detailed report of all injuries sustained by the deputy and the subject, including photographs, if possible.

9.    The names, addresses, and phone numbers of all neutral witnesses not involved in the confrontation.

In addition to the above information, deputies will complete a *Use of Force Report* and attach it to the incident paperwork. A copy will be forwarded to the Director of Operations and the Sheriff. Deputies will as soon as practical, report all uses of firearms and the ASP Tactical Baton to his or her immediate supervisor.

13.  PEPPER AEROSOL RESTRAINT SPRAY

The Harrison County Sheriff's Department will issue OC aerosol restraint spray to give deputies additional use-of-force options for gaining compliance or resistant of aggressive individuals in arrest and other enforcement situations. It is the policy of the Harrison County Sheriff's Department that deputies use OC when warranted, but only according to the guidelines and procedures set forth in this policy.

A.  Authorization

1.  Only deputies who have completed the prescribed course of instruction on the use of OC are authorized to carry the device.

2.  Deputies who have successfully completed the prescribed course of instruction and whose normal duties or assignments may require them to make arrests or supervise arrests shall be required to carry departmentally authorized OC while on duty.

3.  Uniformed deputies shall carry only departmentally authorized canisters in the prescribed manner on the duty belt. Non-uniformed deputies may carry OC in alternative devices as authorized by the department

B.  Usage Criterion

OC spray is considered a use of force and shall be employed in a manner consistent with the department's use-of-force policy. OC is a force option following verbal compliance tactics on the use-of-force continuum.

OC may be used when:

1.  Verbal dialogue has failed to bring about the subject's compliance, and

2.  The subject has signaled his intention to resist the deputy's efforts to make the arrest actively.

Whenever practical and reasonable, deputies should issue a verbal warning before using OC against a suspect. A deputy may use deadly force to protect him from the use or threatened use of OC when the deputy reasonably believes that deadly force will be used against him if he becomes incapacitated.  Once a suspect is incapacitated or restrained, use of OC is no longer justified.

C.  Usage Procedures

1.  Whenever possible, deputies should be upwind from the suspect before using OC and should avoid entering the spray area.

2.  Deputies should maintain a safe distance from the suspect of between two and ten feet.

3.  A single spray burst of between one and three seconds should be directed at the suspect's eyes, nose and mouth. Additional burst(s) may be used if the initial or subsequent burst proves ineffective.

4.  Use of OC should be avoided, if possible, under conditions where it may affect innocent bystanders.

D.  Effects of OC and Deputy Response

1.  Within several seconds of being sprayed by OC, a suspect will normally display symptoms of temporary blindness, have difficulty breathing, burning sensation in the throat, nausea, lung pain and/or impaired thought processes.

2.  The effects of OC vary among individuals. Therefore, all suspects shall be handcuffed as soon as possible after being sprayed. Deputies should also be prepared to employ other means to control the suspect to include, if necessary, other force options consistent with agency policy, provided he does not respond sufficiently to the spray and cannot otherwise be subdued.

3.  Immediately after spraying a suspect, deputies shall be alert to any indications that the individual needs medical care. This includes, but is not necessarily limited to, breathing difficulties, gagging, profuse sweating and loss of consciousness. Upon observing these or other medical problems or if the suspect requests medical assistance, the deputy shall immediately summon emergency medical aid.

4.  Suspects that have been sprayed shall be monitored continuously for indications of medical problems and shall not be left alone while in police custody.

5.  Deputies should provide assurance to suspects who have been sprayed that the effects are temporary and encourage them to relax.

General Order #10—January 3, 2000                                    14

6. Air will normally begin reducing the effects of OC spray within 15 minutes of exposure. However, once the suspect has been restrained, deputies shall help him by rinsing and drying the exposed area.

7. Assistance shall be offered to any individuals accidentally exposed to OC spray and feel the effects of the agent. All such incidents shall be reported as soon as possible to the deputy's immediate supervisor and shall be detailed in an incident report.

E. Reporting Procedures

1. Accidental discharges and intentional uses of OC spray against an individual in an enforcement capacity shall be reported to the deputy's immediate supervisor as soon as possible.

2. A detailed narrative report shall be completed following all discharge of OC spray except during testing, training, malfunction or accidental discharge.

F. Replacement

1. Assigned personnel shall maintain all OC spray devices in an operational and charged state. Requested replacements for damaged, inoperable or empty devices are the responsibility of deputies to whom they are issued.

2. Replacements of OC spray canisters shall occur when the unit is less than half full, as determined by weighing the canister.

3. OC canisters shall be inspected and weighed at the firing range during firearm qualifications. The appropriate agency authority shall maintain a record of this fact.

4. Unexplained depletion of OC canisters shall require an investigation and written report by the deputy's supervisor to the Director of Operations.

14. SPIT NETS

The SPIT Net manufactured by Eagle Gear, is the authorized expectorant shield used by the Harrison County Sheriff's Department for violent, in-custody subjects who are either spitting at law enforcement personnel or who are violent and bleeding from the mouth or head area. The SPIT Net is considered a form of restraint. It prevents a prisoner, in a safe and humane manner, from projecting body fluids onto police personnel. The SPIT Net is made from nylon mesh and is large enough to fit over the head & tied in the back. It is designed to allow unrestricted breathing & prevent body fluids from contacting the deputy.

General Order #10—January 3, 2000                                          15

The following operational guidelines will become effective immediately:

A.   Purpose – The SPIT Net is a biohazard barrier designed to reduce the risk of exposure to:

    1.   HIV (Aids)

    2.   Hepatitis

    3.   Tuberculosis

    4.   Highly dangerous disease pathogens

B.   The SPIT Net also acts as a safe deterrent against:

    5.   Biting;

    6.   Spitting;

    7.   And other aggressive behaviors without impairing the deputy's ability to monitor the suspect's physical condition at all time.

C.   General Guidelines

    1.   The SPIT Net installation illustration shows the proper method of attaching the SPIT Net to a suspect.

    2.   **THE SPIT NET WILL NEVER BE TIED AROUND THE SUSPECT'S NECK FOR ANY REASON.**

    3.   If the SPIT Net cannot be properly secured as shown in the illustration, it will not be used. The SPIT Net may be used any time a suspect demonstrates to the deputy any aggressive behavior or symptoms of any of the above described conditions.

    4.   Anytime the SPIT Net is used, deputy's will continually monitor the suspect to ensure that it does not become entangled around the suspect's neck or become a hazard to the suspect's safety in any way.

        <u>At no time will the prisoner be left alone and unmonitored.</u>

    5.   The SPIT NET is to be discarded after use and is not to be reused for any reason.

    6.   The use of the SPIT Net will be documented in the deputy's arrest or narrative report describing the circumstances for its use.

    7.   The SPIT Net will be removed from the prisoner as soon as it is believed to be safe or as directed by a supervisor

General Order #10—January 3, 2000                                                16

15. TRAINING COURSES

The handgun certification course will be based upon the *NRA Distinguished Expert Qualification Course*. Certification with the shotgun will be made using the *NRA Police Shotgun Qualifications Course*. This course includes 5 rounds of rifled slugs and 5 rounds of *00 buckshot*, using the International Association of Law Enforcement Firearms Instructors (IALEFI–Q) target.

The deputy will be required to attain a minimum score of 75% for pistols. A minimum score of 80% will be required for rifles. Seventy-five (75) percent is the current minimum standard for police pistol qualifications as determined by the National Rifle Association. The failure to reach this level of proficiency will require the deputy to return to the range with a firearms training deputy until the minimum score can be obtained. If the deputy evidently cannot qualify within a reasonable length of time, the firearm's instructor shall notify the Sheriff and the Firearms Committee for further action.

Training Documentation - All training and certification must be documented and forwarded to the Training Deputy for filing.

16. CARE AND MAINTENANCE

All deputies are required to maintain their firearms properly. The Fire arms Committee prohibits alterations except those specifically authorized, in writing. The department will pay any repairs to department issued weapons, which are due to normal, wear or an unavoidable accident. All repairs of department issued weapons that are the result of abuse, negligence, or lack of care by the deputy will be the financial responsibility of the deputy. Damage to personal weapons through normal wear is the responsibility of the deputy. The department, however, will repair damage to personally owned weapons sustained due to faulty practice ammunition.

The property officer is responsible for maintaining all department weapons that have not been issued to a deputy.

17.  QUALIFICATION COURSES

| STAGE | DIST. | POSITION | #RDS | TIME |
|---|---|---|---|---|
| 1 | 25 yrds | Kneeling/standing 6 rounds kneeling with barricade, 12 rounds with barricade (Shooters choice of positions) | 18 | 75 second |
| 2 | 15 yrds | Stage 1:  Kneeling/Standing 12 rounds in 25 seconds (6 kneeling & 6 standing) | 18 | 25 second |
| 3 | 7 yrds | Standing/Unsupported | 12 | 20 second |
| 4 | 3 yrds | Standing (Ready gun Position) one hand only! | 12 | 20 second |

NRA
Police Shotgun Qualification Course

```
┌─────────────────────────────────────────────────────────┐
│                      RIFLED SLUGS                         │
│                                                           │
│  (1)   50 yards    —   1 round, standing from shoulder    │
│                                                           │
│        Time limit  —   10 seconds                         │
│                                                           │
│                                                           │
│        40 yards    —   2 rounds, 1 standing from shoulder, 1 │
│                        kneeling                           │
│                                                           │
│        Time limit  —   15 seconds                         │
│                                                           │
│        25 yards    —   2 rounds, 1 kneeling, 1 standing from │
│                        shoulder                           │
│                                                           │
│        Time limit  —   15 seconds                         │
│                                                           │
└─────────────────────────────────────────────────────────┘
```

```
┌─────────────────────────────────────────────────────────┐
│                      00 BUCKSHOT                          │
│                                                           │
│  (2)   *25 yards   —   3 rounds, 1 standing from shoulder, │
│                        2 kneeling                         │
│                                                           │
│        Time limit  —   20 seconds                         │
│                                                           │
│        15 yards    —   2 rounds, 1 standing from shoulder, 1 │
│                        kneeling                           │
│                                                           │
│        Time limit  —   20 seconds                         │
│                                                           │
│                                                           │
│        *25 yards only . . . Magazine loaded, safety on,   │
│                             chamber empty                 │
│                                                           │
└─────────────────────────────────────────────────────────┘
```

General Order #10—January 3, 2000                    19

Scoring

Rifled Slugs: IALEFI-Q Target, Each hit within the inner ring – 2 points, any hit within the second ring – 1 point. All other hits are scored as a miss.

00 Buckshot (9 or 12 pellets): No other load is allowed! IALEFI-Q Target, any hit in the black – 2 points for 9 pellets; 1.5 points for 12 pellets.

## MINI – 14 RIFLE COURSE

STAGE 1:
> Ten rounds in one (1) minute from the kneeling position

STAGE 2:
> Ten rounds in one (1) minute from the sitting position

STAGE 3:
> Ten rounds in one (1) minute from the prone position

STAGE 4:
> Start with two (2) magazines, each loaded with 5 rounds. Fire 5 rounds standing, unsupported, change magazines, and fire 5 rounds from the prone position. (one (1) minute time limit).

STAGE 5:
> Start with two (2) magazines, each loaded with 5 rounds. Fire 5 rounds standing, unsupported, change magazines, and fire 5 rounds from the prone position. (one (1) minute time limit).

All firing is done from the 50 yard line using the IALEF-Q target.

SCORING

- A hit in the X, 10 or 9 ring counts 2 points each:
- A hit in the 8 ring counts 1 point each
- Any other hit on the target counts as a miss
- Fifty shots are fired..........Total possible score is 100

General Order #10—January 3, 2000                         20

## NIGHT FIRING

### 20 rounds – 100 points

100 YARD LINE
    Prone                 5 rounds on call
    No Time Limit

50 YARD LINE
    1. Prone            5 Rounds w/magazine change
    3 seconds

    2. Stand to Kneel    5 rounds on call
    No Time Limit

25 YARD LINE
1. Standing Ready       3 rounds on call
    No Time Limit

2. Stand to Kneel      2 rounds w/magazine change
    No Time Limit

### A SCORE OF 80% IS REQUIRED TO PASS BOTH COURSES

16.  SHOOTING REVIEW BOARD

    A.  When Required

    When a deputy, either on or off duty, discharges a firearm (except during qualifying or target practice), a written report shall be submitted within 24 hours to the deputy's immediate supervisor. The report shall explain the circumstances and reasons surrounding the discharge as outlined in this policy.

    B.  Actions Required

    The Shooting Review Board will be convened to review all facts and circumstances surrounding the events of the discharge of the weapon in the event of property damage, bodily injury or death and in all enforcement actions. This board shall, at the end of its inspection, submit a written report to the Sheriff listing the following:

    1.  A synopsis of the incident.

    2.  Conclusion as to whether the deputy followed or deviated from department regulations.

    3.  Any recommendations to the Sheriff concerning the incident.

    C.  Shooting Review Board Personnel

    The Shooting Review Board shall be composed of the following personnel:

General Order #10—January 3, 2000                  21

       1.  The Firearms Committee chairman and two (2) members of the Firearms Committee.

       2.  The Sheriff or his designees.

   D.  Administrative Investigations

The Harrison County District Attorney's Office shall be responsible for conducting an independent investigation of all shootings involving deputies of the Harrison County Sheriff's Department. The Sheriff may request other independent investigations by the Mississippi Highway Safety Patrol. HCSD Professional Standards Division will investigate all other incidents not involving discharge of firearms.

## 17. FIREARMS COMMITTEE

  A.  The Firearms Committee will consist of the following personnel:

      1.  Firearms Chairman – Must be an NRA certified instructor and must be elected by other NRA certified firearms instructors. This is a voluntary position and the deputy selected will hold the position for one-year (July to July).

      2.  Firearms Instructors – Six instructors are required for the committee. All must be NRA certified.

## CONCLUSION

This policy is for departmental use only and is not intended for use in any criminal or civil proceeding. The department policy should not be construed as a creation of higher legal standards of safety or care in an evidentiary sense with respect to third party claims. Violations of this policy will only form the basis for departmental administrative sanctions.

The Harrison County Sheriff's Department recognizes that extreme or unusual circumstances may occur that would cause a deputy to deviate from this policy. Deputies are frequently required to make immediate judgement calls that may not comply with the use of force policy. In the event that a deputy must take an action that does not comply with this policy, the deputy will fully articulate & justify, in writing, the reasons for his or her actions. In all cases, the Department will fully review the incident to determine if there was sufficient justification for the deputy's actions.

General Order #10—January 3, 2000                       22