General Order #65
Harrison County Sheriff's Department
October 1, 2002

*[signature]* George Payne, Jr, Sheriff

## PROFESSIONAL STANDARDS UNIT

1. **PURPOSE**

    The purpose of this order is to establish the policy for managing and staffing the Professional Standards Unit of the Harrison County Sheriff's Department. This policy will outline the procedures for investigating complaints of misconduct.

2. **SCOPE**

    This policy is directed to all department personnel.

3. **POLICY**

    The Harrison County Sheriff's Department Professional Standards Unit shall be responsible for conducting internal administrative investigations and applicant background development.

    This policy shall define the methods of investigation and discipline in order to ensure the protection of employees' rights through the conscientious investigation and ultimate disposition of each inquiry. This policy shall ensure the integrity of the department by establishing procedures that provide an investigation of any matter that might affect the efficient, professional operation of the department, and mandated compliance with all general orders.

    A. Internal Investigations Authority

    Internal inquiries and investigations are performed under the authority of the Sheriff. The Professional Standards Unit shall have the primary responsibility of investigating complaints of alleged employee misconduct. The Professional Standards Unit will operate under the supervision and direction of the Sheriff. All orders written or verbal issued in connection with any internal investigation shall be considered as direct orders from the Sheriff. The final authority to exonerate, declare unfounded, not sustained, or to sustain any complaint rests solely with the Sheriff. Internal inquiries are administrative and should not be construed as criminal investigations.

General Order #65 - October 1, 2002                                    1

EXHIBIT
"8"

B. Disciplinary Review

Members of the Professional Standards Unit may be required to attend Disciplinary Review Hearings subsequent to internal investigations. The sole purpose will be to provide the facts and circumstances surrounding the respective cases.

C. Civil Service Meetings

A representative of the Professional Standards Unit may be requested to attend regular or special civil service meetings for providing insight on disciplinary actions occurring inside the department. The representative's responsibility is solely to inform the Civil Service Commissioners of results of particular investigations.

D. PSU Area of Investigative Responsibility

The Professional Standards Unit will investigate serious or sensitive allegations of misconduct and incidents resulting in actual or potential litigation against the county, the Sheriff's Department or employees of the Sheriff's Department. Any such investigation shall be performed under the guidelines of appropriate county policies and Mississippi Statutes.

Legal Action

The Professional Standards Unit may investigate any pending legal action against the department or it's employees. Upon receipt of such information, a case file will be established which will contain all pertinent information on the action and any request for information.

E. Shift Supervisor Area of Responsibility

The appropriate immediate supervisor will investigate complaints of less serious violations. This assignment shall not relieve the Professional Standards Unit from lending assistance when requested or monitoring the investigation.

The Supervisor receiving an external complaint or filing an internal complaint is responsible for preserving evidence to include taking documentary photographs when practical and possible. The Supervisor shall take photographs of complainants in all excessive force complaints even if injuries are not visibly present.

General Order #65 - October 1, 2002                                    2

F. Complaints:

*All external complaints will be documented on a Citizen Complaint Form.*
Complaints may be received in a variety of ways including, but not
limited to: (a) in person (b) by mail (c) telephone (d) email (e) third party
*Anonymous complaints are investigated, but have limitations caused by the*
*inaccessibility of the complainant.*

### Procedure for Citizen Inquiry

A citizen alleging misconduct on the part of any employee shall be
directed to the supervisor on duty regardless of the time of day.  The
supervisor may be able to resolve the complaint without the assistance
of the Professional Standards Unit.  Many complaints of alleged
misconduct can be handled by the Shift Commander or a supervisor,
provided it is done in a professional and timely manner.  Unless the
complaint involves gross misconduct or a criminal violation, the Shift
Commander or supervisor should make every attempt to resolve the
matter without involving the Professional Standards Unit.

If the shift supervisor cannot resolve the complaint satisfactorily or there
is an allegation of a criminal nature, the shift supervisor shall complete
the Citizen Complaint Report and forward this form to the Professional
Standards Unit without delay.

In the event a citizen directly contacts the Professional Standards Unit
when initially registering the complaint, the Professional Standards Unit
will be responsible for referring the complaint to the affected supervisor
or completing the Citizen's Complaint Report and other necessary
documentation.

### Traffic Citations/ Arrests

Complaints relative to differences of opinion between an officer and a
citizen over the issuance of a traffic citation or regarding guilt or
innocence subsequent to an arrest, shall not be investigated by the
Professional Standards Unit, but will be properly handled by the judicial
system.

G. Use of Citizen Complaint Report

1. Personnel receiving the complaint shall have the citizen sign the
   Citizen Complaint Report in their presence.  The substance of the
   complaint shall be documented in the appropriate section of this form.

General Order #65 - October 1, 2002                                    3

2. Under no circumstances shall the Citizen Complaint Report be used as a means to threaten, intimidate, harass or discourage a citizen from making a complaint.

3. Should the citizen refuse to sign the complaint report, the receiving supervisor shall complete the report and document the refusal to sign. A memorandum concerning the allegations shall also be made. The report shall be signed in the space provided for supervisor receiving the complaint. The completed report shall be forwarded to the Professional Standards Unit without delay.

H. Internal Complaint Procedure

In furtherance of the intent of this policy, any employee may submit a written statement, documenting employee misconduct, directly to the Professional Standards Unit which shall process the complaint in accordance with this general order.

I. Written Counseling Form

Written Counseling Forms shall be utilized to document an employee's unsatisfactory performance or to document an incident involving employees. Written Counseling Forms in some cases shall serve as a written consultation. A copy of all the internal complaints or incidents shall be forwarded to the Professional Standards Unit.

If the supervisor believes the complaint, either external or internal, is of such a serious nature that it requires immediate attention, or he needs assistance, he shall contact the Sheriff or the appropriate Director within his chain of command, who shall determine if the complaint requires immediate assistance or the assignment of personnel from the Professional Standards Unit. If the appropriate Director deems that the complaint should be investigated by the Professional Standards Unit, the Director shall make the request to the Sheriff.

J. Initial Investigation Procedures

1. Upon receipt of the documentation and approval of the Sheriff, the Professional Standards Unit shall determine which general order(s), policies or statutes were violated.

2. Should a formal investigation be ordered, an *Initial Notice of Inquiry Report* shall be drafted and forwarded to the affected employee through the chain of command, except under the following circumstances:

   (a) The alleged violation is ongoing.
   (b) The investigation possibly would be compromised by the release of the information.

General Order #65 - October 1, 2002                                    4

3. Garrity warnings shall be given to employees and signed prior to all formal interviews whereby the possibility of criminal conduct may be alleged. When there is no criminal conduct alleged, employees interviewed by the Professional Standards Unit will be advised of the authority of the investigation as well as requirements of complete truthfulness and candor. This will be documented on an audio recording tape.

K. Classification of Allegations

The Professional Standards Unit investigator shall, in the Internal Investigative Report, recommend 1 of the following 5 classifications:

1. Unfounded- the allegation is false or not factual.

2. Exonerated- the incident occurred, but was lawful and proper.

3. Not Sustained- there was insufficient evidence to prove or disprove the allegation.

4. Sustained- the allegation is supported by a preponderance of evidence to justify a reasonable conclusion that the incident did occur.

5. Policy Failure- the policy was not specific or did not cover this incident.

L. Internal Investigations

1. Internal Complaints will be assigned an IA# by the Professional Standards Unit OIC.

2. The complaint will then be assigned to a Professional Standards Unit Investigator by the OIC.

Each internal investigative report will contain:

1. The general order(s) violated.
2. The details in chronological order, addressing each point of accusation.
3. A synopsis of each witness statement.
4. Mitigating circumstances, if appropriate.
5. Recommended classification of the allegations

M. Case File Preparation:

*Unless special circumstances occur, all internal investigations must be completed within thirty days. An extension may be given by the Professional Standards Unit OIC or the Sheriff.*

General Order #65 - October 1, 2002                                    5

Each case file and report will contain the site or copies of the general orders violated. In addition, each case file will include letters and memos relevant to the investigation. All reports must include an investigator's finding and conclusions. Findings and conclusions should be a summary listing of relevant conclusions drawn by the investigator based on facts and circumstances of the investigation and a recommended classification of the allegations shall be provided by the Investigator. The Professional Standards Unit shall not make any recommendations regarding disciplinary action. All Garrity statements, including audio or video tapes of such interviews, must be filed separately from the investigative file in an envelope marked "Garrity statement" and filed accordingly.

N. Dispositions

    1.  Informal Personnel Actions- Actions documented on a Written Counseling Form shall be processed by forwarding a copy of the Written Counseling Form to the Professional Standards Unit for record.

    2.  Formal Discipline- A copy of the Formal Discipline Report, (letter of suspension, termination, etc.) shall be maintained in the affected employee's personnel file as defined in the department General Orders and a copy to be maintained in the Professional Standards Unit file.

O. Corrective Actions

    1.  Informal Personnel Action- When practical informal actions should be positive and educational rather than punitive in nature. The employee's immediate supervisor will complete all informal personnel actions.

    2.  Formal Discipline- Construed to be punitive in nature. It includes, but shall not be limited to:

        (a) Written Reprimand
        (b) Demotion
        (c) Suspension
        (d) Termination

P. Procedural Due Process

    1.  Prior to awarding any level of informal personnel action or formal discipline, the recommending authority may contact the Professional Standards Unit in order to determine the record of the offending employee and the consistent level of personnel action or discipline for the violation.

General Order #65 - October 1, 2002                                    6

2. Required Actions- The following steps will be taken to ensure due process:

   (a) The employee must be informed of the charge(s) against him/her.

   (b) The employee must be given an explanation of the evidence underlying the charge(s).

   (c) The employee must have the opportunity to respond to the charge(s).

   (d) All notices and hearings must be done in a meaningful time and a meaningful fashion.

If the internal investigation classifies the case as either exonerated, not sustained, unfounded or policy failure, the employee(s) involved will receive a letter of disposition.

Q. Reviews, Appeals and Grievances

All appeals and grievances shall follow procedures herein and established by the Harrison County Civil Service Commission and Department Policy. The Sheriff and all Division OIC personnel may review all informal and formal personnel actions.

Obstruction of Internal Investigation

No employee shall by writing, speaking, utterance or any other means commit an act which would hinder or obstruct an authorized internal investigation by the Harrison County Sheriff's Department.

Confidentiality of Investigations

All complaints and complaint investigations will be confidential and will not be discussed within or outside the department without approval of the Sheriff or his designee.

Unauthorized Internal Investigation

No employee shall initiate, conduct, or otherwise participate in any unauthorized investigation.

Other Administrative Investigations

Officer Involved Shootings

The Harrison County District Attorney's Office shall be responsible for conducting an independent investigation of all shootings involving officers of the Harrison County Sheriff's Department. The Sheriff may request other independent investigations by the Mississippi Highway Safety Patrol or other law enforcement agencies. The Harrison County Sheriff's Department Professional Standards Unit will conduct all internal investigations.

General Order #65 - October 1, 2002

7

## Background Investigations

Background investigations of applicants including sworn, non-sworn and reserves, will be conducted by the Professional Standards Unit. A background investigation by the Professional Standards Unit may be requested by any Director when the Director is informed of a need to begin the hiring process of applicants. The PSU investigator will be given a checklist of needed information, and the items on the list will be noted as to time and date of completion. Upon completion of the investigation the application will be returned to the personnel officer with a cover sheet indicating whether or not the applicant passed the background process. In addition, a copy of the cover sheet will be forwarded to the Sheriff and the affected Director. Without the approval of the Sheriff, applicants shall not be offered employment until after a satisfactory background investigation has been completed and it is determined that the candidate is suitable for the position which he/she has applied.

General Order #65 - October 1, 2002

8

General Order #62
Harrison County Sheriff's Department
June 4, 2004

George Payne, Jr., Sheriff

# EMPLOYEE DISCIPLINE

1.  **SCOPE**

    All employees of the Harrison County Sheriff's Department (full or part time) are subject to the provisions of this policy.

2.  **POLICY**

    It is the policy of the Harrison County Sheriff's Department that its employees serve the Citizens of Harrison County effectively and efficiently. In accordance with this policy, the actions of the employee's of the Sheriff's Department shall comply with departmental polices, rules and procedures. The failure of an employee to perform their duties in a satisfactory manner shall be cause for disciplinary or other corrective action. The Harrison County Sheriff and appropriate supervisors will administer this policy.

3.  **DISCIPLINARY REVIEW BOARD**

    The Disciplinary Review is sanctioned under the authority of the Sheriff. In the absence of the Sheriff his designee shall assume the role as appointing authority.

    1)  Board Members
        a)  Operations Major – Board Member
        b)  Administration Major – Board Member
        c)  Corrections Major – Board Member
        d)  Academy Major – Board Member

    2)  Duties and Responsibilities
        a)  Upon the request of any Division Director or the Sheriff, the Disciplinary Review Board will convene to hear formal charges against an employee of the Harrison County Sheriff's Department. The Sheriff or in his absence, his designee must approve all Disciplinary Review Boards.

General Order #62-June 4, 2004


EXHIBIT
"9"

b) Prior to awarding any formal sanctions against an employee, the Disciplinary Review Board will convene to hear the charges against the employee. The employee will be given the opportunity to respond orally or in writing to the charges.

c) The Chairman of the Review Board will be the Major in charge of the Department in which the employee works that is appearing before the board.

d) The Major and at least two members must be present to convene the Board. The Sheriff or his duly appointed designee may appoint a temporary Board member to hear a case. The temporary Board member must have the rank of Captain or above to serve on the Board.

e) After hearing the employee's response to the charges, the Major who is acting Chairman or a dully appointed designee will forward the Disciplinary Review Board's recommendation to the Sheriff.

3) Classification of Allegations

The Major who is acting Chairman or a duly appointed designee shall recommend one of the following four classifications:

(a) Unfounded – the allegation is false or not factual.

(b) Exonerated – the incident occurred, but was lawful and proper.

(c) Not sustained – there was insufficient evidence to prove or disprove the allegation.

(d) Sustained – the allegation is supported by a preponderance of evidence to justify a reasonable conclusion that the incident did occur.

4) Corrective Actions

If formal disciplinary action is warranted, the Disciplinary Review board will make one of the following recommendations:

(a) Written Reprimand

(b) Demotion

(c) Suspension

(d) Termination

General Order #62-June 4, 2004                                    2

5) Final Determination

The Sheriff will review the charges and the recommendations of the Disciplinary Review Board. The Sheriff or in his absence the appropriate Major will make the final determination of what, if any, disciplinary action will be taken.

6) Appeal

All disciplinary actions awarded by the Sheriff, with the exception of letters of reprimand, can be appealed to the Civil Service Commission.

D. Documentation and Removal of Disciplinary Action

Documentation of disciplinary actions including suspension, demotion, or dismissal will remain in the employees' personnel file indefinitely. Letters of reprimand, however, may be removed and expunged by the Sheriff upon the request of the employee.

Letters of reprimand must remain in the employees' personnel file for a minimum of twelve months. An employee may petition the Sheriff to have a letter of reprimand removed from his/her personnel file. If the Sheriff approves the removal of the letter of reprimand, the letter will be expunged from the personnel file.

General Order #44
Harrison County Sheriff's Department
October 15, 2002

George Payne, Jr, Sheriff

## CORRECTIVE MEASURES

1.  **SCOPE:**

    This policy is directed to all employees of the Harrison County Sheriff's Department.

2.  **PURPOSE:**

    The purpose of the General Order is to establish a uniform and incremental system of corrective measures. The primary intent is to maintain good order and structure within the department.

    It is imperative for each employee to obey established regulations and exercise sound judgment at all times. It is the responsibility of each supervisor to maintain the proper discipline among his/her subordinates.

3.  **POLICY STATEMENT:**

    Harrison County Sheriff's Department policy is that all corrective measures be administered at the lowest level of supervision with the least severe actions warranted by the seriousness of the infraction.

4.  **TYPES OF CORRECTIVE ACTION:**

    A supervisor may consider any two actions of equal or greater severity administered to an employee as constituting a trend of irresponsible or incompetent behavior. Any subsequent behavior or problems may be dealt with by more severe measures.

    The following types of corrective actions are listed from the least severe to the most severe:

General Order #44 - October 15, 2002

1

**EXHIBIT**

tabbies®

"10"

A. Verbal Counseling:

Supervisors are obligated to make every effort to resolve minor problems as soon as possible. Private, person-to-person, counseling sessions should be used to avert more serious future problems.

1. The following list is not to be inclusive, but provides examples of instances when this type of corrective action may be used:

   (a) Minor violations of departmental general orders or policies not resulting in injury or monetary loss to the county.

   (b) Minor lapses in operational efficiency.

   (c) Poor performance that appears to be the result of a training issue or a misunderstanding of departmental regulations or policies.

2. A Supervisor may consider a series of two counseling measures as a trend of irresponsible or incompetent behavior by the employee. The third counseling session should be dealt with a more serious measure.

B. Formal Written Counseling:

When an employee appears to be unreceptive to verbal corrections, the discrepancy should be fully documented on a Written Counseling Form.

1. The following list is not to be considered all-inclusive but provides examples of instances when this type of corrective action may be used:

   (a) The third verbal counseling violation of department regulations or policies not resulting in injury or monetary loss to the county.

   (b) Lapses in operational efficiency considered by the supervisor to be serious enough to warrant documentation.

   (c) Unreceptive behavior regarding training and/or constructive criticism from a supervisor or an appointed trainer.

   (d) Failure to comply with a lawful order from a higher ranking employee.

General Order #44 - October 15, 2002

2

2. A series of two Formal Written Counselings may be considered by a supervisor as constituting a trend or irresponsible or incompetent behavior serious enough to warrant the use of a more severe corrective measure.

C. Letter of Reprimand:

A written reprimand may be a part of a continuing pattern of corrective measure or may be used as the initial action depending on the circumstance.

1. The following list is not to be considered all-inclusive but provides examples of instances when a Letter of Reprimand will be used in a continuing pattern of corrective measures.

   (a) Violation of departmental general orders or policies not resulting in injury or monetary loss to the county, which the supervisor believes will not be corrected with a Formal Written Counseling.

   (b) Lapses in operational efficiency such as inefficiency in responding to calls, report problems, and tardiness.

   (c) Unreceptive behavior towards a supervisor and/or an appointed trainer regarding training and/or constructive criticism.

   (d) Failure to comply with a lawful order from a higher ranking employee.

   (e) When the employee fails to make a good faith effort to adhere to previous corrective measures.

2. The following list contains examples of instances when a Letter of Reprimand may be used as an initial corrective measure:

   (a) An act or omission that results in the injury or creates a serious potential for an injury.

   (b) An act or omission that results in monetary loss to the county as a result of damage to county property and/or damage to private property when the county is liable.

   (c) An act that is detrimental to the good order and/or discipline of the department.

   (d) Failure to comply with a lawful order from a higher ranking employee.

General Order #44 - October 15, 2002                                    3

Examples:

(1) Knowingly disobeying the order of a higher-ranking employee.

(2) Public criticism of supervisors, co-workers, citizens, or any part of the county administration.

(3) Encouraging others to disregard the integrity of department regulations, policies, and orders.

3. A series of two Letters of Reprimand may be considered by a supervisor as constituting a trend of irresponsible or incompetent behavior serious enough to warrant the use of a more severe measure.

D. SUSPENSIONS:

Whenever a continuous pattern of performance/conduct has not improved, or is unlikely to improve, a suspension not to exceed thirty days may be implemented if an employee commits a violation of department policy and/or exhibits conduct that has a detrimental impact upon the maintenance of good order and discipline within the department.

1. The following list is not considered as all inclusive, but provides examples of instances that suspension may be used in a continuing pattern of corrective measures:

(a) Infractions of departmental general orders or policies, not resulting in injury or monetary loss to the county.

(b) Lapses in operational efficiency.

(c) Unreceptive behavior towards a supervisor and/or an appointed trainer regarding constructive criticism and/or training.

(d) Failure to comply with a lawful order from a higher ranking employee.

(e) Failure to make a good faith effort to adhere to the corrective measures stipulated in any of the previously corrective actions.

2. The following list contains examples or instances when a suspension may be used as an initial corrective measure. Acts that are seriously detrimental to the good order and discipline of the department including, but not limited to, the following:

General Order #44 - October 15, 2002

4

(a) An act or omission that results in injuries or creates a potential for injuries.

(b) An unsafe act or admission that results in the monetary loss to the county through damage to county property and/or damage to private property when the county incurs the liability.

(c) Defiance of a higher-ranking employee.

(d) Under the influence of alcohol, stimulants, depressants, or any other substance while on duty that can alter the ability to reason and/or function in a crisis situation.

(e) Failure to comply with a lawful order from a higher ranking employee.

(f) Physical or psychological abuse of any employee or citizen.

(g) Any force that exceeds the amount necessary to bring a person under control effectively.

(h) Refusal or failure to respond to a call for service or situation.

(i) Refusal or failure to provide back up or assistance for a fellow employee in a hazardous or a potential hazardous situation.

(j) Making a false official statement.

3.  A supervisor may consider a series of two Suspensions as constituting a trend of irresponsible or incompetent behavior serious enough to warrant the use of a more severe measure.

E. **DEMOTIONS:**

An employee that holds a rank is expected to accept an increasing amount of responsibility when promoted. Whenever it becomes apparent that an employee cannot or will not accept the appropriate responsibility and is unable or unwilling to improve his/her performance/conduct after previous corrective measures have been administered, demotion in rank may be implemented in order to place the employee in a position of reduced responsibility. Demotion may also be implemented as an initial corrective action in rare instances in which the employee's actions are of such magnitude as to jeopardize the good order and discipline of the department.

Demotions in rank are a grave matter and should be implemented only after careful and deliberate consideration of the existing circumstances. The situations listed below are examples of instances in which demotion may be appropriate:

General Order #44 - October 15, 2002

5

1. The following list is not to be considered all-inclusive, examples of instances in which demotion may be used in a continuing pattern of corrective measures:

    (a) Infractions of departmental general order policies which do not result in injury or monetary loss to the county, but which do interfere with the maintenance of an efficient, superior subordinate relationship within the department.

    (b) Lapses in operational efficiency.

    (c) Failure to cooperate with a training instructor directed by higher authority, and/or unreceptive to training or constructive criticism by a higher-ranking employee after other corrective measures have been administered.

    (d) Failure to make a good faith effort to adhere to previous corrective measures.

    (e) Failure to comply with a lawful order from a higher ranking employee.

    (f) Acts, which have the potential of being detrimental to the good order and discipline of the department.

2. The following list is not to be considered all-inclusive, but provides examples of instances in which instances may be used as an initial corrective measure:

    (a) A knowing and willful unsafe act or omission which results in injuries to departmental employees or other citizens, or which creates the potential for injuries.

    (b) A knowing and willful act, which results in the county incurring monetary loss or liability as a result of damage to county or private property.

    (c) Defiance toward a supervisor who is acting in an official capacity.

    (d) Under the influence of alcohol, stimulates, depressants, or any other substance while on duty that alters the individual's ability to reason and/or function in a crisis situation.

    (e) Failure to comply with a lawful order from a higher ranking employee.

    (f) Physical or psychological abuse of another employee.

General Order #44 - October 15, 2002                                    6

(g) Refusal or failure to respond to a police call and/or a request for assistance by another officer in a potentially hazardous situation.

(h) Making a false official statement regarding any incident.

(i) Advising or encouraging any other employee to disobey or evade a department general order or policy.

F.  **DISMISSAL:**

This is the ultimate Corrective Measure to behavior/performance problems and should be taken as a last resort.

Dismissal from employment is a grave matter and should be carefully and thoughtfully considered. The situations listed below are examples of instances in which dismissal is appropriate:

1.  The following list is not considered all inclusive but provides the instances in which dismissal may be used as the final act in a continuing pattern of corrective measures:

    (a) Minor infractions of departmental regulations and policies after other corrective measures have been administered without significant improvement in the overall performance/conduct.

    (b) Lapses in operational efficiency after other corrective measures have been administered without significant improvement in the overall performance/conduct.

    (c) Unreceptive to training and/or failure to cooperate with a training instructor or training program after a less sever corrective measure has been administered without significant improvement in overall performance/conduct.

    (d) Failure to comply with a lawful order from a higher ranking employee.

    (e) Failures to make a good faith effort to correct overall behavior/performance problems after less severe corrective measures have been administered.

    (f) Disruptive influence to the good order and discipline of the department.

    (g) Under the influence of alcohol or any other substance while on duty generally known to alter an individual's ability to reason or function in a normal manner.

General Order #44 - October 15, 2002                                    7

(g) Under the influence of alcohol or any other substance while on duty generally known to alter an individual's ability to reason or function in a normal manner.

(h) Brutality toward citizens, prisoners or co-workers.

(i) Knowingly and willingly using a firearm in violation of departmental general order/policy.

(j) Falsifying a statement(s) on the employee's application.

(k) Accepting money, goods, or services in exchange for protecting illicit operations or granting any special considerations to any person(s).

(l) Willful disobedience of orders.

5. Who Will Administer Corrective Measures:

Any supervising employee can initiate corrective measures but a supervisor in the employee's chain of command should implement the process. Unless special circumstances exist, the employee's immediate supervisor will implement the corrective measure process.

6. The Corrective Measure Process:

The initiating supervisor will prepare a Notification of Intent form by listing the details of the act or omission. This form will be forwarded to the employee's immediate supervisor at which time, the implementation process will begin.

The immediate supervisor will explain to the employee in private the reasons for the corrective measure. The employee will be advised of his/her rights to appeal the corrective measure.

A. Appeal Process:

1. The employee will sign the Notification of Intent form to acknowledge notification of the corrective measure. The employee will indicate if he/she desires to appeal the measure to a higher level.

General Order #44 - October 15, 2002                                              8

2. When an employee indicates he/she wants to appeal the measure, all original paperwork (notification form and any documentation that supports the measure) will be forwarded to the employee's next level of supervision for review. This process will continue until the employee acknowledges acceptance of the measure by annotating it on the form or continues the appeal process to the Sheriff. The Sheriff must approve all suspension, demotion, and dismissal measures.

3. If the Sheriff agrees with the measure, any employee holding permanent civil service status may request a Civil Service hearing for the purpose of investigating the appropriateness of such action. Such hearing will be conducted in accordance with Civil Service regulations. It is the employee's responsibility to adhere to the Civil Service Commission's appeal procedures.

B. Acceptance Process:

If the employee decides not to appeal the measure, the notification form will be attached to the corrective measure paperwork. These documents will be forwarded to the Division Major by means of the employee's chain of command.

1. The Division Major will review the information and determine if the measure is appropriate. The decision will be documented on the form at which time the form will be returned to the implementing supervisor. If the measure is a suspension, demotion, or a dismissal, the Division Major will inform the employee regarding the details of the measure.

2. If the Division Major does not agree with the measure listed, he/she can alter it as he/she sees fit. The Division Major will meet with the implementing supervisor who forwarded the form to him/her and review the changes to the measure. The implementing supervisor will need to meet with the employee in private to explain the changes. Due to the changes of the measures, the employee is allowed to change his/her decision to appeal the measures if the employee desires.

3. The Sheriff will direct the creation of a personnel order regarding corrective measures when orders are necessary.

General Order #44 - October 15, 2002

9

7. Disposition of Records:

The original personnel order and all supporting documents will be filed in the employee's personnel file. A copy of the personnel order will be filed in the employee's performance file by the implementing supervisor.

8. Implications of a Corrective Measure:

A. All Verbal Counseling Measures will remain in an employee's performance file for a period of three months. If no additional measures have been implemented during this period, the corrective measure will not affect the employee for considerations of promotion, special unit transfer, chain-of-status, or any other career orientated personnel action.

B. All Formal Written Counseling Measures will remain in an employee's performance file for a period of six months. If no additional measures are implemented during this period, the measure will not affect the employee for consideration of promotion, special unit transfer, chain-of- status, or any other career orientated personnel action.

C. All Letter of Reprimand Measures will remain in an employee's performance file for a period of one year. If no additional measures are implemented during this period, the measure will not affect the employee for consideration of promotion, special unit transfer, chain-of-status, or any other career orientated personnel action.

D. All Suspension Measures will remain permanently in an employee's personnel file and performance file. During a one-year period immediately following the completion of a suspension, the employee is automatically disqualified for consideration of promotion, special unit, transfers, chain-of-status, or any other career oriented personnel actions.

An employee who receives a suspension measure should honor the measure by missing work. But, the Sheriff has the option to allow an employee to use accrued annual leave or compensation time.

E. All Demotion Measures will remain permanently in an employee's personnel file and performance file. The employee will be eligible for consideration of promotion, special unit transfer, chain-of-status, or any other career orientated personnel actions after two years from the official demotion date.

General Order #44 - October 15, 2002                                    10

9.  Emergency Circumstances:

A Section Leader may relieve an employee from duty with pay in an emergency situation without The Sheriff or Division Major approval. An emergency situation must constitute endangering a human life. The Section Leader will immediately contact the Division Major and start the corrective measure process. If the Division Major is unavailable, the Section Leader will contact the Sheriff.

10.  Reimbursement for Damages/Monetary Loss to Harrison County:

Whenever an employee causes a monetary loss to the County due to an act or omission, which constitutes misconduct or personal negligence, such employee may be required to reimburse the County for the amount of the monetary loss. Reimbursement may be used in conjunction with any corrective measure.

A.  The Sheriff can mandate reimbursement expenses for damages and/or monetary loss to Harrison County as a result of the employee's actions. The amount of the reimbursement will be listed on the employee's personnel order along with the corrective measure implemented.

B.  After the reimbursement has been ordered, the records relating to such action will be filed in the employee's personnel file and performance file.

C.  The Sheriff will specify the method of reimbursement as one of the following:

(1)  The employee may make a one-time payment to be deposited into Harrison County's General Fund.

(2)  The employee may elect to have up to six equal shares deducted from his/her paycheck. Under special circumstances, the Sheriff may authorize deviation from the time restriction.

(3)  The employee's Division Major will ensure that appropriate arrangements are made with the Payroll Office.

General Order #44 - October 15, 2002                                    11

**HARRISON COUNTY SHERIFF'S DEPARTMENT**
**SUPERVISOR INFORMAL COUNSELING NOTES**

Employee: _____ Position: _____

Supervisor: _____ Position: _____

Subject of Counseling: _____

Brief Description of Problem:

_____

_____

_____

_____

Brief Description of Meeting With Employee:

_____

_____

_____

_____

General Order #44 - October 15, 2002                              22-4

## HARRISON COUNTY SHERIFF'S DEPARTMENT
## FORMAL WRITTEN COUNSELING

Employee:_____    Position: _____

Supervisor: _____    Position: _____

Subject of Counseling: _____

_____

Supervisor's Comments:

The following corrective measures are considered appropriate at this time:

_____    _____
Supervisor Signature                                  Date

Employee Comments:

I hereby acknowledge that measures are being taken against me for the above violation. I consider this measure to be ☐not appropriate and I ☐desire an interview with the next supervisor in the chain-of-command.

_____    _____
Employee Signature                                   Date

General Order #44 - October 15, 2002                              22-4

## HARRISON COUNTY SHERIFF'S DEPARTMENT
## NOTIFICATION OF INTENT TO INITIATE
## CORRECTIVE MEASURES

Employee: _____    Position:_____

Initiating Supervisor:_____    Position:_____

Supervisor's Comments:

I am hereby recommending the following corrective measures:

If you consider this measure inappropriate and it is upheld throughout the chain-of-command, you have the right to a hearing before a Board of Inquiry and such board will be convened at your request.

_____    _____
Supervisor Signature    Date

Employee's Comments:

I hereby acknowledge that measures are being taken against me for the above listed violation.  I consider this measure

☐    Appropriate        ☐    Not Appropriate

If the measure is upheld throughout the chain-of-command, I

☐    Desire        ☐    Do Not Desire

a hearing before the Board of Inquiry.

_____    _____
Employee Signature    Date

General Order #44 - October 15, 2002                    22-4

**IMMEDIATE SUPERVISOR COMMENTS:**

☐     I concur with the proposed measure.

☐     I do not concur with the proposed measure.
Recommendations and comments are attached.

_____          _____

Signature                                                      Date

**SECTION SUPERVISOR COMMENTS:**

☐     I concur with the proposed measure.

☐     I do not concur with the proposed measure.
Recommendations and comments are attached.

_____          _____

Signature                                                      Date

**DIVISION MAJOR COMMENTS:**

☐     I concur with the proposed measure.

☐     I do not concur with the proposed measure.
Recommendations and comments are attached.

_____          _____

Signature                                                      Date

**SHERIFF COMMENTS:**

☐     I concur with the proposed measure.

☐     I do not concur with the proposed measure.
Recommendations and comments are attached.

_____          _____

Signature                                                      Date

General Order #44 - October 15, 2002                        22-4

# HARRISON COUNTY SHERIFF DEPARTMENT TRAINING RECORD

**Name:** Thompson, Morgan

**Badge#** 224

**DIVISION:** Corrections

**Hire Date:** May 17, 2004

| CLASS/CERTIFICATION | DATE | TRAINING HOURS | REMARKS |
|---|---|---|---|
| 40 hour class | 21-May-04 | 40 hours | |
| ppct | 21-May-04 | | |
| FIRST AID AND CPR | 21-May-04 | | |
| O.C. SPRAY | 21-May-04 | 2 HRS | |
| HOW NOT TO BECOME A HOSTAGE | 8-Jul-04 | 4 HRS | |
| INMATE DEATHS | 9-Aug-04 | 15MIN | |
| RIOTS AND DISTURBANCE | 10-Aug-04 | 15 MIN | |
| POST ORDERS PURPOSE AND MISSION | 22-Aug-04 | 15 MIN | |
| MONTHLY STATISTICAL REPORT | 24-Aug-04 | 15 MIN | |
| SECURITY PROMOTIONS | 23-Aug-04 | 15 MIN | |
| FACILITY GOALS | 15-Aug-04 | 15 MIN | |
| EMERGENCY HURRICANE | 12-Sep-04 | 15 MIN | |
| SEARCH | 11-Sep-04 | 15 MIN | |
| PROPERTY INVENTORY | 30-Aug-04 | 15 MIN | |
| INMATE UNIFORMS AND HYGIENE ISSUANCE | 14-Sep-04 | 15 MIN | |
| SPECIAL NEEDS INMATES | 13-Sep-04 | 15 MIN | |
| MAINTENANCE | 21-Sep-04 | 15 MIN | |
| NEWS MEDIA | 18-Sep-04 | 15 MIN | |
| JUVENILE INMATES | 20-Sep-04 | 15 MIN | |
| COMMUNICATION | 17-Sep-04 | 15 MIN | |
| USE OF FORCE | 10-Sep-04 | 15 MIN | |
| INMATE HOUSING AND OBSERVATION | 25-Sep-04 | 15 MIN | |
| USE OF THE SALLY PORT | 24-Sep-04 | 15 MIN | |
| GIFTS AND FAVORS | 26-Sep-04 | 15 MIN | |
| DRUG AND ALCOHOL | 27-Sep-04 | 15 MIN | |
| CUSTODY INQUIRIES | 28-Sep-04 | 15 MIN | |
| SUICIDE WATCH | 1-Oct-04 | 15 MIN | |
| NON CONTACT INMATES | 1-Oct-04 | 15 MIN | |
| WEARING SHANK VEST | 1-Oct-04 | 15 MIN | |
| WEARING OF ID BANDS | 1-Oct-04 | 15 MIN | |
| USE OF FORCE | 1-Oct-04 | 15 MIN | |
| USE OF FORCE | 9-Sep-04 | 4HRS | |

LAST UPDATED 8/1/06

1 OF 2

**EXHIBIT**

tabbies

"11"

# HARRISON COUNTY SHERIFF DEPARTMENT TRAINING RECORD

2 OF 2

| | | |
|---|---|---|
| CHAIN OF COMMAND | 30-Nov-04 | 15 MIN |
| UNIFORM AND PERSONAL APPEARANCE | 3-Dec-04 | 15 MIN |
| RECEPTION AND ORIENTATION | 4-Dec-04 | 15 MIN |
| POLICY AND PROCEDURE DIRECTIVE: CUSTODY DIRECTIVE | 7-Dec-04 | 15 MIN |
| DENTAL SERVICES | 10-Dec-04 | 15 MIN |
| EMERGENCY POWER AND COMMUNICATIONS | 11-Dec-04 | 15 min |
| CENTRAL CONTROL | 17-Dec-04 | 15 MIN |
| ROLE OF OUTSIDE AGENCIES | 18-Dec-04 | 15 MIN |
| FEMALE INMATES | 21-Dec-04 | 15 MIN |
| SUICIDE WATCH | 24-Dec-04 | 15 MIN |
| SUICIDE WATCH | 25-Dec-04 | 15 MIN |
| SUICIDE PREVENTION | 27-Dec-04 | 15 MIN |
| SUICIDE PREVENTION | 28-Dec-04 | 15 MIN |
| SUICIDE PREVENTION | 2-Jan-05 | 15 MIN |
| SUICIDE PREVENTION | 3-Jan-05 | 15 MIN |
| OFFICER SAFETY | 6-Jan-05 | 15 MIN |
| UPDATING THE PASS ON BOOKS | 16-Jan-05 | 15 MIN |
| INMATE WORKER GUIDELINES | 10-Dec-04 | 15 MIN |
| PPCT | 3-Mar-05 | 4 HRS |
| 4/19/05 MEMO: EXTENDED RECREATION TIME | 20-Apr-05 | 15 MIN |
| 6/10/05 MEMO: INMATE ACCOUNT CONCERNS | 17-Jun-05 | 15 MIN |
| 6/13/05 MEMO: ATTORNEY VISITATION | 17-Jun-05 | 15 MIN |
| 5/28/05 MEMO: LIBRARY SERVICES | 17-Jun-05 | 15 MIN |
| 6/17/05 MEMO: B/F CAPACITY | 17-Jun-05 | 15 MIN |
| SUICIDE PRECAUTIONS & SIGNS OF SUICIDE RISK | 28-Jul-05 | 3 HRS |
| PROPER TECHNIQUE OF FINGER PRINTING AND PHOTO TAKING | 17-Feb-06 | 4 HRS |
| TASER CERTIFICATION | 25-Feb-06 | 8 HRS |

LAST UPDATED 8/1/06



# State of Colorado



THE BOARD ON PEACE OFFICER STANDARDS AND TRAINING

AWARDS THIS CERTIFICATE

TO

## MORGAN L. THOMPSON

**December 20, 2002**

Date

For fulfilling the prescribed requirements for certification. This certificate expires three years from date of issuance unless the certificate holder meets the requirements for continued certification as established by law and the P.O.S.T. Board.

B— 09355

Number

*Bill Owen*

Governor

*Ken Salazar*

Attorney General, Board Chairperson



# Red Rocks Community College

This certificate is awarded by the Colorado State Board for
Community Colleges and Occupational Education
upon recommendation of the faculty

## Morgan Lee Thompson

Has Successfully Completed the
Requirements in the Program of

## Basic Law Enforcement Training Academy POST

Given This Twelfth Day of December Two Thousand Two



PRESIDENT, COLORADO COMMUNITY COLLEGE SYSTEM

PRESIDENT, RED ROCKS COMMUNITY COLLEGE

CHAIR, STATE BOARD FOR COMMUNITY COLLEGES
AND OCCUPATIONAL EDUCATION



STATE OF COLORADO
RED
ROCKS
COMMUNITY
COLLEGE
FOUNDED 1969

# SOUTHERN REGIONAL PUBLIC SAFETY INSTITUTE

**Harrison County Sheriff's Department**
**The University of Southern Mississippi-Gulf Coast**



*This is to certify that*

## Thomas P. Wills

*has completed*

## BASIC CORRECTIONAL OFFICER TRAINING
### (80 HOURS)

This the 21ST day of November, 2003

Roger Henry, Captain, HCSD
Instructor

Julian Allen, Ph.D., Major, HCSD
Director, SRPSI

*Harrison County Adult Detention Center*
*Policy & Procedures Directives*

## INMATE GRIEVANCE

**POLICY:**     It is the policy of the Harrison County Adult Detention Center to provide to the inmates housed in it's facilities an internal grievance mechanism for the resolution of complaints arising from institutional matters. The intent is to reduce the need for litigation and afford the staff an opportunity to improve jail operations.

## PROCEDURE:

### I.     GENERAL INFORMATION

The Security Captain may appoint a Corrections Officer to fulfill the duties of the Grievance Officer who will be responsible for investigating and responding to all grievances. Shift Supervisors may also be charged with answering grievances.

All Corrections Officers, or other employees who receive a grievance must attempt to resolve the issue raised on the grievance if it falls within the responsibilities of his or her job description.

The grievance should state clearly the time, date, and names of all parties involved with all pertinent details of the incident or complaint.

Should a grievance make accusation of questionable acts or impropriety on the part of a Corrections Staff Member, the grievance will be forwarded to the Security Captain. A written response to the inmate will be made within ten working days of receipt of the grievance.

### II.     FILING

An inmate may file a grievance at any time to bring a problem to the attention of the staff or to appeal a specific action. An inmate may file only for him/herself, although an inmate may assist another inmate in filing. Only one grievance may be filled out at a time on any one single incident or item of concern. An inmate may withdraw a grievance at any time. No staff member will retaliate against an inmate for filing or withdrawing a grievance.

EXHIBIT

"12"

## III.    BASIS FOR GRIEVANCES

A grievance may be filed for any one of the following reasons:

1. Lost property
2. Staff conduct
3. Conditions/confinement
4. Policy/procedures
5. Incidents
6. Reprisals
7. Mail
8. Discipline/classification

Only issues regarding activities within the facility can be addressed in the grievance procedure. Disciplinary actions have an appeal process and are not addressed in the grievance procedure. Issues relating to the Courts, Attorneys, and other issues over which the Harrison County Adult Detention Center has no control cannot be addressed in the grievance procedure. A grievance filed concerning any of these issues will be returned to the inmate with an explanation as to why it was returned.

## IV.    REVIEW

If an inmate registers a complaint against a staff member, that employee shall not play a part in making a decision on the request. However, this shall not prevent the employee from being questioned or providing a narrative concerning the incident.

## V.    GRIEVANCE CLASSIFICATION

A grievance will be classified as either an informal, standard, or emergency grievance.

**Informal Grievance -** may be resolved by staff at any level without the complete processing of a formal grievance.

**Standard Grievance –** may be processed through normal channels because there is not an immediate threat to the welfare or safety of an inmate.

**Emergency Grievance –** must be processed expeditiously because there appears to be an immediate threat to the welfare of an inmate.

## VI.    INFORMAL GRIEVANCE

An inmate may verbally submit a grievance to any Corrections Officer. When presented with an informal grievance, the Corrections Officer may initiate corrective action if the actions is within the normal scope of the officers duties,

the officer will advise the Shift Supervisor. The Shift supervisor will attempt to resolve the matter or have the inmate initiate a standard grievance at their discretion.

## VII. STANDARD GRIEVANCE

An inmate may file a formal grievance within 30 days after a potential grievable event has occurred. The inmate must submit a detailed description of the occurrence in written form. All grievances will be forwarded to the Grievance Officer or Security Captain by way of the request cart. Grievances sent to the Director of Corrections will be given to the Grievance Officer for further investigation. Once the investigation has been completed the Investigating Officer will notify the inmate in written form of corrective action if necessary. The shift Supervisor may delay an investigation of a grievance until employees who may have knowledge of the incident are on duty to respond.

## VIII. EMERGENCY GRIEVANCE

Once an emergency grievance has been submitted the officer will immediately contact his/her Shift Supervisor. The Shift supervisor will be responsible for determining whether the situation is in deed life threatening. In the event the situation appears to be life threatening the Shift Supervisor will contact the Security Captain and corrective measures will be taken at that time.

## IX. GRIEVANCE OFFICER

The Grievance Officer will process and investigate all standard grievances. The Grievance officer will conduct interviews with all individuals involved in order to verify facts. Once the investigation has been completed a written response will be submitted to the inmate who filed the grievance, inmate file, grievance file. A monthly report of grievances addressed will be submitted to the Security Captain Chief of Security and the Director of Corrections.

## X. GRIEVANCE APPEALS

An inmate may file a written appeal within 72 hours of the Grievance Officers decision. The appeal will be forwarded to the Security Captain for review. The Security Captain will respond to the inmate in writing regarding the outcome of his/her appeal, additionally, a copy will be placed in the inmates file. In the event the inmate has been released or transferred a copy will be forwarded to their new location, where possible. A copy of the appeal will be sent to the Director of Corrections for review.

## XI.    RECORDS

Once the grievance process has been completed a complete copy of all documents (i.e., original grievance, investigation note & final disposition) will be forwarded to Record to include in the inmate's custody file.

_Riley_____        _01/01/01_____
Facility Administrator                              Effective Date

Civil Rights Division

*Special Litigation Section - PHB*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

SYC:KWG:WGM:BVL:kdf
DJ 168-41-110

July 20, 2005

Sheriff George Payne, Jr.
Harrison County Sheriff's Department
1801 23rd Avenue
Gulfport, MS  39501

Joseph Meadows, Esq.
Meadows, Riley, Koenenn & Teel
1720 23rd Ave.
Gulfport, MS  39502

Dear Sheriff Payne and Mr. Meadows:

　　　Please find enclosed copies of our expert reports from Steve
Martin and Dr. John May resulting from our most recent inspection
of the Harrison County Adult Detention Center ("HCDC").  We were
encouraged during this last inspection with the improvements in
security operations and medical and mental health care at the
facility.  In this letter, we intend to outline those issues
which, if fully resolved, would permit the parties to jointly
dismiss the outstanding Consent Judgment.

　　　As an initial matter, we applaud the efforts of Sheriff
Payne and the Harrison County Board of Supervisors to hire and
fund increased numbers of security staff for the HCDC.  At the
time of our visit, nearly the full complement of 50 additional
officers had been hired.  Furthermore, HCDC officials have done
an excellent job of recruiting, hiring, and training the new
staff.  As Steve Martin stated in his report, "With these 43
additional officers, coverage for all essential housing posts for
all shifts can be provided so long as the facility is managed at
or below its safe operating capacity of 760."

　　　Unfortunately, however, the population at the HCDC
significantly exceeds the safe operating capacity of 760
established by Sheriff Payne in March of 2001.  On December 5,
2004, the HCDC jail population was 1035 with 355 inmates sleeping
on the floors in all four cell blocks.  The number of inmates



EXHIBIT

"13"

# HARRISON COUNTY SHERIFF'S DEPARTMENT
## PROFESSIONAL STANDARDS UNIT

| File Name<br>**Inmate Joseph Towner** | Date of Report<br>**December 29, 2004** | Date Assigned<br>**December 6, 2004** |
|---|---|---|
| Type Investigation<br>**Excessive Use of Force Allegation** | Case Number<br>**IA2004-29** | |

On December 06, 2004, Sheriff Payne directed Captain Campbell to conduct an investigation regarding allegations that some Corrections Officers had taken inmate Joseph Towner to the recreation yard of B block and assaulted him. It was further alleged that this assault took place approximately 3:00 a.m. on November 12, 2004 and that the alleged assault was in retaliation for inmate Towner's assault on Deputy Archer earlier during the evening shift.

Captain Campbell received a set of reports from Sheriff Payne written by the some of the officers involved as well as a memorandum from Captain Taylor to Major Riley outlining the allegations made against these officers. According to the memo written by Captain Taylor, on November 22, 2004, Captain Taylor received a phone call at his home from a deputy who stated that during the midnight shift approximately one week earlier, some officers had taken an inmate to the B Block exercise yard and assaulted the inmate. Captain Taylor had learned that Inmate Joseph Towner was the inmate who had allegedly been assaulted. On November 23, 2004, Captain Taylor instructed Officer Geas to bring inmate Joseph Towner to Captain Taylor's office. According to Captain Taylor, Inmate Joseph Towner told him that several officers had assaulted him in the exercise yard of B Block. Captain Taylor's memo went on to state that he instructed Officer Geas to determine if he could learn more information from Towner regarding this assault.

Captain Taylor's memo also stated that on November 29, 2004, FTO Martin Lipscomb entered his office and advised him of the incident that had occurred on November 12th regarding Inmate Towner. According to the information given to Captain Taylor, FTO Lipscomb stated that some of the officers planned to assault Inmate Towner after a physical altercation Towner had with Officer Archer earlier during the evening of November 11, 2004. In addition, FTO Lipscomb named all of the officers who were involved in the alleged assault. Captain Campbell read the narratives written by Officers Cox, Lipscomb, Minor, who were the officers allegedly involved in the assault. It was also learned from the reports that Officers Branning, Brawner, and Necaise were also involved in the alleged assault on Inmate Towner.

On December 6, 2004, Captain Campbell interviewed Deputy Jay Cox who was working B Block, specifically B/D, during the early night shift of November 12, 2004. Deputy Cox stated that he had learned in briefing that during the evening shift, Inmate Joseph Towner had assaulted Officer Archer. Deputy Cox further stated that some of the

tabbies®

EXHIBIT

"14"

officers decided they would take inmate Towner from his cell and put him in the exercise yard and use scare tactics to let inmate Towner know that assaulting an officer is unacceptable. Deputy Cox stated the plan was to yell at Towner and advise Towner that he knew he was not to hit a deputy in the facility. Deputy Cox stated that none of the officers present, which included Deputies Brawner, Branning, Lipscomb, Minor, and Necaise physically assaulted, punched or kicked Towner. Deputy Cox stated the officers put Towner on the ground and then used verbal intimidation to get their message across. Captain Campbell asked Deputy Cox if the actions on Towner were within Department policy and he stated that it was not.

On December 6, 2004, Captain Campbell interviewed Deputy Jerred Necaise regarding these allegations. Deputy Necaise stated that during briefing he learned that Deputy Archer had been assaulted by Inmate Towner during the evening shift. Deputy Necaise stated that several of the officers were talking about the assault and sometime around 3:00 a.m., he went to B Block followed by Deputy Branning. He stated that in the exercise yard of B Block was Deputy Brawner, and after he and Deputy Branning arrived in the exercise yard, Deputies Cox, Lipscomb and Minor came into the yard with Inmate Joseph Towner. Deputy Necaise stated that the purpose of them bringing Inmate Towner into the exercise yard was to let Towner know that it was unacceptable for an inmate to attack a deputy. Deputy Necaise stated that none of the officers hit, kicked, or punched Inmate Towner; that they yelled at him and told him he was not to assault any officers. Captain Campbell asked Deputy Necaise why he didn't write a narrative regarding the incident and he stated he was not told to write a narrative. Captain Campbell asked Deputy Necaise if the actions on Towner were within Department policy and he stated that it was not.

On December 6, 2004, Captain Campbell interviewed FTO Martin Lipscomb regarding the incident of November 12, 2004. It should be noted that FTO Lipscomb had written a narrative regarding the incident and had accused the other officers of assaulting Inmate Towner, but stated that he did not assault Towner. It should be further noted that FTO Lipscomb throughout his report referred to the incident with inmate Towner as the officers assaulting the inmate; however, there was no mention in Lipscomb's report that any of the officers actually struck or kicked Inmate Towner. While Captain Campbell was interviewing FTO Lipscomb, FTO Lipscomb recanted his earlier version of what had happened earlier on November 12, 2004 and stated that none of the officers actually hit, kicked or punched Inmate Towner. FTO Lipscomb told Captain Campbell that his definition of an assault was any manner in which an officer would lay his hands on an inmate, specifically pushing the inmate. FTO Lipscomb stated that as he came into the exercise yard and that they (meaning the other officers) pushed Inmate Towner on the deck and began to yell at him. FTO Lipscomb stated in his report that he was the one who got all the officers to stop assaulting Inmate Towner. This is in contrast to the statement of Deputy Jay Cox who stated that FTO Lipscomb pushed Towner into the exercise yard and participated in the verbal abuse of Towner. Captain Campbell asked FTO Lipscomb if the actions on Towner were within Department policy and he stated that it was not.

Captain Campbell asked FTO Lipscomb the reason why he had waited until seventeen days (November 29, 2004) later to report this incident. FTO Lipscomb gave no reason for the delay. Captain Campbell asked FTO Lipscomb regarding his report that he asked Sgt. Mathis, Shift Supervisor, the reason why he was not involved with the incident with Inmate Towner. According to FTO Lipscomb's report, he stated that Sgt. Mathis stated deniably, 'I don't know what you're talking about.' FTO Lipscomb stated that when he asked Sgt. Mathis about the incident, Sgt. Mathis told him he didn't know what he was talking about but it was FTO Lipscomb's opinion that Sgt. Mathis did know. Captain Campbell asked FTO Lipscomb the reason he thought Sgt. Mathis knew about the incident and he stated that he just believed that he did. Captain Campbell asked FTO Lipscomb if the actions on Towner were within Department policy and he stated that it was not.

On December 7, 2004, Captain Campbell interviewed Deputy Jeff Brawner regarding the incident of November 12, 2004. Deputy Brawner stated that during the night shift, he was assigned as R-1, the roving officer. He stated that during the shift, he went into the recreation yard of B Block to smoke a cigarette. He stated that some officers came into the recreation yard including Deputies Necaise, Branning, Minor, Cox and Lipscomb. Deputy Brawner stated that Inmate Towner came running through the door into the recreation yard followed by Deputies Cox, Lipscomb and Minor, and fell down on the deck. Deputy Brawner stated he and the other officers yelled and berated Towner for assaulting an officer. Deputy Brawner stated that their actions were meant to be a scare tactic and none of the officers kicked or struck Inmate Towner. Deputy Brawner stated this incident lasted less than two minutes. Captain Campbell asked Deputy Brawner if the actions on Towner were within Department policy and he stated that it was not.

On December 17, 2004, Captain Campbell interviewed Deputy Justin Branning regarding the incident of November 12, 2004. Deputy Branning stated that he was assigned the night shift in booking and sometime during the shift; Deputy Necaise told him that he was going to B Block and Deputy Branning stated he followed Deputy Necaise. Captain Campbell asked Deputy Branning the reason he followed Deputy Necaise and he stated that anytime anyone went to B Block during a shift, he knew something was going on so he 'tagged along.'

Deputy Branning stated that earlier in the evening during shift briefing, he learned that Inmate Joseph Towner had assaulted Deputy Archer. He stated that as he went into the exercise yard of B Block, he saw Deputy Brawner, then Deputies Cox, Lipscomb, and Minor came into the exercise yard behind Inmate Joseph Towner. Deputy Branning stated that Inmate Towner fell to the deck and the officers surrounded him and began to yell at him and chastise him verbally for striking an officer. Deputy Branning stated that none of the officers hit, kicked or punched Inmate Towner. Captain Campbell asked Deputy Branning if the actions on Towner were within Department policy and he stated that it was not.

On December 16, 2004, at the instructions of Sheriff Payne, Captain Campbell telephoned FBI Special Agent Dwight Johnson regarding the incident with Inmate Joseph

Towner. S/A Johnson stated he would come to the Harrison County Adult Detention Center and interview Inmate Towner during the afternoon.

Approximately 1:00 p.m., Captain Campbell requested Captain Taylor have Inmate Joseph Towner brought to the attorney's office in the court located in the Adult Detention Center. Captain Campbell met with Inmate Towner and asked Inmate Towner to write a statement regarding the incident in which he had been taken into the exercise yard and allegedly assaulted by the officers. Captain Campbell instructed Inmate Towner to take his time and write everything he believed was important for Captain Campbell to know about the incident. Captain Campbell told Inmate Towner that he had been directed by the Sheriff to investigate the allegations against the officers.

Approximately 2:30 p.m., S/A Dwight Johnson came to the Harrison County Adult Detention Center and met with Captain Campbell. Captain Campbell explained the allegations made against the officers and gave S/A Johnson a copy of the statement written by Inmate Towner. Captain Campbell then escorted S/A Johnson to the attorney room where he could interview Inmate Joseph Towner. After S/A Johnson finished his interview with Inmate Towner, he told Captain Campbell that he would meet with the U. S. Attorney's Office to determine if he should investigation these allegations of excessive use of force by said officers. S/A Johnson stated that he had problems with the truthfulness of Inmate Towner.

On December 17, 2004, Captain Campbell interviewed Deputy Michael Minor who was also involved in the incident with Inmate Towner. Deputy Minor stated he entered B Block during the night shift and had escorted an inmate to be locked down. He stated he noticed other officers in the exercise yard and a few minutes later observed two more officers escorting Inmate Towner toward the exercise yard. Deputy Minor stated that when Inmate Towner come out of D section to get his property, Towner began cursing at the officers. Deputy Minor stated that after he observed Deputy Cox and FTO Lipscomb go into the exercise yard, he observed FTO Lipscomb push Inmate Towner into the exercise yard and Deputy Minor followed. Deputy Minor stated that Inmate Towner was on the deck crying and balled up and the officers surrounded Towner chastising him verbally for assaulting an officer. Deputy Minor stated that none of the officers struck, kicked or punched Inmate Towner. Deputy Minor stated that after approximately a minute, Inmate Towner was escorted out of the exercise yard and back into his section. Captain Campbell asked Deputy Minor if the actions on Towner were within Department policy and he stated that it was not.

On December 22, 2004, Captain Campbell interviewed Inmate Joseph Towner regarding the incident of November 12, 2004. Captain Campbell had obtained the statement written by Inmate Joseph Towner on December 16, 2004, which contained 2 ½ pages. Captain Campbell interviewed Inmate Towner regarding the incident. Towner stated that at approximately 3:00 a.m. on the morning of November 12, 2004, he was taken into the exercise yard and approximately ten officers jumped on him, beat him and kicked him and punched him in the face because he had a confrontation with Deputy Archer earlier in the evening. Captain Campbell asked Inmate Towner if he was certain the officers did, in fact, kick him and punch him and he stated they did. Captain

Campbell asked Inmate Towner the reason he did not include those specifics in his statement and he stated that the officers jumped on him. However, it should be noted that Inmate Towner statement of 2 ¼ pages included approximately two pages about the incident with Deputy Archer earlier in the evening and only ¼ page about the alleged assault in the exercise yard. It should also be noted that Inmate Towner showed Captain Campbell a scar he allegedly received in the incident on November 12, 2004 on his arm. Captain Campbell observed the scar as appearing to be several months old, but Towner stated that he received the scar during the confrontation with the officers.

Inmate Towner further stated the next day after the incident; he talked with Sgt. Collins and told Sgt. Collins about the officers jumping on him. It should be noted that Sgt. Collins had not prepared a report to indicate this conversation. Inmate Towner further stated the next day after the incident; he went to medical and was treated by the medical staff and also met with Captain Taylor and Deputy Geas. It should be noted that according to Captain Taylor's report and Deputy Geas' report, they did not meet with Inmate Towner until November 23, 2004 some eleven days after the alleged incident.

On December 22, 2004, Captain Campbell went to the medical department to review the medical files on Inmate Joseph Towner. According to the medical files, on November 19, 2004, Towner was seen by a nurse complaining of pain in his back. According to the notes written on the medical chart, the nurse stated that there were no bruises or lacerations found on Inmate Towner. In addition, it was noted that on November 22, 2004, Inmate Towner was seen by the attending physician, who also stated that he saw no injuries, but gave Inmate Towner some Ibuprofen.

## Findings and Conclusions

It was concluded from this investigation that during the early morning hours of November 12, 2004, Deputies Lipscomb, Necaise, Brawner, Minor, Branning and Cox isolated Inmate Joseph Towner in the exercise yard of B Block. It was further concluded that the officers verbally harassed and verbally abused Inmate Towner because of an incident, which occurred between Inmate Towner and Deputy Archer earlier that evening. By their own admission, these deputies did verbally abuse Inmate Towner in retaliation for Towner's attack on Deputy Archer and that the officers admitted that their actions were not in Department policy.

It was further concluded there was no evidence to sustain the allegation that the officers physically assaulted Inmate Towner with respect to kicking, punching, or hitting Towner. The medical notes regarding Inmate Towner's visit with the nurse on November 19, 2004, where he complained of being assaulted by officers on November 12, 2004, revealed no cuts, bruises or scratches observed by the attending nurse and physician. This reinforced Captain Campbell's observation of the scar on Towner's right forearm, which Captain Campbell believed to be an old scar.

It was also concluded that during the interview with Inmate Towner, that Towner was dishonest with Captain Campbell. Inmate Towner was allowed approximately one hour to write a statement regarding the incident in which he was allegedly assaulted. The

statement consisted of 2 ¼ pages, or 62 lines. Approximately 87% (54 lines) of the statement related to the incident with Deputy Archer, where Towner was accused of assaulting Deputy Archer. Only 10 % (6 lines) of the statement related to the alleged assault by the officers. It should be noted that in Towner's statement, he did not state that any officer hit, punched or kicked him. An analysis of the majority of Towner's statement was an attempt by Towner to justify the reason he hit Deputy Archer earlier that evening. It was concluded that Towner was not concerned about the alleged physical assault, because it did not occur, however; it is believed that his focus was to attempt to justify his assault on Deputy Archer because he would possibly face criminal charge.

In Towner's statement it is interesting to note that during the first two pages, he mentioned that he hit Deputy Archer with his fist and Deputy Archer also hit him with his fist. No mention or description of any type of blows from the incident in the exercise yard was ever given by Towner. Inmate Towner's explanation to Captain Campbell for this inconsistency was that he would only mention specific punches or blows or kicks if there was one inmate and one deputy fighting and if several officers jumped on him and punched him or kicked him, he would only refer to that as 'being jumped on.' This explanation is unbelievable at best.

It was also concluded from this investigation that although Deputies Branning, Brawner, Cox, Minor and Necaise stated that FTO Lipscomb took part in the entire verbal abuse on Towner, no one heard FTO Lipscomb state that he attempted to end the alleged assault. FTO Lipscomb attempted to portray his role as taking no part in the alleged assault and it was he who stopped the assault. In addition, it was interesting to note that FTO Lipscomb wrote a narrative on the incident and reported it to Captain Taylor 17 days after it occurred. One may conclude that FTO Lipscomb's actions regarding his manner of reporting the incident was an attempt to lessen his participation and show his concern by attempting to stop the incident. This may had been because he was the senior officer present during the incident.

It was finally concluded that the above mentioned officers violated **General Order 1-5.5** "... *and shall guard against using his office or person, whether knowingly or unknowingly, in any improper or illegal action...*" and **General Order 1, "The Law Enforcement Code of Ethics"**, *"I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decision....".* It is further concluded that the above mentioned officers violated **Harrison County Adult Detention Center Policy and Procedures** entitled *General Rules of Conduct* " *Employees will treat inmates with courtesy, dignity, and respect at all times".* The allegations that these officers violated the above mentioned policy is *SUSTAINED*; however, the allegations that the officers used physical force with respect to kicking, punching, or hitting Inmate Joseph Towner is *UNFOUNDED.*

| Report By: | Reviewing Supervisor |
|---|---|
| Captain Steve Campbell | Sheriff George Payne |



# HARRISON COUNTY
# SHERIFF'S DEPARTMENT

*George H. Payne, Jr.*
*Sheriff*

Post Office Box 1480
Gulfport, Mississippi 39502

January 31, 2005

Officer Martin Lipscomb
Harrison County Adult Detention Center
10451 Larkin Smith Drive
Gulfport, MS  39503

## LETTER OF DISCIPLINARY ACTION

Dear Officer Lipscomb:

An Administrative Hearing was held on January 7, 2005, in response to the charge of violating General Order # 1, 4, 4.6 and 1, 5, 5.5.  Specifically, on November 12, 2004, you participated in an inappropriate demonstration against Inmate Joseph Towner, whereby the inmate was placed on the recreation yard and reprimanded regarding an earlier assault on an officer.

You appeared at that hearing and after weighing the evidence against you, the following disciplinary action will be taken:

- *You are hereby suspended for five days without pay*
- *You are hereby removed for FTO status*

The above sanction will be scheduled at the discretion of the Director of Corrections.  Be advised, should any future violations of this type occur, further disciplinary actions will be taken up to an including termination.  You have fifteen days if you desire to appeal these actions to the Civil Service Commission.

Sincerely,

George H. Payne, Jr.
Sheriff

cc:    Civil Service Commission
       Personnel File
       Major Riley

EXHIBIT

"15"

Office: (228) 865-7002



# HARRISON COUNTY
# SHERIFF'S DEPARTMENT

*George H. Payne, Jr.*
*Sheriff*

Post Office Box 1480
Gulfport, Mississippi 39502

January 31, 2005

Officer Michael Minor
Harrison County Adult Detention Center
10451 Larkin Smith Drive
Gulfport, MS 39503

## LETTER OF DISCIPLINARY ACTION

Dear Officer Minor:

An Administrative Hearing was held on January 7, 2005, in response to the charge of violating General Order # 1, 4, 4.6 and 1, 5, 5.5. Specifically, on November 12, 2004, you participated in an inappropriate demonstration against Inmate Joseph Towner, whereby the inmate was placed on the recreation yard and reprimanded regarding an earlier assault on an officer.

You appeared at that hearing and after weighing the evidence against you, the following disciplinary action will be taken:

- *You are hereby suspended for five days without pay*

The above sanction will be scheduled at the discretion of the Director of Corrections. Be advised, should any future violations of this type occur, further disciplinary actions will be taken up to an including termination. You have fifteen days if you desire to appeal these actions to the Civil Service Commission.

Sincerely,

George H. Payne, Jr.
Sheriff

cc:    Civil Service Commission
       Personnel File
       Major Riley



# HARRISON COUNTY
# SHERIFF'S DEPARTMENT

*George H. Payne, Jr.*
*Sheriff*

Post Office Box 1480
Gulfport, Mississippi 39502

January 31, 2005

Officer  Jerred Necaise
Harrison County Adult Detention Center
10451 Larkin Smith Drive
Gulfport, MS  39503

## LETTER OF DISCIPLINARY ACTION

Dear Officer Necaise:

An Administrative Hearing was held on January  7, 2005, in response to the charge of  violating
General Order # 1, 4, 4.6 and 1, 5, 5.5.   Specifically, on November 12, 2004, you participated in
an inappropriate demonstration against Inmate Joseph Towner, whereby the inmate was placed
on the recreation yard and reprimanded regarding an earlier assault on an officer.

You appeared at that hearing and after weighing the evidence against you, the following
disciplinary action will be taken:

- *You are hereby suspended for five days without pay*

The above sanction will be scheduled at the discretion of the Director of Administration.  Be
advised, should any future violations of this type occur, further disciplinary actions will be taken
up to an including termination.  You have fifteen days if you desire to appeal these actions to the
Civil Service Commission.

Sincerely,

George H. Payne, Jr.
Sheriff

cc:     Civil Service Commission
        Personnel File
        Major Smith



# HARRISON COUNTY
# SHERIFF'S DEPARTMENT

*George H. Payne, Jr.*
*Sheriff*

Post Office Box 1480
Gulfport, Mississippi 39502

January 31, 2005

Officer Jeffrey Brawner
Harrison County Sheriff's Dept.
10451 Larkin Smith Drive
Gulfport, MS 39503

### WRITTEN REPRIMAND

Dear Officer Brawner:

An administrative hearing was held in response to the charge of Unacceptable Behavior, General Order #1, Section 4, 4.6 (i.e., Violation of Department/General Rules of Conduct) and General Order #1, 5, 5.5. Specifically, on November 12, 2004, you participated in an inappropriate demonstration against Inmate Joseph Towner, whereby the inmate was placed on the recreation yard and reprimanded regarding an earlier assault on an officer.

The following disciplinary action will be taken against you:

> ***\* You are hereby served with an official written reprimand***

Be advised, if any future violations of this type occur, further disciplinary actions will be taken up to an including termination.

Sincerely,

George H. Payne, Jr.
Sheriff

cc:     Personnel File
        Major Riley



# HARRISON COUNTY
# SHERIFF'S DEPARTMENT

*George H. Payne, Jr.*
*Sheriff*

Post Office Box 1480
Gulfport, Mississippi 39502

January 31, 2005

Officer Justin Branning
Harrison County Sheriff's Dept.
10451 Larkin Smith Drive
Gulfport, MS  39503

### WRITTEN REPRIMAND

Dear Officer Branning:

An administrative hearing was held in response to the charge of Unacceptable Behavior, General Order #1, Section 4, 4.6 (i.e., Violation of Department/General Rules of Conduct) and General Order #1, 5, 5.5.  Specifically, on November 12, 2004, you participated in an inappropriate demonstration against Inmate Joseph Towner, whereby the inmate was placed on the recreation yard and reprimanded regarding an earlier assault on an officer.

The following disciplinary action will be taken against you:

> *\* You are hereby served with an official written reprimand*

Be advised, if any future violations of this type occur, further disciplinary actions will be taken up to an including termination.

Sincerely,

George H. Payne, Jr.
Sheriff

cc:     Personnel File
        Major Riley

Office: (228) 865-7092              Fax: (228) 865-7071              Dispatch: (228) 865-7060