IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**GARY BRICE MCBAY**                                                              **PLAINTIFF**

**V.**                                            **CIVIL ACTION NO: 1:07cv1205-LG-RHW**

**HARRISON COUNTY, MISSISSIPPI, ET AL.**                        **DEFENDANTS**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Gary Brice McBay ("McBay"), by and through his undersigned counsel, submits this Response in Opposition to Defendant George Payne's ("Defendant") Motion for Summary Judgment and would show unto the Court, the following:

In the case at bar, there exist numerous genuine issues of material fact which preclude summary judgment. First, Defendant Morgan Thompson's beating of Plaintiff is a genuine issue of material fact due to the conflicting accounts provided by Plaintiff, Defendant Thompson, the video evidence (absence of video evidence), Regina Rhodes, and the reports filed with respect to the incident. Second, the injuries sustained by the Plaintiff are genuine issues of material fact due to the physical evidence, booking photos, nurses notes, and various accounts of the injuries sustained. Third, the knowledge of Sheriff George Payne and the Harrison County Board of Supervisors with respect to the widespread abuse of inmates at the Harrison County Adult Detention Center ("HCADC") and the adoption of an "official policy" is a genuine issue of material fact due to the admissions in the numerous plea agreements by various correctional officers, Steve Martin's report submitted to the Sheriff and Board of Supervisors, deposition testimony of George Payne, deposition testimony of William Martin, deposition testimony of Bobby Eleuterius, deposition testimony of Regina Rhodes, sworn testimony of various other

individuals, and this Court's finding of a genuine issue of material fact with respect to an "official policy" at HCADC in *Alves v. Harrison County, et al.*, Civil Action No. 1:06-cv-912-LG-RHW (S.D. Miss. Feb. 23, 2009).  Finally, the custom and practice of abuse being a moving force behind the assault on Plaintiff is a genuine issue of material fact due to the admissions in the numerous plea agreements by various correctional officers, Steve Martin's report submitted to the Sheriff and Board of Supervisors, deposition testimony of George Payne, deposition testimony of William Martin, deposition testimony of Bobby Eleuterius, deposition testimony of Regina Rhodes, sworn testimony of various other individuals, and this Court's finding of a genuine issue of material fact with respect to a moving force in *Alves*.

Accordingly, Defendant's Motion for Summary Judgment should be denied due to numerous genuine issues of material fact.

**I.     Summary Judgment Standard**

"Summary judgment is proper when there exists no genuine issue of material fact and the movant is entitled to judgment as matter of law." *Strong v. Univ. HealthCare Sys.*, L.L.C., 482 F.3d 802, 805 (5th Cir. 2007).  "The evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant." *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 465 (5th Cir. 2005).  To survive a summary judgment motion, the nonmovant "need only present evidence from which a jury might return a verdict in his favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**II.    Beating of the Plaintiff at the Harrison County Adult Detention Center**

    **A.     Applicable Law**

The appropriate analysis of excessive force claims by pre-trial detainees is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically

for the very purpose of causing harm." *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993). Often, there is no evidence of the correctional officer's subjective intent, ad the trier of fact must base its determination on objective factors suggestive of intent. *Id.* at 1446. The Fifth Circuit suggests the following factors: (1) extent of the injury suffered; (2) need for the application of force; (3) relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of the forceful response. *Id.* at 1447. An officer's malice can be evident from the very excessiveness of his conduct. *Id.*

    **B.**     **Facts**

Plaintiff was brought to the HCADC on the night of November 6, 2005 on suspicion of public drunk – these charges were later dropped and Plaintiff was never convicted of any crime. While Plaintiff was waiting to be processed through booking, Plaintiff's legs were swept out from under him by Defendant Morgan Thompson. See Exhibit "A", booking video; See Exhibit "B", Regina Rhodes deposition, pp. 28-29, Lines 19-5. Plaintiff was taken to the floor and left lying on the floor for a few minutes. Evidence of this takedown is also the subject of Plaintiff's pending Motion for Sanctions for Spoliation.

Then, Plaintiff was escorted to the entrance of the shower room. See Exhibit "C", excerpt of booking video. Plaintiff's handcuffs were removed by Defendant Morgan Thompson. *Id*. After removing Plaintiff's handcuffs, Defendant Thompson violently shoved Plaintiff to the ground before he entered the shower room. *Id.*; Exhibit "B", pp. 34-35, Lines 11-7. Plaintiff did nothing to provoke such a takedown.

Next, Plaintiff entered the shower room followed closely by two correctional officers – Morgan Thompson and Kenneth Windham. Once in the shower, Thompson began striking the

Plaintiff in the face multiple times with a closed fist. See Exhibit "D", Thompson deposition, p. 15, Lines 12-13; p. 54, Lines 23-25. The shower room does not have video cameras. While continuing to strike the 5 foot 8 inch, 125 lb. Plaintiff, the 6 foot 3 inch 200+lb Thompson drove Plaintiff's head into the shower grate causing a "stamp" on the side of Plaintiff's head. See Exhibit "E", photo; Exhibit "B", p. 44, Lines 1-13; p. 148, Lines 4-7. While being beaten by Thompson, Plaintiff pleaded, "please, no more." See Exhibit "F", Plaintiff's deposition, p. 30, Line 20.

After the beating, the Plaintiff was in and out of consciousness in the shower room, and the nurse was called to attend to him. The Plaintiff was beaten so badly that he laid in the shower room for approximately twenty minutes while other officers and onlookers checked the shower room door to see what happened. See Exhibit "A", video. Once Plaintiff exited the shower room, there was so much blood in the shower room that a trustee took approximately three minutes to mop up the shower room floor. *Id.*

Following the Plaintiff's beating, Defendant Thompson was teased by other officers. The other officers teased Thompson because he hit Plaintiff so many times in the face, and because these strikes violated the red light/green light policy of the officers regarding where they should strike inmates. See Exhibit "D", Thompson deposition, p. 44-45, Lines 13-9. Thompson stated that "McBay was a big reason" for the teasing, and Thomson further admitted that "I gave him [McBay] a black eye." *Id.* at p. 44, Lines 15-16, 20. Thompson further admitted to Regina Rhodes that Thompson drove the Plaintiff's skull into the shower grate creating an "X" on Plaintiff's head. See Exhibit "B", p. 148, Lines 4-7.

### C. Genuine Issues of Material Fact

There are significant genuine issues of material fact with respect to Thompson beating the

Plaintiff.  First, Thompson testified that did not have any type of physical altercation with the Plaintiff until they entered the shower.  See Exhibit "D", Thompson Deposition, p. 51-52, Lines 25-2.  Thompson denied ever striking or pushing Plaintiff to the ground before entering the shower.  However, while Plaintiff was waiting to be processed through booking, Plaintiff's legs were swept out from under him by Defendant Morgan Thompson.  See Exhibit "A"; Exhibit "B", pp. 28-29, Lines 19-5.  Plaintiff was taken to the floor and left lying on the floor for a few minutes.  Then, Plaintiff was escorted to the entrance of the shower room.  See Exhibit "C".  Plaintiff's handcuffs were removed by Defendant Morgan Thompson.  *Id.*  Next, Defendant Thompson violently shoved Plaintiff to the ground before they entered the shower room.  *Id.*; Exhibit "B", p. 34-35, Lines 11-7.  Plaintiff did nothing to provoke such a takedown.

It is clear that Thompson shoved, pushed, and/or physically caused Plaintiff to go to the ground before entering the shower.  For Thompson and Defendants to maintain otherwise is patently false.  Nevertheless, there are genuine issues of material fact with respect to Defendants and Thompson's versions of events.

Next, the use of force report submitted in this matter states that Plaintiff "grabbed Deputy Thompson's shirt and punched him in the head."  See Exhibit "G", Use of Force report.  In the narrative form of the report, it states that when Plaintiff and Thompson entered the shower, Thompson asked Plaintiff to remove his clothes. Id.  In response, the report alleges that Plaintiff took an aggressive stance towards Thompson, causing Thompson to move toward McBay to employ a soft empty hand control. Id.  Plaintiff then allegedly grabbed Thompson by the shirt and allegedly struck Thompson twice in the head. Id.

According to Thompson and Defendant's Motion for Summary Judgment, this is not how the incident happened.  The Defendant and Thompson maintain that once Plaintiff and

5

Thompson entered the shower, Thompson reached out of the door for some clothes and Plaintiff punched Thompson in the head.  See Exhibit "D", p. 47-48, Lines 16-3; Docket No. 301, p. 5. Thompson and Defendant both allege that Plaintiff struck Thompson again in the head.  *Id.*

However, the grainy booking video shows another version of events.  While there are no cameras in the shower room, there is a camera pointed at the shower room door.  This camera angle shows Thompson entering the shower directly behind Plaintiff, and Deputy Windham right behind.  This video angle also shows that Thompson never reached outside the door to grab clothes, and moreover, the video does not show any clothes on the counter.

Finally, Thompson beat Plaintiff so severely that Plaintiff cannot remember every specific detail.  Defendant's Motion for Summary Judgment harps on Plaintiff's inability to remember specific details of the actual beating.  However, Defendants should not be rewarded for beating Plaintiff so badly that he cannot remember.  While Plaintiff does not remember every detail, Plaintiff does remember begging Thompson to stop – "please, no more."  Moreover, Regina Rhodes testified that Thompson admitted to her that he "stamped" Plaintiff's head into the shower grate.  This testimony, coupled with the various accounts of the Defendants as discussed *supra*, creates a genuine issue of material fact with respect to Plaintiff's beating to preclude summary judgment on the issue.

Indeed, even accepting Defendant's and Thompson's current version of events, which is specifically in dispute, the context of the altercation did not require multiple closed fist punches to the head and face of Plaintiff.  The Plaintiff is approximately 5 foot 8 inch, 125 lbs., and Thompson is approximately 6 foot 3 inch 200+lbs.  Multiple closed fist punches to the head was an unnecessary response to an allegedly severely drunk detainee – allegedly so drunk that he could not sign his consent form for the nurse.  See Exhibit "G".  Moreover, Thomas Randazzo,

6

the untrained and unofficial bouncer of Choppers (the bar Plaintiff where Plaintiff was arrested), was able to subdue Plaintiff by holding him with one hand why waiting for the police to arrive. See Exhibit "H", Thomas Randazzo deposition, p. 24, Lines 4-15.  Multiple closed fist punches to the head is an excessive response to an allegedly belligerent drunk who allegedly refused to dress out.  While this version is specifically disputed, it still does not relieve Defendants of liability.

Genuine issues of material fact exist with respect to Defendant Thompson's beating of Plaintiff.  Summary Judgment should be denied.

**III.    Plaintiff's Injuries**

**A.    Evidence of Injuries**

The Defendant maintains that Plaintiff "arrived at the jail with the injuries that he was accusing the HCADC personnel of causing."  However, this statement is belied by the evidence and testimony in this matter.

First, Thompson admitted that "I gave him [McBay] a black eye."  See Exhibit "D", p. 44, Line 20.  Thompson admitted that he struck Plaintiff multiple times in the face with closed fist punches.  *Id.* at p. 15, Lines 12-13; p. 54, Lines 23-25.  Thompson further admitted to Regina Rhodes that Thompson drove the Plaintiff's skull into the shower grate creating an "X" on Plaintiff's head.  See Exhibit "B", p. 148, Lines 4-7.

Second, the use of force report and nurse's notes show the injuries sustained by the Plaintiff.  The Use of Force report described "facial swelling and nose bleed as injuries sustained at Thompson's hands.  See Exhibit "G".  The report also stated that Plaintiff suffered a cut on the head, and swollen and bruised left eye.  *Id.*  The narrative of the report described that Thompson called medical after Thompson struck Plaintiff because Plaintiff had "bleeding from the nose and

7

facial swelling." *Id.* The nurse's notes describe the same injuries following the altercation. *Id.* While Defendant maintains that these injuries were suffered before entering the jail and the black eye could have developed the next morning, the actual evidence contradicts this position.

Moreover, the use of force report was not filled out or drafted by Thompson. See Exhibit "D", p. 10, Lines 20-22. Thompson stated Officer Teel filled out the use of force report for this incident. *Id.* However, Thompson admitted Teel never actually witnessed the incident. Id. at p. 13 Lines 16-22. Thompson maintains that Teel was in another area of booking and heard the event. *Id.* Contrary to Thompson's assertion, according to Defendant Payne's admission responses, the roster sheet for the night in question, the video evidence, and the Teel's time card, Teel was not present on the night of Plaintiff's beating. See Exhibit "I". Defendants still have not produced the identity of the person who completed the report.

Finally, photos of the Plaintiff following the incident demonstrate the injuries he sustained. See Exhibit "J". The facial swelling and black eyes show the extent of the beating from Thompson. The "stamp" from the shower grate which Thompson admitted to creating is clearly shown on the side of Plaintiff's head. When shown the booking photo of Plaintiff at his deposition, Thompson stated that Plaintiff did not "look like that when I [he] left" his shift later that evening. p. 9, Lines 10-18. However, the use of force report and nurse's note clearly denote the bruising and swelling of the eyes, and indeed, Thompson later admitted in his deposition that he gave him the black eye. These contradictions and accounts of the injuries create enough genuine issues of material fact which preclude summary judgment on this issue.

    **B.**    **Injuries More Than *De Minimus***

With respect to the excessive force claim, the Defendant's motion for summary judgment asserts that Plaintiff cannot establish that he suffered no more than a *de minimis* injury.

8

In *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), the Supreme Court held that a correctional officer's use of excessive physical force against a prisoner may in an appropriate setting constitute cruel and unusual punishment of the prisoner, contrary to the Eighth Amendment, even though the prisoner does not suffer either "significant injury" or "serious injury." *Id.* 112 S.Ct. at 997 ("serious injury"), 998 ("significant injury"), 999 ("serious injury"), 1000 ("significant injury"). Likewise, *Hudson* clearly implies that merely because the injury suffered is only "'minor'" does not of itself always preclude finding an excessive force violation. *Id.* at 1000. *Hudson*, looked largely to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* 112 S.Ct. at 999. For purposes of this inquiry, *Hudson* placed primary emphasis on the degree of force employed in relation to the apparent need for it, as distinguished from the extent of injury suffered. *Id.*

A showing of some type of injury, more than *de minimus*, is necessary to assert an excessive force claim. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). In order to determine whether injuries caused by excessive force are *de minimus*, **the context in which the force was used must be examined**. *Id.* (emphasis added). "[T]he amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances.'"" *Id.* at 703-04 quoting *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996)).

In *Gomez v. Chandler*, 163 F.3d 921 (5th Cir. 1999), in concluding that a prisoner's injury was not *de minimis*, the Court stated that the "application of force" was "of a character far [more] intense and [more] calculated to produce real physical harm," *Gomez*, 163 F.3d at 924. The focus was on the application of force under the context, not the extent of the physical injury

suffered.

As the Fifth Circuit stated in *Beck v. Alford*, 1994 WL 442383 at *1 (5th Cir. July 27, 1994), when "there are allegations of injury together with circumstances that suggest that more than *de minimis* injury **could have occurred**, or that the use of whatever force there was would shock the conscience, the stage is set for a credibility contest, and the case should go to a finder of fact." (emphasis added). It is clear that the law in Fifth Circuit focuses on the application of force, the context the force was used, and the injury that could have happened, not what injury actually did occur.

In the instant matter, it is clear Plaintiff suffered significant facial bruising and swelling, contusions to his head and neck, and Plaintiff suffered a concussion resulting in damage to his cognitive functions which has prevented Plaintiff from returning to his profession. See Exhibit "K", Dr. Stephen Martin report. Dr. Stephen Martin has diagnosed Plaintiff with post traumatic stress syndrome resulting from the savage beating by Thompson. Dr. Martin has further found that the PTSD and frontal lobe dysfunction is the result of the beating and concussion sustained at the hands of Thompson. Plaintiff cannot return to work as an independent insurance adjuster because of the permanent cognitive and emotional/behavioral effects from the injuries sustained. Indeed, Defendants' own expert, Dr. Ciota, while disagreeing with the neurocognitive analysis of Dr. Martin, has observed that Plaintiff has been damaged from a psychological perspective, inclusive of taking on a dependent role as a result of his injuries sustained at the hand of Thompson. Dr. Ciota also commented that, while it happens in a minority of cases, the posttraumatic stress symptoms and psychological problems exhibited by Plaintiff can occur from the result of the injuries sustained. The injuries clearly meet the threshold of more than *de minimus*.

In the instant matter, genuine issues of material fact exist regarding the need and amount of force used by the correctional officer; therefore, the Plaintiff's injuries cannot be determined to be *de minimus* simply by evaluating the physical nature of the injury. See *Hull v. Ford*, 2007 WL 1839843 (5th Cir. June 25, 2007).

## IV.  Custom and Practice – Knowledge

### A.  Applicable Law

Municipalities and counties can be held liable for Section 1983 claims for deprivation of civil rights. A plaintiff is required to demonstrate the following three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the custom or policy. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). A policy may be evidenced by custom that is "a persistent, widespread practice of City [County] official or employees, which, although not officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy…" *Id.* at 579 quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984).

A plaintiff must demonstrate that the municipality was "deliberately indifferent" to the known consequences of the policy. *Id.* at 580. Deliberate indifference is an objective standard that encompasses "not only what the policymaker actually knew but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights." *Lawson v. Dallas County*, 286 F.3d 257, 264 (5th Cir. 2002). Plaintiff must demonstrate that the policymaker had actual or constructive knowledge of the actions of his subordinates. *Webster*, 735 F.2d at 842. "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations are so widespread that they were the subject

of prlonged public discussion or of a high degree of publicity." *Id.* The sheer numerosity of incidents can provide evidence of constructive knowledge. *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

    **B.**    **Application of Law to Facts**

In the case at bar, it is undisputed that Sheriff Payne was the policymaker for the relevant time frame. As to an official policy being adopted, Plaintiff has alleged that a persistent, widespread practice existed at the jail whereby booking officers/ jailers abused, tortured, intimidated, and harassed pretrial detainees/inmates. Moreover, Plaintiff alleges that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had actual knowledge of the violence at the jail, and in the alternative, that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had constructive knowledge of the violence at the jail. In support of these allegations, Plaintiff relies on the following pieces of evidence.

    **1.**    **Plea Agreements**

Former correctional officers have signed plea agreements and entered guilty pleas for violations of prisoners/pre-trial detainees civil rights. See Exhibit "L". In the plea agreements, Regina Rhodes, Morgan Thompson, Daniel Evans, Karl Stolze, Thomas Wills, Dedri Caldwell, and William Jeffery Priest each admitted to assaulting and witnessing assaults of inmates at the detention center. Thompson and Caldwell admitted that they each participated in over 100 assaults against inmates between May 17, 2004 and August 28, 2006. Evans admitted that he had participated in several assaults against inmates and witnessed numerous assaults of inmates by other officers. Stolze admitted that he participated in several assaults against inmates and that he and his co-conspirators "engaged in a pattern of conduct that included, but was not limited to .

12

. . assaulting inmates, knowing that the physical force was unnecessary, unreasonable, and unjustified." William Jeffery Priest also admitted that he committed numerous assaults on inmates. The conduct described in the plea agreements includes punching, kicking, and choking inmates. These officers also admitted that they submitted false and misleading reports regarding their misconduct.

This practice of abuse and violence was so widespread and over such a period of time that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had either actual or constructive knowledge of the activities.

### 2.  Steve Martin Report

Steve Martin investigated the HCADC on behalf of the Department of Justice. Martin submitted a report, dated February 1, 2005, wherein he stated that there was a "very disturbing pattern of misuse of force" at the HCADC. See Exhibit "M", Martin report. Martin also found a "lack of appropriate review of incidents" and "the failure to properly investigate the incidents." *Id.* This report was sent to both the Sheriff and Harrison County Board of Supervisors. See Exhibit "N", Letter dated July 20, 2005.

Sheriff George Payne admitted receiving Martin's report. During his deposition, Sheriff Payne stated that he assigned Major Riley and Steve Campbell, of the Professional Standards Unit, to investigate the claims in the report. See Exhibit "O", p. 24, Lines 1-13. However, during the deposition of 30(b)(6) designee Steve Campbell, Campbell stated that he was never requested by Sheriff Payne to investigate these claims contained in Martin's report. Exhibit "P", p. 54, Lines 9-15. Indeed, when asked about Steve Martin, Campbell stated, "[W]ell, what I got from him was inmates never do anything wrong, correction officers always screw up." *Id.* at p. 52, Lines 5-7.

13

Now, Sheriff Payne has submitted an affidavit wherein he states that once he received Martin's report, he forwarded it to the Federal Bureau of Investigation; however, Sheriff Payne never mentioned this during his deposition and no record has been produced showing the report was forwarded to the FBI. It is clear that there are conflicting accounts as to whether the Sheriff took this report seriously. Sheriff Payne stated that he requested Campbell to investigate, but Campbell denies this occurred. Sheriff Payne did not mention the FBI with respect to the report during the deposition, but in support of the summary judgment motion, he now mentions involves the FBI. Clearly, the prison officials such as Campbell did not think too highly of Martin, and did not take his report seriously.

Martin's report provides official notice to both the Sheriff and Board of Supervisors about the escalating violence at the jail. However, as is evident in the plea agreements with respect to the time frame of abuse (2004-2006), the officials in charge did nothing to discourage such violence despite being on notice that it was occurring.

### 3. Deposition of Sheriff Payne, in his official capacity

During his deposition, Sheriff Payne was asked the following question and responded in the following way:

> Q: Do you believe that this is a – this problem in these plea exhibits is a problem you should have known about?
>
> A: **Yeah.** I don't know if it was possible for me to know about it, but I wish I'd have known about it. (emphasis added).

See Exhibit "O", 30(b)(6) deposition of Defendant, Payne testimony, p. 51, Lines 11-16 (emphasis added). During his deposition, Sheriff Payne's answer was "Yeah", but then he paused for a few seconds, and provided a qualifier. But his admission that he "Yeah" probably

should have known creates a genuine issue of material fact to preclude summary judgment on the issue that Sheriff Payne had either actual or constructive knowledge of the violence at the jail.

Finally, during his deposition, Sheriff Payne acknowledged that he spoke with Harrison County Board of Supervisor member William Martin about Martin's report and violence at the jail. This is confirmed by William Martin who testified that he had spoken with Sheriff Payne regarding the violence at the jail over a number of years. See Exhibit "Q", William Martin deposition, p. 22. When William Martin was asked to explain his concerns about violence at the jail, he testified that the Board periodically received complaints from inmates that they were being beaten. *Id.* Martin testified that Payne replied that they were working on the problem. *Id.* Finally, board member Bobby Eleuterius also testified that remembered receiving Steve Martin's report, but does not remember anything being done about it. See Exhibit "R", Eleuterious deposition, p. 44-45, Lines 16-5.

As is evident by the sworn testimony of Sheriff Payne and certain Board members, it is clear that both Sheriff Payne and the Board of Supervisors had either actual or constructive knowledge of the problem of violence at the HCADC.

### 4. Regina Rhodes Deposition

Regina Rhodes testified that the practice of abuse of inmates "was almost daily" while she was employed at HCADC from 2004 to 2006. Exhibit "B", p. 14, Lines 3-9. Rhodes described the pattern of abuse that she personally observed while she worked in booking at the HCADC. Rhodes described practices such as: red light/green light (*i.e.* abusing detainees in areas that would not be visible); targeting and taunting of persons who had been brought in on drinking charges or were drunk; falsifying reports; encouragement to falsify reports; special names for days of the week; and beating, kicking and otherwise abusing inmates. *Id.* pp. 9-18.

15

This abuse and violence was so widespread and over such a period of time that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had either actual or constructive knowledge of the activities.

### 5. Teel Trial Testimony

The correctional officers testified that they frequently referred to an unofficial policy of "red light, green light," which meant that officers should only strike inmates in areas that would be concealed by the jumpsuit worn by prisoners. See Exhibit "S", Priest testimony, p. 424, Lines 11-16. The face and head would therefore be considered a "red light," while the chest would be considered a "green light." The officers also testified regarding ways in which they would "fool" the surveillance cameras in booking to make it appear that inmates were resisting when in fact they were not. *Id.* at p. 408. They also testified that they would yell "stop resisting" to make others believe their violence against inmates was in response to resistance by the inmates. Id. at p. 435. The officers also had special names for the days of the week, such as "Thump a Thug Thursday." See Exhibit "T", Moore testimony, p. 556. The officers felt that the unnecessary assaults were funny and humorous. See Exhibits "S" and "T". Defendant Thompson testified that he felt like he lost touch with humanity and forgot that these inmates were human beings, and he confirmed this belief in his deposition testimony in this matter. Exhibit "D", p. 44, Lines 10-18.

This abuse and violence was so widespread and over such a period of time that Sheriff George Payne, in his official capacity, and the Harrison County Board of Supervisors had either actual or constructive knowledge of the activities.

### 6. *Alves v. Harrison County, et al.*, Order dated Feb. 23, 2009

This District Court found the following with respect to a custom of abuse of inmates at

16

the jail during the relevant time frame and the knowledge of the Sheriff and Board of Supervisors:

> sufficient evidence from which a jury could conclude that the custom of abuse of inmates at the jail was sufficiently widespread to constitute an official policy. The Court further finds that the evidence that hundreds of unjustified assaults were committed against inmates between 2004 and 2006 tends to show that Sheriff Payne either knew or should have known of the violence. Specifically, even members of the Harrison County Board of Supervisors, who were farther removed from the jail than the Sheriff, were aware of the culture of violence and inmate abuse at the jail. Finally, the evidence of this custom of abuse at the jail is indicative of deliberate indifference. As a result, the Court finds that a genuine issue of material fact exists regarding whether the custom of inmate abuse at the jail was sufficiently widespread so as to constitute an official policy of which the Sheriff had actual or constructive knowledge.

Accordingly, Defendant's assertion that there are not genuine issues of material fact with respect to the custom and practice of abuse and the relevant knowledge thereof is incorrect.

## V.    Moving Force

As discussed *supra*, the officer involved in the assault on the Plaintiff has been convicted of numerous similar assaults. Also, there is a significant amount of evidence before the Court that the officers in the booking area of the jail believed it was humorous to wrongfully assault inmates (*i.e.* taunting, teasing, naming days of the week, etc.). Accordingly, for all of the reasons cited above, there are genuine issues of material fact with respect to whether the custom of inmate abuse was a moving force behind the assault of the Plaintiff.

## VI.    Conspiracy

Using the evidence that is discussed at length *supra*, there are genuine issues of material fact with respect to whether a custom of which Sheriff Payne had constructive, or actual, knowledge caused the development of a conspiracy to assault inmates that was a moving force

17

behind the violation of Plaintiff's constitutional rights.

In summary, there are numerous genuine issues of material fact which preclude summary judgment in this matter. Accordingly, the Court should deny Defendant's Motion for Summary Judgment.

        RESPECTFULLY SUBMITTED

        GARY BRICE MCBAY, Plaintiff

        BY:    BROWN BUCHANAN, P.A.


        BY:    */s/Patrick R. Buchanan*_____
                  PATRICK R. BUCHANAN
                  MARK V. WATTS

## **CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that I have this day mailed by United States mail, postage prepaid, a true and correct copy of the foregoing pleading to the following counsel:

Cyril T. Faneca
Haley Necaise Broom
Joe Crawford Gewin
Dukes, Dukes, Keating & Faneca
Post Office Drawer W
Gulfport, MS  39502-0680

Ian A. Brendel
James L. Davis III
Post Office Box 1839
Gulfport, MS  39502-1839

Karen Jobe Young
Meadows Law Firm
Post Office Box 1076
Gulfport, MS  39502

This, the 14th day of December, 2009.

                 */s/ Patrick R. Buchanan*_____
                 PATRICK R. BUCHANAN

PATRICK R. BUCHANAN (MSB #8439)
MARK V. WATTS (MSB #102204)
BROWN BUCHANAN, P.A.
796 VIEUX MARCHE, SUITE 1
POST OFFICE BOX 1377
BILOXI, MS  39533-1377
TELEPHONE: (228) 374-2999
FACSIMILE:   (228) 435-7090