# Exhibit B

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      SOUTHERN DIVISION
 3
 4   GARY BRICE McBAY,
            Plaintiff,
 5
 6   VERSUS            CIVIL ACTION NO: 1:07cv1205LG-RHW
 7
     HARRISON COUNTY, MISSISSIPPI,
 8   by and through its Board of
     Supervisors; HARRISON COUNTY
 9   SHERIFF, George Payne, in his
     official capacity; CORRECTIONS
10   OFFICER MORGAN THOMPSON,
     acting under color of state law,
11          Defendants.
12
13

                 DEPOSITION OF REGINA L. RHODES
14
15          Taken at the offices of Brown Buchanan,
            P.A., 796 Vieux Marche' Mall, Suite 1,
16          Biloxi, Mississippi, on Thursday,
            September 17, 2009, beginning at 2:22
17          p.m.
18
19   APPEARANCES:
20          PATRICK R. BUCHANAN, ESQUIRE
            MARK V. WATTS, ESQUIRE
21          Brown Buchanan, P.A.
            796 Vieux Marche' Mall, Suite 1
22          Biloxi, Mississippi  39530
               ATTORNEYS FOR PLAINTIFF
23
            JOE C. GEWIN, ESQUIRE
24          Dukes, Dukes, Keating & Faneca, P.A.
            2909 13th Street, Sixth Floor
25          Gulfport, Mississippi  39501
               ATTORNEY FOR GEORGE PAYNE, JR.
```

1    Center.  I'm going to call it the jail just

2    because I don't want to say four words instead of

3    one word, frankly.  So when I say "jail," can we

4    understand that I'm referring to the Harrison

5    County --

6         A.    Yes, sir.

7         Q.    -- Detention Center?

8               All right.  When you worked there, are

9    you familiar with the term "brother by a different

10   mother," the phrase?

11        A.    Yes, sir.

12        Q.    What's that mean to you?

13        A.    Well, basically, we shortened it,

14   brother from another mother.  It was just to

15   explain the closeness between the folks that

16   worked at the jail.

17        Q.    All right.  The correction officers that

18   worked together?

19        A.    Yes, sir.

20        Q.    And y'all were close and relied on each

21   other and depended on each other?

22        A.    Yes, sir.

23        Q.    All right.  Have you heard the term "red

24   light, green light"?

25        A.    Yes, sir.

1      Q.    Was that a phrase that was used in

2   booking?

3      A.    Yes, sir, it was.

4      Q.    Tell us what that phrase means to you.

5      A.    Red light would be the facial area,

6   anything that you -- you weren't supposed to hit

7   anything that would show on a booking photo, and

8   green light would be the rest of the body.

9      Q.    All right.  And how did y'all come to

10  use red light, green light and determine where you

11  should and shouldn't hit?

12     A.    Well, after Deputy Thompson had a

13  particularly bad booking shot of an inmate named

14  Only, OIC Teel had a impromptu meeting with our

15  shift in the back of booking and inmate records

16  and said that red light, green light -- you know,

17  that the chief was -- the chief, Captain Gaston,

18  was upset about the booking photo and that we

19  needed to be more careful.

20     Q.    All right.  Be more careful where you

21  hit people?

22     A.    Yes, sir.

23     Q.    Okay.  So it's okay to hit folks just as

24  long as it didn't show up on the booking photo?

25  MR. GEWIN:

1          Object to leading.

2     MS. YOUNG:

3          Object to the form.

4     MR. BUCHANAN:

5          Q.    Subject to the objection, did you hear

6     my question?

7          A.    Yes, sir, I did.

8          Q.    Okay.  So it was okay to hit people as

9     long as it didn't show up on the booking photo?

10         A.    Yes, sir.

11         Q.    People in booking, I mean, there are

12    different legal terms for them, inmates, detainees

13    and all of that.  I'm going to call them inmates

14    just for sake of ease again, not necessarily

15    subscribing any legal terms or get you to give me

16    legal opinions on the different rights owed to an

17    inmate versus a detainee and all of that.  Okay?

18    Was it common, in your experience when you were

19    there, for inmates that were brought in there to

20    be taunted by the correction officers?

21         A.    Yes, sir.

22         Q.    Tell us about that.

23         A.    If the inmate came in and was either

24    running their mouth or, you know, belligerent in

25    any way, you know, even if they weren't sometimes,

Page 12

1    the officers would start picking on them, taunting
2    them, you know, if -- in particular, if somebody
3    was looking at you, you know, looking at you hard,
4    you know, you might say if you're feeling froggy
5    jump or, you know, you're looking at me like you
6    want to hit me, go ahead, stuff to that effect.
7         Q.   Did you hear Officer Teel ever taunt
8    inmates?
9         A.   Yes, sir.
10        Q.   Did you hear Officer Thompson ever taunt
11   inmates?
12        A.   Yes, sir.
13        Q.   Did you hear Officer Wills ever taunt
14   inmates?
15        A.   Yes, sir.
16        Q.   How about Officer Stolze, did he ever
17   taunt the inmates?
18        A.   Yes, sir.
19        Q.   And Officer Thompson has pled guilty to
20   charges arising out of his employment there at the
21   jail and is serving time?
22        A.   Yes, sir.
23        Q.   All right.  And the same with Officer
24   Stolze?
25        A.   Yes, sir.

1      Q.    And Officer Priest?

2      A.    Yes, sir.

3      Q.    And Officer Wills?

4      A.    Yes, sir.

5      Q.    All right.  Folks that would come in who

6   had been drinking, were they more apt to be

7   taunted by these officers?

8      A.    To me, I would say they appeared to be.

9      Q.    And why is that?

10     A.    They were easier targets.

11     Q.    Give me one minute real quick.  Let me

12  jump -- and I hate to jump around on you, but I

13  need to ask a couple of questions before I ask

14  some other questions.  So let me go back to

15  Exhibit 1.  On Page 3 of Exhibit 1, it says that,

16  While she, being you, were assigned to the booking

17  area, you observed Teel and other corrections

18  officers engage in a pattern of physical abuse of

19  inmates at the jail.  Is that a true statement?

20     A.    Yes, sir.

21     Q.    All right.  More specifically, Teel and

22  other correction officers routinely participated

23  in striking, punching, kicking, choking and

24  otherwise assaulting inmates in circumstances that

25  did not justify the use of force.  Is that a true

```
 1    statement?
 2        A.    Yes, sir, it is.
 3        Q.    Those things, that pattern, that
 4    practice of abuse, did that happen -- I mean, did
 5    it happen just on one day during the time you were
 6    there or did it happen for a long period of time
 7    while you were employed there?
 8        A.    It was almost daily while I was employed
 9    there.
10        Q.    All right.  It said, Teel regularly
11    encouraged other correction officers regarding
12    their involvement in this conduct.  Is that a true
13    statement?
14        A.    Yes, sir, it is.
15        Q.    Meaning he did things and he got the
16    other officers involved in the things -- the
17    assault on the inmates?
18        A.    Yes, sir.
19        Q.    All right.  Additionally, Teel and other
20    correction officers submitted false, incomplete,
21    and misleading jail reports for the purpose of
22    covering up these assaults.  Is that a true
23    statement?
24        A.    Yes, sir.
25        Q.    All right.  And it says you were aware
```

1    that Teel and other correction officers were

2    submitting false and incomplete and misleading

3    reports to cover up the uses of unnecessary force

4    and failed to report their criminal conduct.  Is

5    that a true statement?

6         A.    Yes, sir, it is.

7         Q.    All right.  Those things that I just

8    read in that paragraph, do those things apply to

9    Officer Stolze?

10        A.    Yes, sir.

11        Q.    Do they apply to Officer Priest?

12        A.    Yes, sir.

13        Q.    Do they apply to Officer Teel?

14        A.    Yes, sir.

15        Q.    Do they apply to Morgan Thompson,

16   Officer Thompson?

17        A.    Yes, sir.

18        Q.    All right.  Were you there on the night

19   the incident happened with Jessie Lee Williams?

20        A.    Yes, sir, I was.

21        Q.    Before Mr. Williams was beaten to death,

22   was he taunted by the booking officers?

23        A.    Yes, sir, he was.

24        Q.    Did Mr. Williams make any comments or

25   say anything to the booking officers either before

1    or when they were taunting him?

2    MR. BRENDEL:

3            Object to the form.  When you're talking

4    about booking officers, I want to make sure we

5    know which booking officers we're talking about.

6    MR. BUCHANAN:

7        Q.    Do you recall who was on duty that

8    night?

9        A.    Yes, sir.

10       Q.    Who was on duty that night?

11       A.    Myself, OIC Teel, and Thompson.

12       Q.    Morgan Thompson --

13       A.    Yes, sir.

14       Q.    -- and Officer Teel?  All right.  And

15   did Officer Teel and Officer Thompson taunt

16   Mr. Williams?

17       A.    Yes, sir.

18       Q.    Did he say anything to Officer Teel or

19   Officer Thompson before or when they were taunting

20   him?

21       A.    While he was handcuffed he said he was

22   going to beat Teel's ass.

23       Q.    But he was handcuffed when he said that?

24       A.    Yes, sir.

25       Q.    And then after Mr. Williams was beat,

1    the nurse was called, right?

2        A.    Yes, sir.

3        Q.    And the nurse looked at him, said he had

4    a cut lip, cut ear and his eyes were puffy?

5        A.    Yes, sir.

6        Q.    And she also said, I believe, that he

7    didn't need to go to -- he didn't need to go out

8    for AMR?

9        A.    Yes, sir.

10       Q.    All right.  She said that he was going

11   to live and be okay?

12       A.    Yes, sir.

13       Q.    And I asked you this, and it's in your

14   pleas.  So the booking officers would falsify

15   their reports; is that right?

16       A.    Yes, sir.

17   MR. GEWIN:

18            Object to the form.

19   MR. BRENDEL:

20            Object to the form, time.

21   MR. BUCHANAN:

22       Q.    I'm trying to look for a page

23   discreetly, and I'm not having that much luck, so

24   I apologize.  So I'll just tell you that I'm

25   taking an extra minute here because I can't find

1   the page that I was looking for.  There we go.

2            The objection was time.  Would it be

3   fair to say that from when you started in May of

4   2004 until when you left in April of 2006, the

5   corrections officers would falsify reports?

6        A.   Yes, sir.

7   MR. BRENDEL:

8            Object to the form, not specifying the

9   correction officers' names.

10  MR. BUCHANAN:

11       Q.   You and I have already talked about the

12  names of correction officers who falsified

13  reports, haven't we?

14       A.   Yes, sir.

15       Q.   Thank you.

16            (Exhibit 2 was marked.)

17  MR. BUCHANAN:

18       Q.   Exhibit 2 is the Uniform Booking/Arrest

19  Form for William David Seal, and I want to talk to

20  you about that in terms of you weren't on duty

21  when Mr. Seal was booked into the jail.  And let

22  me ask you this:  You're aware that there are

23  cameras in the jail, right --

24       A.   Yes, sir.

25       Q.   -- showing different areas of the

1      A.   Yes.

2          Q.   All right.  Can we roll forward?  All

3      right.  What I want you to do here is, if you

4      would, watch the square, the right hand -- in the

5      right-hand corner and -- yeah, can you back that

6      up for me a little bit?  All right.  Stop.  All

7      right.  We're at 20:42:33, and you're watching the

8      right-hand, lower right-hand corner square.

9          A.   Yes, sir.

10         Q.   And did you see -- stop it.  At 20 -- it

11     looks like 20:43:14 or a little bit before.  I

12     mean, obviously there's a fuzzy line at the

13     bottom, and the date and time stamp is very hard

14     to read, isn't it?

15         A.   Yes, sir.

16         Q.   All right.  But did you see that at the

17     bottom, the legs?

18         A.   Yes, sir.

19         Q.   Tell us what you saw or what you believe

20     you saw.

21         A.   I believe whichever inmate was standing

22     there had his feet come out from underneath him.

23         Q.   All right.  And what type of move would

24     a correction officer use on an inmate to take them

25     down to have his feet come out from under him like

```
 1    that?

 2         A.    A leg sweep.

 3         Q.    And why would you use a leg sweep?

 4         A.    If you needed to place an inmate on the

 5    floor quickly if he was being aggressive.

 6    MR. GEWIN:

 7              Pat, could they back up and show what

 8    you're talking about?  I don't see anything in

 9    this particular frame.

10    MR. BUCHANAN:

11              All right.  Those are the legs right

12    there, but, yeah, back up.

13    MR. WATTS:

14              That's the area you have to watch.  You

15    want to back it up?

16    MR. BUCHANAN:

17              Yeah.  Back it up, if you can.

18    MR. WATTS:

19              It's there, 20:43:10.

20    MR. BUCHANAN:

21              You missed it, Joe, when you looked down

22    on your paper.

23    MR. GEWIN:

24              I saw something.

25    MR. BUCHANAN:
```

```
 1   MR. BUCHANAN:

 2        Q.   You can answer.

 3        A.   That he was about to have a physical

 4   altercation with an inmate.

 5        Q.   So the gloves on, hat backwards meant

 6   that something bad was about to happen?

 7        A.   Yes, sir.

 8   MR. BRENDEL:

 9             Object to the form.

10   MR. BUCHANAN:

11        Q.   All right.  Go forward.  Now, I want you

12   to watch him with this inmate.  And did you see

13   that?

14        A.   Yes, sir.

15        Q.   All right.  What did you see?

16        A.   It appeared that he -- he either hit him

17   or pushed him down because the inmate fell.

18        Q.   Did that look like the inmate was

19   bending over to take his shoes and socks off?

20        A.   No, sir.

21   MR. BRENDEL:

22             Object to the form, speculation.

23   MR. BUCHANAN:

24        Q.   Did that look like the inmate was so

25   drunk that he couldn't stand up?
```

Page 35

```
 1        A.    No, sir.
 2   MR. BRENDEL:
 3            Object to the form.
 4   MR. BUCHANAN:
 5        Q.    Did it look like Officer Thompson
 6   physically took the inmate down?
 7        A.    Yes, sir.
 8   MR. BRENDEL:
 9            Object to the form.
10   MR. GEWIN:
11            Can we back up and look at that again?
12   MR. BUCHANAN:
13            Sure.
14   MR. GEWIN:
15            Let's do that.
16   MR. BUCHANAN:
17            And it's 20:50:19 in there.  When I get
18   a clear shot of a time stamp, I try to call it out
19   for you.
20   MS. YOUNG:
21            And just for the record, the same
22   objection I stated earlier, that this witness is
23   not testifying about something she saw when she
24   was there.  She's just giving her opinion as to
25   what somebody else is doing, which is
```

1        Q.    Tell us what that is.

2        A.    That appears to be a stamp from the

3   shower grate on the booking floor.

4   MR. BRENDEL:

5             Object to the form.

6   MR. BUCHANAN:

7        Q.    All right.   And how would inmates get

8   that kind of stamp?

9   MR. BRENDEL:

10             Object to the form.

11       A.    If they were either thrown to the floor

12   or when they were on the floor, if they were

13   kicked into the grate.

14   MR. BUCHANAN:

15       Q.    All right.   Is that based on your

16   personal experience and knowledge of what happened

17   in the jail?

18       A.    Yes, sir, it is.

19       Q.    All right.   Let's take all of this --

20   well, let me ask you a couple more questions.

21   Let's do it this way.   Let me ask you a couple

22   more questions about Brice, and then we'll take a

23   break.   Okay?

24       A.    Okay.

25       Q.    Officer Thompson testified that when he

```
 1   had a discussion with Officer Thompson about that
 2   "X"?
 3        A.   Yes, I did.
 4        Q.   In that discussion, did Officer Thompson
 5   tell you that "X" came from Brice's head
 6   contacting the drain in the shower?
 7        A.   Yes, he did.
 8        Q.   Based on your training as a correction
 9   officer for the Harrison County Detention Center,
10   was it okay to use force when people cussed you?
11        A.   No.
12        Q.   So if a drunk cussed you, you couldn't
13   take them down, cuff them or do anything else
14   physical to them?
15        A.   No.
16        Q.   Or, I guess, you shouldn't?
17        A.   Not according to policy.
18        Q.   Mr. Gewin talked with you about brachial
19   plexus stun and if an inmate approached you with a
20   shank, or a shiv I think was the word he used,
21   and, you know, could you defend yourself.  Exhibit
22   9 I'm going to show you is Brice's Use of Force
23   Report.  If you could just verify for me -- here
24   on the first page where it says --
25        A.   Active aggression?
```