# Exhibit M

Case 1:06-cv-00912-LG-JMR    Document 212-13    Filed 12/10/2008    Page 1 of 6

# 7TH SUPPLEMENTAL REPORT OF STEVE J. MARTIN

## PREPARED FOR THE U.S. DEPARTMENT OF JUSTICE
## CIVIL RIGHTS DIVISION/SPECIAL LITIGATION SECTION

### ON THE

### HARRISON COUNTY DETENTION CENTER
### GULFPORT, MISSISSIPPI

### FEBRUARY 1, 2005



## I. INTRODUCTION

This is the 7th in a series of reports addressing the defendants' compliance with certain provisions of the <u>Consent Judgment</u> entered between the parties on January 11, 1995. The six previous reports have detailed numerous, serious and persistent problems related to overcrowding, staffing and security. The last report in this series was filed after a site inspection in November 2001 (see 6th Supplemental Report of Steve J. Martin, February 20, 2002). After this report was filed, the Department of Justice filed their *Motion For Order To Show Cause Why Defendants Should Not Be Held in Civil Contempt*. This motion included my declaration detailing longstanding and pervasive staffing deficiencies at the Harrison County Detention Center ("HCDC"). The motion resulted in a considerable increase in security staff assigned to housing and support areas of HCDC.

The current report documents the defendants' compliance in light of the recent and significant increases in security staffing. The majority of the new staff positions came online between April 2004 and October 2004. This most recent site inspection occurred on December 14-15, 2004. While the recent staff allocation certainly represents a serious commitment by Harrison County officials to facilitate compliance with the terms of the <u>Consent Judgment</u>, the recent gains made through the increased staffing allocation are seriously undermined and jeopardized by egregious overcrowding, as detailed below.

## II. METHODOLOGY

In preparation of this site inspection, the quarterly reports submitted by the defendants were reviewed, especially those reports submitted from April 2004 to present. These quarterly reports contain daily population data, post assignment/master rosters, and statistical reports on

1

Post Assignment rosters (Novembe/December 2004) indicate that officers are routinely assigned to all essential posts on all shifts. The facility is also now operating with an adequate number of officers in such support positions as rovers, transport and medical security. HCDC officials have done an admirable job of recruiting, hiring and training such a sizeable cadre of new staff during the last six months of 2004. The required pre-service training course is supplemented by a on-the-job training program in which all new officers are assigned a Field Training Officer who systematically trains officers on specific posts utilizing performance checklists to establish a requisite level proficiency. I also reviewed the in-service training course work (40 hours) which offers an adequate variety of relevant topics.

C. Security Administration

1. <u>Staff Use of Force</u>. In the six previous reports filed since 1997 there was a single instance in which I reported on a misapplication of force, chemical agents or restraints (see 2nd Supplemental Report, July 1998). As aforementioned, there were thirty-one incidents of force in December 2004, which represents a serious increase in the use of force at the HCDC. In reviewing the use of force incident packages for November/December 2004, a very disturbing pattern of misuse of force is evident. Of the four incidents summarized below, it should be noted that four of the same officers were involved in two or more of the four incidents. These four incidents are summarized to illustrate the nature of the misuse of force, the lack or appropriate review of the incidents, and the failure to properly investigate the incidents. An overcrowded facility when combined with inexperienced and ill-trained staff, and inadequate controls to properly manage staff use of force, inevitably results in incidents such as the following:

Incident of November 12, 2004: On November 12, 2004 at approximately 6:00pm, an officer attempted to place a resisting inmate on the wall in order to secure and transport him to a secure cell. The inmate struck the officer with a closed fist, at which time another officer called for assistance. Officers restrained the inmate and escorted him to pre-hearing detention. Details of this incident were discussed among other officers in the late evening hours of the 12th and early morning hours of the 13th. At approximately 3:00am on the 13th, the inmate was removed from his pre-hearing detention cell and escorted to an outdoor recreation yard on the cellblock where at least six officers were present, some of whom then assaulted the inmate. On November 22nd, the security captain received information about this incident from a non-involved officer on the midnight shift. The captain interviewed two of the six officers present during the assault, both of whom acknowledged the incident. None of the six officers present had filed any written reports in the immediate aftermath of the incident. This matter was referred for investigation which is pending. At the time of the site inspection, no disciplinary or administrative action had been initiated on any of the six officers and they remain in inmate contact positions at the facility.

Incident of November 16, 2004: Two inmates had a verbal confrontation with an officer (one of six involved in the above incident) who ordered them to return to their cell; an order with which they complied. A sergeant thereafter ordered the officer who had just had the verbal confrontation to escort one of the two inmates to pre-hearing segregation. The officer continued to use confrontational language with the inmates now secured in a cell. Rather than de-escalate and assemble an extraction team, the officer opened the cell door and utilized a burst of OC spray on both inmates. He then utilized a second burst of spray when the inmate allegedly took "an aggressive stance." He then utilized a third burst at which time the inmate began to crawl on the floor, at which time he was finally secured. An officer who witnessed the incident and assisted in placing restraints on him filed a report in which he documented only a single burst of spray. There is no evidence that this incident was subject to any kind of administrative review nor was it investigated. There is evidence this incident could have been avoided entirely if de-escalation procedures been employed. Moreover, the sergeant should have assembled escort officers other than the officer who was involved in the verbal altercation. Finally, three separate applications of OC spray on an unarmed inmate who should have been immediately secured upon opening the cell door is evidence of very questionable use of force tactics that should have been at least reviewed or investigated by a non-involved supervisor.

Incident of November 28, 2004: During the intake process, an inmate threw an article of clothing at an officer. The officer administered a one-second burst of OC spray, after which he and two other officers immediately took the inmate to the ground and restrained him. The other two officers failed to file reports of his

8

incident. The inmate sustained the following unexplained injuries: swollen ear, abrasions to jaw and left and right back and a laceration to the lip. There is no evidence that this incident was subject to review or investigation, notwithstanding a failure to report by two officers and unexplained hard-impact injuries consistent with allegations made by the inmate that the officers assaulted him with closed fists and kicks. Two of the three officers involved in this incident were also among the six officers present in the 11/12/04 incident, above.

Incident of December 14, 2004: Booking officers inexplicably chose to escort an intoxicated inmate to the dayroom of a housing unit. When the inmate resisted the escort to the housing unit, an altercation ensued between the inmate and three booking officers. After the altercation in the booking area, the three officers escorted the inmate to the cellblock. Once the inmate was in the cellblock, he complained of an injury he received as a result of the altercation in booking. When these booking officers, who had returned to the booking area, heard via radio that medical personnel had been dispatched to the cellblock, they of their own accord returned to the cellblock where another altercation occurred in which hard impact closed fist strikes were exchanged between the inmate and one of the three booking officers. During the course of the site inspection on December 14, I interviewed the subject inmate who had sustained obvious and multiple head trauma (eye swollen shut, swelling in temporal area and cheek). The use of force report on the earlier incidents had been completed. The section of the report completed by medical staff found no injuries were sustained by the inmate. The security captain who accompanied me on the site inspection ordered that the inmate be re-examined and photos taken of his injuries. Upon re-examination, medical staff again failed to note at least three separate and obvious facial/eye injuries sustained by the inmate during the altercations. The injuries were finally noted on his medical chart when I specifically requested same. In an egregious violation of their own inmate disciplinary procedures, personnel, without a hearing of any kind, found the inmate guilty of assault within hours of the incident (the Rule Violation Report contains an obvious false entry that the inmate admitted guilt).

2. Inmate Classification. The present classification system is seriously compromised due to the extreme overcrowding. As a result, classification personnel rely almost exclusively on the current charge offense behavior to house inmates. Space is simply too scarce to allow personnel to make housing decisions beyond such categories as juvenile/adult, male/female, misdemeanor/felony. Behavior-based custody decisions are at best reactive rather than

inmates use a single toilet which is in obvious violation of the American Correctional Association Standard of one toilet for every twelve inmates. The shower ratios are equally deficient.

## IV. CONCLUSIONS

Severe overcrowding has adversely impacted virtually all areas of operation. The laudable gains made with increased staff are seriously undermined by the sheer number of inmates housed at HCDC. Both the physical plant and security operations are presently compromised to a point at which the facility is unsafe for both inmates and staff.

*Steve J. Martin*

11