```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      SOUTHERN DIVISION

 3

 4   GARY BRICE MCBAY,
          Plaintiff,
 5

 6   VERSUS            CIVIL ACTION NO: 1:07CV1205-LG-RHW

 7

     HARRISON COUNTY, MISSISSIPPI,
 8   BY AND THROUGH ITS BOARD OF
     SUPERVISORS; HARRISON COUNTY
 9   SHERIFF GEORGE PAYNE; WAYNE
     PAYNE; DIANE GASTON RILEY;
10   STEVE CAMPBELL; RICK GASTON;
     RYAN TEEL; MORGAN THOMPSON;
11   JOHN DOES 1 - 4; AMERICAN
     CORRECTIONAL ASSOCIATION;
12   JAMES A. GONDLES, JR.; UNKNOWN
     DEFENDANTS 1 - 3 EMPLOYEES OF
13   AMERICAN CORRECTIONAL
     ASSOCIATION; HEALTH ASSURANCE,
14   LLC, AND UNKNOWN DEFENDANTS 1
     - 2 EMPLOYEES OF AMERICAN
15   CORRECTIONAL ASSOCIATION,
          Defendants.
16

17   _____

18            **DEPOSITION OF THOMAS RANDAZZO**

19   _____

20        Taken at the offices of Dukes, Dukes,
          Keating & Faneca, 2909 13th Street,
21        Sixth Floor, Gulfport, Mississippi, on
          Thursday, July 9, 2009, beginning at
22        9:32 a.m.

23

24                                         COPY

25
```



```
 1   understand the question; is that fair enough?
 2        A.   Yes, sir.
 3        Q.   And sometimes folks will make an
 4   objection or something.  If they do, if you'll
 5   just pause a moment so that we can deal with that,
 6   if they object to the form of the question or the
 7   responsiveness of your answer.
 8             And I'll try not to talk on top of you
 9   if you'll let me finish my question, even if you
10   anticipate what it's going to be, so that the
11   court reporter here doesn't have to try to take
12   down two people talking at one time, okay?
13        A.   Okay.
14        Q.   We're here about an incident that
15   happened November 6th, 2005 at the Choppers Lounge
16   in Gulfport.  What was your involvement?  Were you
17   there the night of November 6th, 2005?
18        A.   Yes.  We had been in the bar playing
19   pool in a pool tournament.  The gentleman in
20   question had been asked to leave.  Visibly
21   intoxicated.
22        Q.   Who asked him to leave?
23        A.   The bartenders.  They had cut him off,
24   asked him -- you know, you need to go sleep, get a
25   ride home, whatever.
```

```
 1      Q.   Describe this person, if you would.
 2      A.   I really don't recollect what he looks
    like.  I know he was a lot smaller than me.  He
    wasn't a very big person, per se.  He just -- I
    know he was intoxicated.  I can't remember what he
    looked like physically.
 7      Q.   Let me let you look at this.  This will
    be Exhibit 2.
 9      A.   (Witness examining document.)
10           (Exhibit 2 was marked.)
11  MR. GEWIN:
12      Q.   So what would you estimate his height or
    weight at?
14      A.   Approximately 5'8", 5'10", somewhere
    around in there.  He was a lot smaller than me.
    Weight, maybe 180 at the most.
17      Q.   There's a picture of the booking photo
    of Mr. Gary Brice McBay.  Does that resemble the
    fellow?  Does that look like him?
20      A.   I believe so.
21      Q.   Okay.  So this is the person that you
    asked to leave the bar November 6th, 2005?
23      A.   The bartenders, yes, sir.
24      Q.   Okay.  Were you just there as a patron,
    or tell us about that?
```

1   A.   Well, I ran their pool tournaments on
2 weekends, Friday, Saturday and Sundays.
3 Unofficial bouncer.  Whenever trouble would pop up
4 in the bar, myself or the owner, one of us, would
5 try to calm it down, you know, get control of the
6 incident.
7        The night in question, he was asked to
8 leave.  I watched him walk outside.  He's bumping
9 into cars.  I mean, he's really intoxicated.
10   Q.   Did you speak with him before --
11   A.   Not before he went out the door.  I
12 followed him out, tried to call him, hey, let us
13 call you a cab or sleep in your truck.  He just
14 kept walking, got in his truck.
15   Q.   Was this a parking lot outside the bar?
16   A.   Yes, sir.  It was attached to the bar
17 itself.  I mean, it's only maybe 30 foot out to
18 the road itself.
19   Q.   What road is that?
20   A.   I can't remember the name of it.
21   Q.   Is it a paved road?
22   A.   Yes, sir.
23   Q.   Okay.
24   A.   He climbed in his truck, which was quite
25 high off the ground, the bottom of it was.  The

1   door still open. I talked to him, said, look,
2   give me your keys, sleep in your truck, get the
3   keys in the morning, you don't need to be on the
4   road driving. He was really drunk. He continued
5   to argue with me. I said, look, let us call you a
6   cab, sleep in your truck or something, don't
7   drive. I said, I don't want to call the police on
8   you. Well, at that time, he swung at me.
9       Q.   Did he hit you?
10      A.   Glancing. I mean, it was a glancing
11  blow. So I pulled him out of his truck.
12      Q.   How did you do that?
13      A.   Grabbed him by his shirt and pulled.
14      Q.   Did you pull him all the way out?
15      A.   Yes, sir.
16      Q.   Where did he go?
17      A.   He landed on the ground right next to --
18  in front of me, actually. I picked him up. I
19  said, look, I don't want to call the police, sleep
20  in your truck or get a cab, you don't need to be
21  driving.
22      Q.   What happened next?
23      A.   He swung at me again.
24      Q.   Did he hit you that time?
25      A.   Yes, sir, he did. He caught me in the

```
 1   jaw that time.
 2        Q.   What did you do?
 3        A.   I hit him back.  He went to the ground.
 4   I picked him up, walked him over to the building.
 5        Q.   Was he able to walk?
 6        A.   He was able to walk, staggering, but he
 7   was able to.
 8        Q.   When you said you pulled him out of the
 9   truck to the ground, what kind of ground are we
10   talking about, grass, gravel, pavement?
11        A.   Actually it's a mixture of grass, sand,
12   gravel.  Once I got him to the wall, my then
13   girlfriend, which is now my wife, walked outside.
14   I told her, call the sheriff's department.  He
15   commenced to swing at me again.
16        Q.   Did he hit you?
17        A.   No.  I put him to the ground.
18        Q.   How did you do that?
19        A.   I grabbed the back of him and put him
20   down.
21        Q.   Face down?
22        A.   Yes, sir.
23        Q.   What was the ground like where that
24   happened?
25        A.   About the same material, grass, sand,
```

1  gravel.
2      Q.   Parking lot?
3      A.   Yes, sir, still in the parking lot.
4  Once he was on the ground, I sat on him, put his
5  hands behind his back and held him there.
6      Q.   Was he face down?
7      A.   Yes, sir.
8      Q.   Okay.  Was he talking to you at the
9  time?
10     A.   He was cussing me.  I just sat there and
11 waited till the police showed up.  And when the
12 officers came around the corner, I started to get
13 up.  They told me, no, they want to get him in
14 handcuffs before I get off of him.
15          Once they put the cuffs on him, I stood
16 up.  They asked me to go speak with the other
17 officer, which I did, and gave him my statement of
18 what had happened.
19     Q.   What did you tell the officer?
20     A.   That he was too drunk to drive.  We
21 asked him to sleep in his car, taxi, you know,
22 options for him not to be driving.  He refused.
23 He swung at me.  I put him to the ground.  Then I
24 brought him over here, and that's when we had, you
25 know, someone call y'all.

1   Q.  Did Mr. McBay exhibit any injuries at
2   the time, any evidence of any injuries?
3   A.  If he had some bruising, it may have
4   been caused by me.  I can't guarantee.  I know I
5   did hit him.  He may have had like a scratch or
6   something on his cheek area.
7   Q.  Anything wrong with his nose?
8   A.  I didn't see it.  I mean, it really
9   happened so fast.  And when he's on the ground,
10  I'm not looking at him no more.  I was just
11  waiting for the police to get there to get him.
12      Once they got there, I spoke with the
13  officer, stayed there.  They started walking him
14  to the car, and I went back into the bar.  And
15  that was the last I had heard anything until being
16  contacted by your association about this.
17  Q.  As I understand your testimony, you put
18  Mr. McBay on the ground at his truck and then
19  again up near the wall of the bar?
20  A.  Yes, sir.
21  Q.  Did you put him to the ground face down
22  both times?
23  A.  Yes, sir.
24  Q.  And you don't know for sure if Mr. McBay
25  suffered any injury?

1  A.  I didn't see him because I wasn't really
2  looking at his face.  I was trying to contain him
3  until the police got there.
4  MR. GEWIN:
5         This will be Exhibit 3.
6         (Exhibit 3 was marked.)
7  MR. GEWIN:
8  Q.  You mentioned that you talked to one of
9  the two officers that showed up?
10  A.  Yes, sir.
11  Q.  And gave a statement of what you saw and
12  what happened?
13  A.  Yes, sir.
14  Q.  If you would, look at Exhibit 3.  This
15  is the arrest report.  Just read that to yourself
16  to refresh your memory.
17  A.  (Witness examining document.)  Okay.
18  Q.  Does that refresh your memory?
19  A.  That's pretty much what I had just said.
20  Q.  And this report notes the date of the
21  offense was November the 6th, 2005.  That was
22  after the storm.  Was the bar pretty full that
23  night, or how would you describe it?
24  A.  Yeah.  They had probably 40, 50 people
25  there.  I can't remember if there was a party

1  going on or what, but I know there was quite a few
2  people there.
3       Q.   Did reading this narrative that you gave
4  one of the investigating police officers, does
5  that refresh your memory of any injuries that Mr.
6  McBay was showing that night?
7       A.   I really couldn't say because I don't
8  know if I injured him when I put him to the ground
9  either time.
10      Q.   I'm not asking what caused it, but your
11 report says that Mr. McBay had a bloody nose.
12      A.   Okay.  Well, if he did, I mean, that's
13 the only thing I can say is it happened when I put
14 him on the ground.  I'm not positive that I caused
15 injuries.
16      Q.   We're not asking that, just if he had a
17 bloody nose or not?
18      A.   I don't remember.  I really can't recall
19 now.
20      Q.   But you did this contemporaneous --
21      A.   If I said it in there, yes, that's what
22 happened.
23 MR. GEWIN:
24           Off the record, please.
25                (Off the record.)

1    Choppers.

2    MR. GEWIN:

3         I was just curious about that.  Nothing

4    further.

## EXAMINATION

6    BY MR. BRENDEL:

7         Q.    Sir, my name is Ian Brendel.  I

8    represent some of the various correctional

9    officers who were at the jail, at the Harrison

10   County Jail.  I just wanted to clarify a few

11   things that you talked about earlier, namely let's

12   start with the time that passed between the time

13   you say you sat on Mr. McBay until the police got

14   there.  Tell me about how long that was.

15        A.    Approximately 15 minutes.

16        Q.    Okay.  And I think during that time

17   period, you said he was cursing?

18        A.    Yes.

19        Q.    Was he trying to get up and get out from

20   under you?

21        A.    He could try, but he wasn't going to do

22   it.  I weigh 300 pounds.  This man was not moving

23   once I got on top of him.

24        Q.    Was he trying to, though?

25        A.    Yeah.  He tried a couple times and then

1  he quit.
2      Q.   Tell us how he tried to.
3      A.   Just wiggling, trying to get away from
4  me, trying to get his hands unloose from my hands.
5      Q.   When you say hands unloose from your
6  hands, were his hands on his stomach, were they
7  behind his back?
8      A.   I had them behind his back and gripped
9  as if he were in cuffs.
10     Q.   Another question I have:  On this
11 incident report -- actually the arrest report, and
12 I'm going to show you -- I'm just going to point
13 to you and read it right here.  It says, McBay had
14 a bloody nose.  Can you see it right there?
15     A.   Yes, sir.
16     Q.   Okay.  You talked to the officers after
17 this happened, right?
18     A.   Yes, sir.
19     Q.   Was your memory at that time fresh as
20 far as the things that happened that evening when
21 you talked to the officers?
22     A.   Oh, yes.
23     Q.   Okay.  It says that McBay had a bloody
24 nose.  Did he have a bloody nose before the police
25 got there?

```
 1      A.    Yes.
 2      Q.    Okay.  How did he get the bloody nose?
 3      A.    Possibly caused by myself.
 4      Q.    When you say possibly by yourself, did
 5  you see him get in a fight with anybody else in
 6  the bar?
 7      A.    No, sir.  It could have been when I put
 8  him on the ground.
 9      Q.    When you first saw Mr. McBay in the
10  parking lot, did he have a bloody nose at that
11  time?
12      A.    No.
13  MR. BRENDEL:
14           That's all I have.
15                    EXAMINATION
16  BY MR. WATTS:
17      Q.    Mr. Randazzo, Exhibit 3, again, just
18  look at it.  And if you can read starting with
19  Deputy Allen observed, just read that sentence.
20      A.    Deputy Allen observed Mr. Randazzo
21  sitting on top of Mr. McBay and noticed that Mr.
22  McBay had a bloody nose.  AMR responded, and Mr.
23  McBay refused.
24      Q.    And earlier you said that you can't
25  remember whether or not he had a bloody nose, but
```

1  him.
2      Q.  And you felt like just putting a bear
3  hug would have pretty much put him under control,
4  too?
5      A.  Yeah.
6      Q.  After he hit you in the jaw, I believe
7  you said you hit him?
8      A.  Yes, sir.
9      Q.  Where did you hit him?
10     A.  I'm not positive.  I know it was
11 somewhere above the neck -- or shoulder area.  I
12 mean, I may have caught him in the jaw, I may have
13 caught him in the nose, I may have caught him in
14 the top of the head.  I don't really remember.
15 But once I hit him, he went down, and that's when
16 I sat on him.
17     Q.  So after you hit him one time, he went
18 down?
19     A.  Yes, sir.
20     Q.  And then you sat on him.  Did you hit
21 him hard, as hard as you could?
22     A.  Probably.
23     Q.  Probably.  And at that point, he was
24 pretty much under control after you hit him one
25 time?

1    A.   Yes, sir.

2    Q.   And then you sat on him?

3    A.   Once I sat on him, he was done.

4    Q.   And when you sat on him, you had
5 motioned with your hand earlier that you were
6 holding his hands behind his back?

7    A.   Yes, sir.

8    Q.   Were you holding his hand with one hand
9 or two hands?

10   A.   I had his wrists crossed.  He had small
11 enough wrists to where I could actually lock them
12 in with one hand.

13   Q.   So you had him locked down with one hand
14 on the ground?

15   A.   Yes, sir.

16   Q.   And he couldn't get out of it?

17   A.   No, sir.

18   Q.   So it wasn't necessary for you to keep
19 hitting him to keep him under control?

20   A.   No, sir.

21   Q.   Did you hit him in the body in any way?

22   A.   I just hit him the one time.

23   Q.   In the face?

24   A.   Yes.

25   Q.   But you didn't hit him with any body

1  later that night. After you got off of him and
2  the police escorted him away, can you describe any
3  of these injuries that he had that you remember?
4      A.  I'm not sure if I caught him in the eye,
5  so I can't guarantee I didn't do that. The scrape
6  on his nose may have been caused when I threw him
7  down. I can't say for certain because none of
8  this was -- had shown up yet. It was too soon for
9  any black eyes to show up and things like that. I
10 mean, in a 15-minute period, if I hit somebody in
11 the eye, it's not going to go black instantly.
12     Q.  Okay.
13     A.  So I can't guarantee that he didn't have
14 those an hour later.
15     Q.  So you're saying you don't know if you
16 hit him in this eye and in this eye?
17     A.  Or one or the other. I don't know where
18 exactly I hit him when I swung.
19     Q.  Earlier you had said that -- I think one
20 of the first questions he asked was that you had
21 been here earlier. Was that during a deposition
22 in this office?
23     A.  A lawyer with the firm here called,
24 asked me a few questions about this, and that was
25 it. I was here maybe 20 minutes.

