# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **GARY BRICE MCBAY** | § | **PLAINTIFF** |
| | § | |
| **VERSUS** | § | **CAUSE NO. 1:07cv1205-LG-RHW** |
| | § | |
| **HARRISON COUNTY, MISSISSIPPI, BY AND THROUGH ITS BOARD OF SUPERVISORS; HARRISON COUNTY SHERIFF GEORGE PAYNE, IN HIS OFFICIAL CAPACITY; and CORRECTIONS OFFICER MORGAN THOMPSON, ACTING UNDER COLOR OF STATE LAW** | § § § § § § § § § | **DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART HARRISON COUNTY'S MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is Defendant Harrison County's Motion for Summary Judgment [298]. Plaintiff Gary Brice McBay brought this action for the alleged abuse he received while in the custody of the Harrison County Adult Detention Center ("HCADC"). The County argues (1) it has no control over the Sheriff, (2) there is no evidence of excessive force, (3) there is no evidence of an official policy of excessive force, (4) he admits he seeks no damages for denial of medical care, (5) does not know who caused his injuries, (6) did not ask for medical care, and (7) he is not entitled to punitive damages. The Court has considered the parties' submissions and the relevant legal authority. The Section 1985(3) claim is dismissed without prejudice. The remainder is denied.

## FACTS AND PROCEDURAL HISTORY

On the evening of November 6, 2005, McBay was leaving a bar in Gulfport, Mississippi. The bar's unofficial bouncer, Thomas Randazzo tried to convince McBay to either sleep in his

truck or call a taxi. An altercation ensued between the two. Randazzo pinned McBay down on the ground while Randazzo's girlfriend called the police. McBay was arrested on suspicion of public drunk and taken to HCADC.

Many of the events surrounding McBay's booking are disputed. While McBay was being booked at the HCADC, he alleges that for no reason, Thompson knocked his legs out from under him across from the booking desk, and pushed him to the ground, just outside the shower room. It is undisputed that Thompson escorted McBay to the shower room to change into the inmate uniform. It is undisputed that, while in the shower, Thompson punched McBay in the face several times. Additional events in the shower are disputed, such as what other force was used and why.

McBay subsequently filed this lawsuit. He brings claims against the County under Sections 1983, 1985, and 1988 for excessive force, failure to provide medical care, covering up the alleged abuse, failure to train and supervise, and conspiracies to use excessive force and to cover up the alleged abuse. From the County, he seeks compensatory damages, attorney fees, and costs.

## DISCUSSION

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. To make this determination, the Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit. Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). A "material fact" is one that might affect the outcome of the

suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The party that bears the burden of proof at trial also bears the burden of proof at the summary judgment stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986). "[W]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon . . . mere allegations or denials . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

SECTION 1983

The County first argues it is not responsible for the Sheriff's acts and the County cannot be held liable unless the Board of Supervisors themselves violated McBay's rights and set the unconstitutional official policy. The County relies on Mississippi Code Annotated Section 19-25-69.

A claim against the sheriff in his official capacity is treated as a claim against the county, and sheriffs in Mississippi are the final policymakers with respect to all law enforcement decisions made within their counties. *Brooks v. George County, Mississippi*, 84 F.3d 157, 165 (5th Cir. 1996). Where a plaintiff sues a government official in his official capacity and brings the same claims against that government entity, the former claims are merely duplicative of the latter. *Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001). Additionally, the Fifth Circuit has noted in *dicta* that a district court erred when it dismissed Harrison County but refused to dismiss the official capacity claim against Sheriff Payne. *Harris v. Payne*, 254 Fed. Appx. 410, 422 (5th Cir. Nov. 19, 2007). Harrison County is liable for Payne's acts as Sheriff, because he is the final policymaker for Harrison County, regardless of the existence of a policy or custom. *Id.*

I.   EXCESSIVE FORCE

Alternatively, Harrison County argues McBay did not suffer excessive force and there was no policy of excessive force "at the jail." (The County's Mem. Summ. J. at 9). He responds that there is a genuine issue of material fact as to whether he experienced excessive force and whether there was such a custom.

A municipality may be held liable under 42 U.S.C. 1983 when its official policies or customs violate the Constitution. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). The policy or custom must cause the constitutional tort. *Id.* at 691. "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Thus, to prove Harrison County is liable under Section 1983, McBay must prove (1) the existence of a policymaker, and (2) an official policy or custom, (3) which is the moving force behind a constitutional violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

A.   CONSTITUTIONAL VIOLATION

The Due Process Clause, applicable to the States via the Fourteenth Amendment, protects a pretrial detainee from excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386, 395 n.11 (1989). The standard for analyzing an excessive force claim under the Fourteenth Amendment is the same as the Eighth Amendment standard. *Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993). This right is violated if there is (1) more than a de minimis injury, (2) which resulted directly and only from the use of force that was excessive to the need, and (3) the force was objectively unreasonable. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). To determine whether the force was excessive, the inquiry is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for

the very purpose of causing harm." *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993).
"Often, of course, there will be no evidence of the detention facility official's subjective intent, and the trier of fact must base its determination on objective factors suggestive of intent." *Id.* Some of these factors would be (1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between the need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of the forceful response. *Id.* at 1447 n.29.

The County argues there was no excessive force because "there is no evidence of any assault on Mr. McBay" and "McBay was not following lawful orders . . . and McBay hit Morgan Thompson twice in the head, causing Thompson to defend himself." (The County's Mem. Summ. J. at 9-10). Thompson testified that he punched McBay two or three times in the shower in self defense. According to Thompson, McBay had first punched Thompson twice in the face, while they were in the shower room. The video of the booking room shows evidence that prior to going into the shower, Thompson caused McBay's legs to fly out from under him. The County provides no argument as to why that act was not excessive force. Thompson testified there was no reason for any force prior to the shower. Therefore, the County has not shown the absence of a genuine issue of material fact on this element of plaintiff's claim.

### B.  POLICY OR CUSTOM

The Court next examines whether there is evidence of a policy or custom of excessive force at the jail. "Official policy is ordinarily contained in duly promulgated policy statements, ordinances, or regulations." *Piotrowski*, 237 F.3d at 579. Where the policy is facially constitutional, the plaintiff must prove that "it was promulgated with deliberate indifference to

the 'known or obvious consequences' that constitutional violations would result." *Id.* (quoting *Bd. of the Comm'rs of Bryan County, Okla., v. Brown*, 520 U.S. 397, 407 (1997)). A custom is a "persistent, widespread practice of [government] officials or employees, which, although not officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579. "Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). The Fifth Circuit held:

> Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Id.* at 842. "[T]he sheer numerosity of incidents can provide evidence of constructive knowledge." *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

McBay argues that there was a long-term, widespread custom of using excessive force on pre-trial detainees and other inmates at the HCADC. He presents evidence of hundreds of instances of excessive force at the HCADC from 2004 to 2006. He presents evidence that the Sheriff and the Board of Supervisors were warned of this widespread abuse several times before McBay's incident on November 6, 2005.

For example, Thompson admitted to using unjustified force on over one hundred inmates while he worked at the jail and to witnessing over one hundred additional unjustified assaults committed by other deputies. He admitted that he and these other deputies had engaged in a conspiracy to deprive persons of their right to be free from excessive force. This conduct

occurred from 2004 to 2006.  Former deputies Regina Rhodes, Karl Stolze, Preston Wills, Daniel Evans, William Priest, and Sergeant Dedri Caldwell pled guilty to this same conspiracy and course of conduct.

Rhodes testified that it was common for the correction officers to taunt the inmates who were brought into the booking room.  She heard Officer in Charge Ryan Teel, Thompson, Wills, and Stolze engage in this taunting.  Intoxicated inmates were more likely to be taunted because "[t]hey were easier targets."  (Rhodes's Dep. at 13).  She observed a pattern of abusing inmates that included "striking, punching, kicking, choking and otherwise assaulting inmates in circumstances that did not justify the use of force."  *Id.* at 13-14.  She said this excessive force occurred "almost daily while I was employed there," "from May 2004 to February 2006."  *Id.* at 14; (Rhodes's Plea Agreement at 3).  She testified that Teel often encouraged the correction officers to use excessive force and to get involved in instances of excessive force.

Timothy Brandon Moore worked at the jail from 2002 to 2005.  He testified that booking officers were mistreating people at the jail.  There was a meeting on April 20, 2005, with the booking staff.  The purpose of the meeting "was basically to blast booking.  It was aimed at the excessive force being used."  (Moore's Test. at 548-49).  Despite this meeting, there was no change in booking.  It was a daily practice to prepare false reports to cover up excessive force. The booking officers had discussions about the video cameras in booking and how to avoid detection of excessive force.  "Captain Gaston said several times, if you have to do anything, do it off camera, in the shower or in the hallway. . . .  The cameras were our enemy."  *Id.* at 555. The booking officers had theme nights for different days of the week.  These included, "Thump a Thug Thursday, Fight Night Friday, Slap a Ho Saturday."  *Id.* at 556.  They were told to "kick[]

ass and not tak[e] names," which meant "we were using excessive force and not writing reports." *Id.* According to Moore the booking officers felt it was funny to use excessive force and they would laugh and egg each other on. Whenever a female officer had a female detainee in the shower for the dress out procedure, Teel would lead the booking officers in a chant of, "Spray the bitch," to encourage the female officer to use OC spray on the detainee. *Id.* at 567. When he led these chants, he would not be able to see if any force was needed. If the female officer did not spray the detainee, the officer "[w]ould be known as an inmate lover." *Id.*

Priest testified, whenever a detainee was being loud, the officers were instructed by Captain Gaston to get the detainee quiet by whatever means necessary.

> A. Again, sometimes you could talk a person out of it. Other times, we may have to get a little physical and restrain them to the bench using the leg restraints.
>
> . . .
>
> A. There's several incidents. Picking individuals up and throwing them on the bench, drag them to the floor, things of that nature.
>
> Q. And at the time that this force was used, what was the person doing?
>
> A. Probably just a whole lot of talking, belligerent actions.

(Priest's Test. at 403). The booking officers were instructed that "If an individual had gotten on our nerves, was continuing to become a problem, maybe we need to teach that guy a lesson." *Id.* at 404. Several times Priest witnessed booking officers choke people until they passed out. The officers would sometimes spray the toilet seats and benches with OC spray. They then would laugh when an inmate would become contaminated with the spray. The booking officers would have multiple conversations about using excessive force and how to make it look like it was the inmate's fault. "Jokingly, if somebody was being abused. It was sort of the thing to say, 'Stop

resisting,' whether they were or were not." *Id.* at 435. Priest likewise testified that the officers joked about and encouraged each other to use excessive force. He, too, testified it was a practice to yell, "Spray the bitch," every time a female officer was dressing out a female detainee. If the officer did not, the others "[m]ight jokingly call her an inmate lover." *Id.* at 436.

> A. If you didn't take action against an individual inmate, then you may be labeled as inmate lover, somebody that is sympathetic towards inmates.
>
> Q. What did it mean to be labeled an inmate lover?
>
> A. Well, you're either with the group or you're not with the group.

*Id.*

Priest testified that, on October 4, 2005, detainee Only Al-Khidhr was brought in the booking room. Priest was not present but he was briefed about Al-Khidhr when Priest came in on the next shift. He saw the booking photo, which showed "a brutal mess. He was beat up pretty bad." *Id.* at 417. Thompson admitted to Priest that he had beat up Al-Khidhr. Thompson posted at least six copies of the booking photo all over booking. When Priest took some down, he "was kind of warned away by Thompson telling me don't take them down. Leave them up." *Id.* at 418. The rest remained up at least throughout the day.

Thompson testified that he was often teased by the other officers for hitting inmates in the face, because it was a violation of the "red light/green light" rule:

> A . . . They would say red light's the face, green light at the motor points. And they said I always went on the red light. And McBay was a big reason for that.
>
> . . .
>
> Q . . . Red light is when you hit them in the face and it leaves a mark people can see; is that right?

>       A      Yes.
>
>       Q      And a green light is where you can hit them, but it's hidden by the clothes and people can't see it.
>
>       A      Green light's all the approved motor points, the things you're supposed to hit. Yeah.
>
>       Q      Would green light be in the body, anything that is covered?
>
>       A      Yeah.

(Thompson's Dep., 11:48 a.m.-12:45 p.m., at 44-45). Rhodes testified that red light/green light was a phrase used in booking:

>       A.     Red light would be the facial area . . . you weren't supposed to hit anything that would show on a booking photo, and green light would be the rest of the body.
>
>       Q.     All right. And how did y'all come to use red light, green light and determine where you should and shouldn't hit?
>
>       A.     Well, after Deputy Thompson had a particularly bad booking shot of an inmate named Only, OIC Teel had a impromptu meeting with our shift in the back of booking and inmate records and said that red light, green light–you know, that the chief was–the chief, Captain Gaston, was upset about the booking photo and that we needed to be more careful.
>
>       Q.     All right. Be more careful where you hit people?
>
>       A.     Yes, sir.
>       . . .
>
>       Q.     Okay. So it was okay to hit people as long as it didn't show up on the booking photo?
>
>       A.     Yes, sir.

(Rhodes's Dep. at 10-11). Her testimony indicates the red light green light practice was instituted prior to McBay's arrival at the jail and was the response to allegations that the same

Deputy Thompson had struck another inmate in such a way as to show up on the booking photo. Priest likewise testified that this practice was known to him. After Priest had hit a detainee in the mouth, Priest was chastised by fellow officer Stolze:

> A. He wasn't concerned about the inmate. He was concerned about what I had done.
>
> Q. Why was he concerned about what you had done?
>
> A. He relayed to me that sort of phrase that we would use, red light/green light. Red light meaning you don't hit to a part of the body that you can visibly see a mark. Green light meaning you can hit an individual where it cannot normally be seen on the body, things of that nature.

(Priest's Test. at 424). This was a phrase with which Priest was already familiar.

There is evidence that prior to July 2005, Sheriff Payne was actually notified by the United States Department of Justice of its finding of 31 instances of force in a one month period from November 2004 to December 2004, which represented both a "serious increase in the use of force" as well as "a very disturbing pattern of misuse of force." (Pl.'s Resp. Ex. M at 3). *See also*, (Pl.'s Resp. Ex. N). When asked whether or not he should have known of the custom of excessive force, Sheriff Payne first testified, yes. As the defendants point out, he then denied this, but that is a credibility question for the jury.

Taken together, this and other evidence permits a reasonable jury to find that there was a custom of excessive force that was sufficiently widespread and persistent to constitute an official policy. The evidence that there was hundreds of instances of excessive force, and daily occurrences for over a year prior to November 6, 2005, is sufficient to show that Sheriff Payne had at least constructive knowledge. He admitted that he should have known and admitted that he was on notice at least over eight months prior to the subject incident. It is undisputed that

even members of the Board of Supervisors for the County, who were further removed from the jail than Sheriff Payne, were on notice of the alleged culture of violence at the jail.  Finally, the evidence supports a finding of deliberate indifference.  The County is not entitled to summary judgment on the excessive force claim.

II.     DENIAL OF MEDICAL CARE

The County alternatively argues that McBay admitted he seeks no damages for denial of medical care, that he never asked for medical care, and does not know whether Randazzo or Thompson caused McBay's injuries.  He responds that there is a genuine issue of fact as to who caused his injuries.

The County first points to page 204 of McBay's deposition for the proposition that he admitted he is not seeking damages for this claim.  There is no such testimony on that page.  What he testified to on the following page was that he was not claiming that Defendant Thompson had anything to do with the denial of medical attention.  The First Amended Complaint asserts this claim against the County based on other personnel's conduct.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'"  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "Deliberate indifference . . . occurs only where a prison official subjectively knows of and disregards a substantial risk to the inmate's health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The "official's knowledge of a substantial risk of harm may be inferred if the risk was obvious."  *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).  In addition, Section 1983 requires a showing of proximate causation, which is evaluated under the common law standard.  *Murray v. Earle*, 405 F.3d 278, 290 (5th Cir. 2005).

McBay is not required to prove that the jail officials caused the injuries that required medical treatment, nor is he required to ask for medical care. Rather, he must prove that jail personnel were deliberately indifferent to his serious medical needs. The County does not challenge whether there was deliberate indifference, he had a serious medical needs, it caused him damages, or whether there was a policy of denial of medical care. Therefore, the County has not demonstrated it is entitled to summary judgment on this claim.

SECTION 1985(3)

The County argues that the First Amended Complaint fails to state a claim under Section 1985(3), because there is no allegation of racial animus. McBay responds that there are genuine issues of fact regarding the conspiracy claims.

To survive a Rule 12(b)(6) motion to dismiss, McBay must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). This does "not require heightened fact pleading of specifics." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555-56. The Court must view the facts in favor of the plaintiff. *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002).

The complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Bell Atlantic*, 550 U.S. at 555) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Section 1985 provides a cause of action for several types of conspiracies, under

subsections one through three. 42 U.S.C. § 1985. McBay does not expressly cite to the portion or portions of Section 1985 on which he relies. Subsection three prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws," or to prevent another from voting or advocating in a federal election. 42 U.S.C. § 1985(3). A conspiracy to deprive another of the equal protection of the laws, requires a showing that "some racial, or class-based discriminatory animus lay behind the conspiracy." *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 270 (5th Cir. 2001). "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' . . . its adverse effects upon an identifiable group." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271-72 (1993). Some Fifth Circuit cases only accept racial claims under this provision. *Horaist*, 255 F.3d at 271 n.12; *Bryan v. City of Madison*, 213 F.3d 267, 276 (5th Cir. 2000); *Newberry v. E. Tex. State Univ.*, 161 F.3d 276, 281 n.2 (5th Cir. 1998); *Deubert v. Gulf Fed. Savs. Bank*, 820 F.2d 754, 757 (5th Cir. 1987). *Deubert* held, "*it is well-established* in this circuit that the only conspiracies actionable under section 1985(3) are those motivated by racial animus." *Id.* (emphasis added). However, *Deubert* did not address contemporary cases which held otherwise. For example, one such case held, "*It is well-settled* law that discriminatory animus behind an alleged violation of section 1985(3) must be racially based or in some other way class-based." *Galloway v. Louisiana*, 817 F.2d 1154, 1159 (5th Cir. 1987) (emphasis added). These other Fifth Circuit cases require a class that is based on an "inherited or immutable characteristic," political belief, or association. *Sullivan v. County of Hunt*, 106 Fed. Appx. 215, 220 (5th Cir. 2004); *Hamill v. Wright*, 870 F.2d 1032, 1037-38 (5th Cir. 1989); *McLean v. Internat'l Harvester Co.*, 817 F.2d 1214, 1219 (5th Cir. 1987) (scapegoat employees

not protected class, because it "does not possess discrete, insular and immutable characteristics similar to race, national origin or sex"); *Galloway*, 817 F.2d at 1159; *Kimble v. D.J. McDuffy, Inc.*, 623 F.2d 1060, 1066 (5th Cir. 1980). Of course, none of these cases found the allegations or non-racial animus at issue to be sufficient.

Under either view, the First Amended Complaint here misses the mark. The only characteristic McBay alleges he and the other alleged victims share is that they are "accused and arrested citizen[s] temporarily incarcerated as . . . 'pre-trial detainee[s],'" "other inmates," and "other detainees held in Booking." (1st Am. Compl. at 1,2, 35 (¶¶1, 5)). His allegations, taken as true, do not state a conspiracy motivated by race, another inherited or immutable characteristic, political belief, or association. *Accord*, *Burkett v. City of El Paso*, 513 F. Supp. 2d 800, 822 (W.D. Tex. 2007) ("those arrested by the El Paso Police Department" not sufficient to allege racial or class-based animus under Section 1985(2)).

Further there is no allegation that the conspiracy was to prevent another from voting or advocating in a federal election. Therefore the Complaint fails to state a claim against the County under Section 1985(3). The Section 1985(3) claims against the County are dismissed without prejudice.

PUNITIVE DAMAGES

The County finally argues that McBay is not entitled to seek punitive damages against the County on any claims. McBay does not respond to this argument. The First Amended Complaint does not seek punitive damages against the County. Both the original Complaint and the First Amended Complaint seek compensatory, costs, and attorney fees from the County and "other such relief" as the Court may grant. (1st Am. Compl. at 36); (Compl. at 59). The original

Complaint specifically sought "punitive damages" against other defendants. *Id.* at 58. Therefore, it appears that McBay was specifically leaving out a request for punitive damages against the County in both Complaints. This issue is moot.

**IT IS THEREFORE ORDERED AND ADJUDGED**, that for the reasons stated above, Defendant Harrison County's Motion for Summary Judgment [298] should be and is hereby **GRANTED IN PART AND DENIED IN PART.** The Section 1985(3) claim against the County is dismissed without prejudice. The remainder is denied.

**SO ORDERED AND ADJUDGED** this the 14th day of April, 2010.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE